# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
               :

SHAKIRA LESLIE; and SHAMILL
BURGOS; on behalf of themselves and all
others similarly situated,

         Plaintiffs v.

CITY OF NEW YORK; KEECHANT SEWELL,
Police Commissioner for the City of New York, in
her official capacity; KENNETH COREY, Chief of
Department for the New York City Police
Department, in his official capacity; JAMES
ESSIG, Chief of Detectives for the New York City
Police Department, in his official capacity;
EMANUEL KATRANAKIS, Deputy Chief in the
Forensic Investigations Division of the New York
City Police Department, in his official capacity;
and DR. JASON GRAHAM, Acting Chief Medical
Examiner for the City of New York, in his official
capacity;

        Defendants.

------------------------------------------------------- x

**CLASS ACTION COMPLAINT**

_____-CV-_____

## PRELIMINARY STATEMENT

1.     This class-action, civil rights lawsuit challenges New York City's policy and practice of secretly taking and analyzing the DNA of people whom the police suspect of committing a crime without a warrant or court order and maintaining this DNA in an index where it is perpetually compared to past and future crime scene evidence. Through this practice, the City has seized the DNA of thousands of unsuspecting, primarily Black and Latinx New Yorkers, and turned them into permanent criminal suspects.

2.     For years now, New York City Police Department ("NYPD") detectives have targeted unsuspecting New Yorkers, including young children, by bringing them into interrogation

rooms that have been prepared in advance to capture saliva, skin cells, or other genetic material. In these interrogation rooms, detectives offer people cigarettes and drinks to secretly collect their DNA. In one example, detectives handed a 12-year-old boy a McDonald's soda and, after the boy drank from it and was escorted out the room, they secretly removed the straw for DNA testing and placed the boy's DNA in an index of people suspected of criminal activity ("the Suspect Index").

3.     The NYPD sends these DNA samples to the Office of Chief Medical Examiner ("OCME"), which analyzes the samples, creates a DNA profile, and compares that profile to crime scene DNA evidence in perpetuity. Through the Suspect Index, the NYPD and OCME partner to put people's DNA profiles through a genetic lineup that compares the profiles against all past and future crime scene DNA evidence—all without obtaining a warrant or court order to conduct these DNA searches.

4.     The Suspect Index is illegal. Unlike state and federal DNA index systems, the City's Suspect Index lacks legislative authorization. As a result, it operates without any independent oversight. New York law prohibits the indexing of a person's DNA unless the person has been convicted of a crime. Nonetheless, the City's Suspect Index ignores state laws and regulations that limit DNA indexing and hoards the DNA of arrestees and suspects. Without any independent oversight, the NYPD and OCME have additionally deployed a new and invasive investigatory technique using DNA samples to investigate a suspect's entire family.

5.     Because of a history of institutional racism and disparities in arrest rates in New York City, Black and Latinx people make up the vast majority of arrestees who are subject to the City's DNA taking and indexing practice. And, with the City's new genealogical investigative technique, the parents, grandparents, siblings, children, and even the distant relatives of suspects and arrestees can be swept into the City's genetic investigations.

6.      The Defendants have violated and continue to violate the Plaintiffs' rights under the Fourth Amendment of the United States Constitution and their rights under New York law. Plaintiffs seek injunctive and declaratory relief to end the City's practice of targeting thousands of individuals, many of whom have never been convicted of a crime, to take their DNA and turn them into permanent suspects.

## PARTIES

7.      Plaintiff Shakira Leslie is a 26-year-old Black resident of New York City and has no criminal convictions. In 2019, the Defendants took her DNA, without her knowledge, and put it in the Suspect Index, where it is subject to suspicionless comparison against at least 29,492 DNA samples from crime scenes.

8.      Plaintiff Shamill Burgos is a 22-year-old Latino former resident of New York City and has no criminal convictions. In 2019, the Defendants took his DNA, without his knowledge, and put it in the Suspect Index, where it is subject to suspicionless comparison against at least 29,492 DNA samples from crime scenes.

9.      Defendant the City of New York (the "City") is a municipal corporation within the State of New York. The New York City Police Department and the Office of Chief Medical Examiner are agencies of the City of New York. The City is responsible for the policy, practice, supervision, and implementation of all NYPD and OCME matters and is responsible for the appointment, training, supervision, and conduct of all NYPD and OCME personnel. In addition, the City is responsible for ensuring that NYPD and OCME personnel obey the laws of the United States and New York State.

10.     Defendant Keechant Sewell is the Police Commissioner of New York City. As Commissioner, Sewell has final policymaking authority with respect to the NYPD. She is sued in her official capacity.

11.      Defendant Kenneth Corey is the Chief of Department of the NYPD. As Chief of Department, Corey is responsible for directing and overseeing the activities of operational bureaus, including the Detective Bureau. He is sued in his official capacity.

12.     Defendant James Essig is the Chief of Detectives of the NYPD. As Chief of Detectives, Essig manages and sets policy for the Detective Bureau and its specialized divisions, including the Forensic Investigations Division. He is sued in his official capacity.

13.     Defendant Emanuel Katranakis is a Deputy Chief in the Detectives Bureau and the commanding officer of the Forensic Investigations Division of the NYPD. As the commanding officer, Katranakis manages and sets policy for the Forensic Investigations Division. He is sued in his official capacity.

14.     Defendant Dr. Jason Graham is the Acting Chief Medical Examiner for the OCME. As the Acting Chief Medical Examiner, Dr. Graham has final policymaking authority with respect to OCME. He is sued in his official capacity.

## FACTS

***Defendants Have a Policy and Practice of Unlawfully Collecting, Analyzing, and Indexing the DNA of Unsuspecting New Yorkers, Including Young Children***

15.     The NYPD has an established practice and procedure for secretly taking a person's involuntarily shed DNA for comparison against all crime scene evidence involving DNA. The NYPD Detective Guide ("the Guide") provides instructions for secretly taking a person's DNA when they are in a controlled environment, like a police precinct, and when they are in a non-controlled environment, like a coffee shop.

16.     In most cases, NYPD detectives take a person's DNA after bringing them to the police precinct. The Guide instructs detectives to clean a precinct's interrogation room by removing any used drinking containers or other trash and any used ashtrays. Detectives then must use Clorox wipes to clean any tabletops, desks, and chairs, and place an unused disposable ashtray on the table. With these measures, the trap is set to capture a person's DNA.

17.     When a person is in the interrogation room, the Guide instructs detectives to "[p]rovide the suspect with an object that will be partially consumed (e.g., cigarette, chewing gum, apple) or a container filled with a beverage (e.g., water in a plastic cup, soda in a can, coffee in a Styrofoam cup, juice in a plastic bottle)." It then instructs detectives to maintain constant observation of the person until they can collect the item. In practice, NYPD officers do not allow people to take the used items with them when they leave the interrogation room. After the interrogation, the Guide instructs detectives to collect the person's involuntarily shed DNA sample by putting on gloves and placing the object with the DNA sample in an evidence bag.

18.     For years now, NYPD detectives have followed the Guide's instructions to target whomever they choose and secretly take their DNA. In total, thousands of people, including children, have had their DNA taken by the NYPD pursuant to this policy and practice.

19.     In March 2018, for example, NYPD detectives interrogated a 12-year-old boy they suspected of having committed a crime and took his DNA, according to reporting by the New York Times. In the interrogation room, detectives handed him a McDonald's soda. The boy drank the soda and ultimately was escorted out of the room by police. Without the knowledge or consent of the boy or his parents, detectives removed the straw from the soda and had the DNA sample from the straw compared to DNA evidence found at the crime scene. The boy's DNA did not match the crime scene DNA and the charges against him were dropped. However, following the NYPD's

policy, OCME proceeded to store the boy's DNA in its Suspect Index, making him a suspect in future criminal cases involving DNA. His DNA remained in the Suspect Index for more than a year where it was compared against tens of thousands of crime scene samples until his parents were finally able to get it expunged.

20.     In another example, detectives were caught on videotape scrubbing clean an interrogation room table and placing a new ashtray on the table before escorting a man into the room. NYPD video footage released to the public shows a detective providing the man a cigarette, which he smokes and puts out in the ashtray.[1] After cuffing the man's hands behind his back and escorting him out of the room, the detective returns with gloves on his hands and places the cigarette butt in an evidence bag.

21.     According to NYPD policy and practice, detectives have the discretion to take the DNA of any adult whom they suspect of committing any crime, and the discretion to take the DNA of any minor they suspect of committing a felony or certain specified misdemeanors. No warrant or court order is required. No supervisor approval or other additional process is required. Detectives only have to obtain supervisor approval before taking the DNA of a minor suspected of committing a misdemeanor that is not specified in the Guide.

22.     Even when someone has explicitly refused to consent to providing a DNA sample, NYPD detectives have circumvented that refusal by simply taking the person's DNA without their knowledge. NYPD detectives even circumvent refusals to take the DNA of children. In a February 2020 New York City Council hearing, senior NYPD officials admitted to giving NYPD detectives the discretion to secretly take a child's DNA after the child and their parent have refused to provide it.

---

[1] https://www.youtube.com/watch?v=ww_npq7h_to

23.     After detectives secretly collect an object with a person's DNA sample, they deliver it to OCME. OCME, pursuant to its own published manuals, then analyzes the DNA sample, which includes extracting the DNA, creating a DNA profile, and comparing it against DNA evidence in the case in which the person is a suspect. OCME then, again pursuant to its own published manuals, uploads the person's DNA profile to the Suspect Index to continuously compare the person's DNA profile against all past and future crime scene DNA evidence. Once uploaded to the Suspect Index, the person's DNA profile can remain there indefinitely, even if that person's charges are dismissed. The Suspect Index thus operates like a genetic lineup that continuously compares the DNA profiles of thousands of New Yorkers, including children and individuals with no criminal history, against tens of thousands of crime scene DNA samples.

24.     OCME officials know that the NYPD routinely takes the involuntarily shed DNA of suspects without a warrant or court order and that the Suspect Index it maintains is comprised of such DNA. In written testimony submitted to the New York City Council in February 2020, the former Assistant Laboratory Director of OCME and creator of the original OCME local database system, publicly raised ethical and civil liberties concerns regarding the NYPD's tactics for obtaining DNA samples and the transformation of the Suspect Index into "a vast repository of DNA from dragnets, surreptitious collection, and collection from children."

25.     Nonetheless, OCME has continued its partnership with the NYPD to subject people to continuous genetic lineups without their knowledge or consent, including children. For example, in August 2020, J.B., a 15-year-old boy from the Bronx who has special educational needs, was arrested on his way to a deli. He was brought to the police precinct on weapons charges and processed as an alleged juvenile delinquent. J.B. had never been arrested before and had no prior contact with the criminal or family court systems. Sweating and frightened, he waited in a room

until police officers offered him a bottle of Coca-Cola, which he quickly accepted and drank. Almost immediately, the officers returned, told him they were not supposed to give him the bottle, and demanded it back. He gave the bottle back to the officers. J.B. didn't realize it then, but this had been a ruse to obtain his DNA.

26.     The officers never asked J.B. for his consent before secretly taking his DNA. Although J.B.'s mother had rushed to the precinct to be with her son, the NYPD never asked for her consent either. After taking his DNA, the NYPD then sent it to OCME for processing. But OCME never compared J.B.'s DNA to any evidence in his case. Instead, OCME uploaded his DNA profile to the Suspect Index. When J.B., through his attorneys, discovered that his DNA was in the Suspect Index, he sent a letter to OCME requesting that his DNA profile be removed from the index. OCME refused to do so without a court order. After J.B. filed an Article 78 petition in New York State Supreme Court seeking such an order, OCME finally consented to remove his profile. By then, his DNA had been compared to tens of thousands of crime scene evidence, for which there was no reason to suspect his involvement.

27.     The Defendants' policy and practice of testing people's DNA without their consent and without a warrant or a court order ignores state law privacy protections applicable to all New Yorkers, including suspects and arrestees. Under New York Civil Rights Law 79-L, New York State prohibits genetic testing, including "DNA profile analysis," of any person's biological material known to contain DNA without the person's written informed consent, unless permitted by court order or under state law provisions authorizing such testing for people convicted of crimes. The Legislature included these limited exceptions to the civil rights law "to balance the rights of the individual with the legitimate interests of our criminal justice system," according to the law's sponsor in the State Senate. But the Defendants have far exceeded those limits.

*The Suspect Index Unlawfully Expands Beyond Lawful State and Local DNA Indexing Frameworks*

28.     Through the maintenance and use of the Suspect Index, the Defendants have created an unauthorized expansion of the national DNA database system. Since 1994, federal and state governments have established and maintained a national system to facilitate DNA comparisons, known collectively as the Combined DNA Index System (CODIS), that was created by and is regulated through federal and state law. Law enforcement rely on this DNA indexing system to compare DNA from crime scene evidence against uploaded DNA profiles of individuals: if the DNA markers are the same, a "match" is reported to law enforcement.

29.     CODIS is an umbrella system of DNA indices: the National DNA Index System (NDIS), the State DNA Index Systems (SDIS), and the Local DNA Index Systems (LDIS). Each index system categorizes DNA samples into smaller, discrete indices. Only two categories are relevant here: "Known" indices, which store DNA profiles of known persons, and "Forensic Unknown" indices, which store DNA profiles collected from crime scene evidence.

30.     Within CODIS are DNA databases from all 50 states (known as SDIS databases), including New York State's DNA index system. New York's SDIS is jointly maintained by the New York State Division of Criminal Justice Services and the New York State Police. Each state's legislature determines whether their state's SDIS includes arrestees. In New York, the state legislature restricted the eligibility criteria for its "Known" index to people convicted of certain crimes. DNA profiles are thus only uploaded to New York's SDIS if they meet this eligibility criteria.

31.     Most local laboratories that participate in CODIS maintain their own LDIS, which is an independent local DNA database. Each such laboratory, including OCME, is authorized to maintain its own LDIS to perform a limited function: to store crime scene DNA profiles for upload

to higher SDIS Unknown indices, where they are compared to the profiles stored in the Known indices in SDIS. OCME maintains an LDIS and uses it for this authorized purpose. But, within its LDIS, OCME also maintains another, unauthorized "Known" index, referred to here as the Suspect Index. That unauthorized index contains profiles from arrestees and mere suspects, including children as young as 11 years old, that are barred by state law from being included in New York's SDIS, and it continuously compares these unauthorized profiles to all past and future crime scene DNA evidence.



**Unlike the "Known" Indices within NDIS and SDIS, the City's Suspect Index is Illegal and Unregulated**

32.     OCME operates the City's Suspect Index in violation of the New York State Legislature's comprehensive DNA laws and its regulatory structure. Through Article 49-B of the Executive Law, the New York State Legislature created SDIS and the laws governing state and local forensic DNA laboratories. Under Article 49-B, local laboratories such as OCME are barred from maintaining a local "Known" index separate from SDIS. Nonetheless, OCME developed and

continues to maintain its own "Known" index, the Suspect Index. OCME not only maintains a "Known" index in violation of Article 49-B, it includes DNA profiles in the index that Article 49-B explicitly disallows.

33.     The New York State Legislature made a deliberate decision to limit SDIS's "Known" DNA profiles to people convicted of crimes and has steadfastly refused to expand this index in order to carefully balance the needs of law enforcement against the privacy of minors and of adults accused but not convicted of crimes. Despite this, the NYPD collects, and OCME analyzes and permanently indexes, DNA samples from children, suspects, and arrestees, including those whose charges are dismissed, circumventing New York State's clear legal mandate.

34.     This practice is particularly egregious as it relates to children. Juvenile delinquency proceedings are, by design, intended to relieve children from the stigma or burden of a criminal record, and juvenile delinquency proceedings as a matter of law can never result in criminal convictions. Rather, if a court finds that a child engaged in conduct that would constitute a crime if conducted by an adult, the result is a juvenile delinquency adjudication, not a criminal conviction. The law affords children significant safeguards to protect their privacy throughout juvenile delinquency proceedings even when an adjudication is made. These protections include that police records of a child's arrest must be withheld from public inspection; that all fingerprints and photos of a child alleged to be a juvenile delinquent be destroyed if there is a favorable disposition or the person reaches the age of 21 without a criminal conviction or open case; that, except where required by statute, no one may require a person to divulge information relating to a juvenile delinquency arrest or proceeding; and that adjudications may not prevent the person from engaging in any profession or lawful activity.

35.     The City's policy contains no safeguards to prevent the indefinite retention of a child's DNA profile. The City's policy contains no time limitation for the use of a child's DNA, even if they are never convicted of a criminal offense. Instead, the City's practice of subjecting children to perpetual genetic lineups treats them like permanent suspects in crimes.

36.     The City's Suspect Index is not only illegal, but it is unregulated by any independent body. NDIS and SDIS operate under strict federal regulations and under FBI oversight. But the Suspect Index is not subject to such oversight. New York's SDIS not only operates under federal regulation and FBI oversight, it also operates under state regulations and the independent oversight of the New York State Commission on Forensic Science. The Commission was established under Article 49-B to develop minimum standards for all forensic laboratories in New York. But the Commission has no authority over OCME's creation and operation of the Suspect Index. Thus, unlike New York's SDIS, the Suspect Index, operates without any independent oversight.

### The City's Practice of Using the Private Genetic Material of Unsuspecting New Yorkers to Turn Them into Permanent Suspects Invades their Privacy

37.     The City's practice of hoarding the DNA of unsuspecting New Yorkers in an unauthorized and unregulated Suspect Index exploits the fact that people unavoidably shed their DNA wherever they go through skin cells, hair, and saliva. By merely touching an object's surface with their fingertip, a person causes their DNA to be deposited on it. Every used coffee cup, tissue, straw, cigarette butt, soda can, and piece of gum leaves behind thousands of copies of a person's genetic material. People unavoidably shed their DNA even when they aren't touching objects or consuming things. Each hour, a person sheds approximately 30,000 to 40,000 skin cells. And each day, a person sheds 40 to 100 hairs.

38.     Scientific developments have even made it possible to vacuum DNA samples from the open air, according to a recent scientific journal article. While this new technique is currently being used to identify nearby zoo animals based on their airborne DNA samples, it reveals the great extent to which DNA is unavoidably shed in the environment.

39.     While people unwittingly shed DNA, the information contained within it remains critically important and private to them. Unlike a fingerprint, DNA reveals deeply personal characteristics like a person's genetic predispositions toward certain medical conditions, including Alzheimer's, cystic fibrosis, breast cancer, and addiction; their ancestry; and their biological familial relationships, including previously unknown parentage.

40.     Traditional forensic DNA testing analyzes so-called "non-coding" regions of our DNA to determine someone's identity. While it had typically been understood that only the "coding" DNA regions reveal personal characteristics, in recent years researchers have found that "non-coding" DNA regions can reveal more than someone's identity. For example, researchers have found dozens of associations between "non-coding" DNA and genetic traits ranging from schizophrenia to cancer.

41.     While CODIS laboratories across the country are limited under federal regulation to "non-coding" analysis, the City has rolled out its plans to use "coding" DNA to map out a person's family tree. A new NYPD investigative practice, called Investigative Genetic Genealogy (IGG), relies on the "coding" regions of DNA to generate investigative leads in cases.

42.     IGG begins with a DNA sample from an unsolved crime. In order to generate an investigate lead using IGG, the police must first send the crime scene DNA sample to a private laboratory to analyze the DNA's "coding" regions. The next step is to search for genetic relatives of the DNA found at the crime scene – in other words, to try to locate family members of the

putative perpetrator – using commercial databases, like FamilyTreeDNA and GEDmatch, to which millions of people have uploaded their DNA profiles. If a potential family member of the perpetrator is identified through a commercial database search, then the third step in the IGG process begins: building out a family tree.

43.     To find out who within a family is a match to the crime scene DNA sample, NYPD investigators build out a family tree starting with the family member identified through a commercial database. Unless several members of that person's family have uploaded their DNA in commercial genealogical databases, NYPD investigators need to collect DNA from the other relatives in the family tree, including family members that are not suspected of involvement in the underlying crime, to determine ancestral lines and familial relationships and narrow their search.

44.     In December 2021, Deputy Chief Katranakis refused to answer questions about whether the NYPD would seek a warrant or a person's consent before collecting DNA samples in its IGG investigations, rather than relying on the surreptitious collection procedures outlined in the Detective Guide. Through the City's collection and retention of thousands of DNA samples from suspects and arrestees, much of the DNA collection work necessary to build out family trees for IGG has already begun. OCME retains a vial of DNA extract, which contains both "coding" and "non-coding" regions, in cold storage for each suspect or arrestee for whom the NYPD has already requested OCME perform forensic DNA testing. Using IGG, NYPD investigators can use a person's DNA sample, secretly taken in an unrelated case, to investigate that person's entire family in search of a relative that is a match to the crime scene sample.

45.     In essence, this new technology creates an incentive for the NYPD to surreptitiously collect and store as much "suspect DNA" as possible, because the DNA of a suspect may turn out to be genetically related to DNA collected at a crime scene and investigated using IGG. In March

2021, Deputy Chief Katranakis informed state officials that, in the NYPD's view, state regulations addressing the use of investigative genetic genealogy do not apply to the NYPD. The City's use of this investigative method has since been shrouded in complete secrecy and free from any safeguards.

46.    IGG investigations implicate the genetic privacy of a suspect's parents, siblings, children, and other extended relatives without any independent checks or standards. Genealogical researchers warn that systems like IGG can use one DNA profile to ascertain genetic information about relatives as distant as third cousins or a second cousin once removed. Given the amount of information available in "coding" DNA, IGG investigations have been described as the equivalent of the government going through all of your medical and familial records.

47.    Because of the racially disproportionate rates of arrests in New York City, the City's practice of collecting the DNA of arrestees and storing the samples in the Suspect Index makes mostly Black and Latinx people permanent suspects in all crimes involving DNA evidence. Of all NYPD arrests from 2006–2020, 48.5% of arrests were of Black individuals and 26% were of Latinx individuals. Of the total arrests during this period, 12% of arrests were of white, non-Latinx individuals.

48.    Beyond the harm of being treated as permanent suspects, Black and Latinx people whose DNA are in the Suspect Index face the risk of wrongful arrest from DNA contamination. Because DNA transfers easily to and from persons and surfaces, contamination presents a persistent problem to determining what DNA is relevant in crime scene evidence. Terrell Gills, for example, was a regular customer at the local Dunkin Donuts in his Queens neighborhood and, unbeknownst to him, left his DNA behind there. When the store was robbed, a swab of a touchscreen cash register matched to Gills' profile in SDIS. Although two other similar robberies

had taken place within a few days of each other at nearby Dunkin Donuts stores and had resulted in the arrest of another man, Mr. Gills was wrongfully arrested and jailed pretrial for a year and a half, and prosecuted based solely on the DNA match. He was acquitted at trial.

49.     The risk of DNA contamination is made worse in New York City because rank-and-file NYPD officers who come into contact with crime scene evidence have refused to place their DNA in an "elimination database" to confirm when contamination takes place. The National Institute of Standards and Technology, a federal agency, recommends that all law enforcement personnel place their DNA in an elimination database to ensure accurate DNA comparisons. But unions representing NYPD officers have steadfastly refused to comply with this recommendation, citing their privacy concerns over storing officer DNA in a database.

***Despite the NYPD's Promises of Reform, the City's Suspect Index Has Continued to Grow***

50.     In February 2020, under pressure from the City Council, the NYPD announced reforms to its DNA retention policies, with the central change being that the NYPD promised to review the DNA profiles in the Suspect Index and notify OCME if it authorized, pursuant to its own criteria, that profiles can be removed. The NYPD announced that it would conduct an initial review of all suspect profiles that are at least two years old. After that review, every four years the NYPD will review the suspect profiles that are at least four years old. And for any new profiles added to the Suspect Index, the NYPD will review those profiles upon reaching their second year of existence in the index.

51.     Under the NYPD's unilaterally developed review criteria, the NYPD will not recommend that an individual's profile be removed if the profile is eligible for inclusion in SDIS because of a criminal conviction, if the individual is a suspect in an ongoing police investigation

or prosecution, or if "no judicial conclusion was reached on the person's innocence." The NYPD retains sole discretion to determine when these criteria for retaining someone's DNA are met.

52.     The NYPD also announced that individuals who were acquitted in the case for which their DNA was taken can submit a certificate of disposition to OCME to seek the removal of their DNA profile from the Suspect Index. However, they announced no plans to notify individuals whose DNA was taken surreptitiously that their DNA was placed in the Suspect Index. The NYPD and the local District Attorney's office both have unregulated discretion to approve or veto removal requests.

53.     On May 3, 2021, the NYPD completed its initial audit of suspect profiles that are at least two years old. According to the NYPD, out of nearly 30,000 suspect profiles, the NYPD reviewed 20,460 profiles. Of the 20,460 profiles reviewed, the NYPD marked 5,400 profiles for removal and retained 15,060 profiles in the index, resulting in over 73% of the reviewed profiles remaining in the Suspect Index. Of those profiles remaining in the Index, 1,106 profiles are for individuals who cannot be stored in any index under state law because they have never been convicted of a crime.

54.     The City's Suspect Index has continued to grow, despite the NYPD's promised reforms. From June 2, 2021, the date of the first OCME report following the audit, to March 1, 2022, the date of OCME's most recent report, the Suspect Index has grown from 28,660 to 31,826 profiles, an increase of 3,166 individuals or almost a dozen New Yorkers per day. These samples have been searched without suspicion by comparing them against approximately 29,492 DNA samples from crime scenes and will continue to be searched against any future evidence.

***Plaintiffs' DNA Were Taken by the NYPD and Placed in the City's Suspect Index to be Perpetually Searched***

***Shakira Leslie***

55.    On July 3, 2019, Plaintiff Shakira Leslie was sitting in the back seat of a friend's car and leaving a cousin's birthday party. The NYPD pulled the car over for a purported traffic infraction and ordered Ms. Leslie, along with the driver and three other passengers, out of the car to be searched. According to the police, the front seat passenger possessed a firearm in a fanny pack.

56.    Ms. Leslie was searched and the NYPD found no contraband on her. And yet, the police arrested her, and brought her to the precinct for questioning. Ms. Leslie was charged with possessing the weapon the NYPD found in the possession of the front seat passenger.

57.    At the precinct, the NYPD deprived Ms. Leslie of food and water for over 12 hours before they finally brought her into an interrogation room. She was so thirsty that, when police officers offered her a cup of water, she immediately took it and drank.

58.    Unbeknownst to Ms. Leslie, the cup of water was a ruse by the NYPD to obtain her DNA. The NYPD collected the cup and took her DNA without her knowledge, pursuant to their policy and practice. Ms. Leslie never offered, and was never asked for, her consent to have her DNA taken. And the NYPD did not obtain a warrant or court order before secretly taking her DNA and sending the sample to OCME to perform DNA testing.

59.    After performing an analysis of the DNA, generating a suspect profile, and comparing it to DNA found on evidence recovered in the case, OCME determined that her profile did not match any DNA evidence in the case.

60.    Ms. Leslie was never indicted for any crime in the case and ultimately all charges against her were dismissed. Despite her innocence, pursuant to its policy and practice, OCME still

placed Ms. Leslie's DNA profile into the Suspect Index, where it is compared without suspicion against all past and new crime scene evidence involving DNA.

61.     At the time her DNA was taken in 2019 and through the present day, Ms. Leslie has not been convicted of a crime. Ms. Leslie now works as a hair stylist and makeup artist, while also caring for her newborn son.

62.     On January 26, 2022, OCME confirmed that Ms. Leslie's DNA profile remains in its Suspect Index. Ms. Leslie is troubled by the City treating her as a permanent suspect in all crimes.

### *Shamill Burgos*

63.     On September 7, 2019, Plaintiff Shamill Burgos was sitting in the front passenger seat of a friend's car that was parked in the lot of an apartment complex. Mr. Burgos' friend had just bought the car and Mr. Burgos was checking it out. An unmarked NYPD car then drove up, two officers came out with their hands on their weapons, and they ordered everyone to get out of the car. NYPD officers then searched the car and reportedly found a gun inside of a fanny pack in the trunk of the car.

64.     The police arrested Mr. Burgos and brought him to a precinct for questioning. At the precinct, he was placed in a room and handcuffed to a pole for hours. He was later transferred to a different precinct where he was eventually brought to an interrogation room, where officers handed him a cup of water and a cigarette. He smoked the cigarette and drank the water.

65.     After escorting Mr. Burgos out of the interrogation room, NYPD officers returned to the interrogation room, collected his used cigarette and took his DNA without his knowledge, pursuant to their policy and practice. Mr. Burgos never offered, and was never asked, to consent

to have his DNA taken. And the NYPD did not obtain a warrant or court order before secretly taking his DNA and sending the sample to OCME to perform DNA testing.

66.     Mr. Burgos was later brought to court where he was arraigned and immediately released. He was never indicted in the case and his charges were dismissed. Despite that, pursuant to its policy and practice, OCME analyzed Mr. Burgos' DNA, generated a suspect profile, and placed his DNA profile into the Suspect Index, where it is compared without suspicion against all past and new crime scene evidence involving DNA.

67.     At the time his DNA was taken in 2019 and through the present day, Mr. Burgos has not been convicted of a crime. Mr. Burgos is now enrolled in the infantry division of the U.S. military, where for the last two years he has served his country both domestically and abroad. He is currently stationed in Louisiana.

68.     On January 10, 2022, OCME confirmed that Mr. Burgos' DNA profile remains in their Suspect Index. Mr. Burgos is worried and scared by the City treating him as a permanent suspect in all crimes, especially when he no longer lives in New York.

## CLASS ACTION ALLEGATIONS

69.     The named Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people who have had or will have their DNA surreptitiously taken and analyzed by the Defendants without consent and without a warrant or court order and maintained in the City's Suspect Index. All four requirements of Rule 23(a) are satisfied:

  a.  *Numerosity*: Joinder of all class members is impracticable because of the size and fluid nature of the class. Thousands of DNA samples maintained in the

Suspect Index were surreptitiously taken and analyzed by the Defendants and are perpetually compared against crime scene evidence.

b.  *Commonality*: There are questions of law and fact common to all members of the class, including, but not limited to: whether the Defendants have the policy and practice of surreptitiously taking and analyzing unsuspecting people's DNA and maintaining it in the Suspect Index, and whether that policy and practice results in the violation of the class members' Fourth Amendment and statutory rights.

c.  *Typicality*: The claims of the named Plaintiffs are typical of those of the class. The named Plaintiffs, like all class members, have been subjected to the Defendants' policies, actions or inaction, have been injured by this, and require similar relief.

d.  *Adequacy of Representation*: The named Plaintiffs and class counsel will fairly and adequately represent the interests of the class. The named Plaintiffs have suffered injury and are committed to obtaining declaratory and injunctive relief that will benefit the entire class by ending Defendants' surreptitious and perpetual comparison of their DNA against crime scene evidence. Their interests are not antagonistic to those of other class members. Class counsel have many years of combined experience in complex civil litigation, civil rights, and class action litigation.

70.  Class-wide declaratory and injunctive relief are appropriate under Rule 23(b)(2) because the Defendants have acted or refused to act on grounds applicable to the class as a whole.

## JURISDICTION AND VENUE

71.     This case arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), as this action seeks redress for the violation of the Plaintiffs' constitutional rights under color of state law. This Court also has supplemental jurisdiction over this action's state law claim pursuant to 28 U.S.C. § 1367(a).

72.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201(a) and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

73.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## CLAIMS FOR RELIEF

### First Cause of Action

Violation of the Fourth Amendment
Right to Be Secure Against Unreasonable Searches and Seizures

74.     Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative class under the Fourth Amendment of the United States Constitution.

### Second Cause of Action

Violation of Article 49-B of the Executive Law

75.     Defendants' actions or inactions alleged herein have violated and continue to violate the rights of the named Plaintiffs and the putative class under Article 49-B of the Executive Law.

**RELIEF REQUESTED**

**WHEREFORE**, the Plaintiffs respectfully request that the Court:

a.  Assume jurisdiction over this matter;

b.  Certify this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c.  Declare that the City's practice of secretly taking, analyzing and maintaining peoples' DNA in its Suspect Index for comparison against crime scene evidence constitutes an unreasonable search in violation of the Fourth Amendment absent a warrant or court order permitting the search;

d.  Declare that the City's maintenance of a Suspect Index violates Article 49-B of the Executive Law;

e.  Permanently enjoin the Defendants from subjecting the Plaintiffs and the putative class to the unconstitutional and unlawful practices described here;

f.  Order the Defendants to expunge all suspect profiles in the City's Suspect Index that were created and maintained as a result of the unconstitutional and unlawful practices described here;

g.  Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

h.  Grant any other relief the Court deems just and proper.


Dated: March 21, 2022                          Respectfully submitted,
          New York, N.Y.

                                               *s/ Philip Desgranges*

                                               _____
                                               Philip Desgranges
                                               J. David Pollock
                                               Brittany Thomas
                                               Anna Blondell
                                               Allison Durkin
                                               Lisa Freeman
                                               Corey Stoughton
                                               The Legal Aid Society
                                               199 Water Street
                                               New York, NY 10038
                                               212-577-3398

pdesgranges@legal-aid.org
jpollock@legal-aid.org
bthomas@legal-aid.org
ablondell@legal-aid.org
adurkin_fellow@legal-aid.org
lafreeman@legal-aid.org
cstoughton@legal-aid.org

*Attorneys for Plaintiffs*