UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

SHAKIRA LESLIE; and SHAMILL
BURGOS; on behalf of themselves and all
others similarly situated,

                        *Plaintiffs*,

        v.

CITY OF NEW YORK; KEECHANT SEWELL,
Police Commissioner for the City of New York, in
her official capacity; KENNETH COREY, Chief of
Department for the New York City Police
Department, in his official capacity; JAMES
ESSIG, Chief of Detectives for the New York City
Police Department, in his official capacity;
EMANUEL KATRANAKIS, Deputy Chief in the
Forensic Investigations Division of the New York
City Police Department, in his official capacity;
and DR. JASON GRAHAM, Acting Chief Medical
Examiner for the City of New York, in his official
capacity;

                        *Defendants*.

---------------------------------------------------------- x

Case No. 1:22-CV-02305

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Philip Desgranges
J. David Pollock
Brittany Thomas
Anna Blondell
Allison Durkin
Lisa Freeman
Corey Stoughton
The Legal Aid Society
199 Water Street
New York, NY 10038

*Attorneys for Plaintiffs*

Dated: March 21, 2022
      New York, N.Y

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND .............................................................................................. 2

    The City's Policy and Practice of Secretly Collecting, Analyzing, and Indexing the DNA
    of Unsuspecting New Yorkers………………………………………………………2

    Putative Class Representatives .................................................................... 7

ARGUMENT ................................................................................................... 9

    I. PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(A)......................... 10

        A.   The Proposed Class Is Numerous. ............................................. 10

        B.   Questions of Law and Fact Are Common to the Proposed Class. ................ 12

        C.   The Claims of the Named Plaintiffs are Typical of the Proposed Class. ..................... 13

        D.   The Named Plaintiffs Will Fairly and Adequately Represent the Class. ..................... 13

    II. PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(B)(2). .................. 14

    III. PROPOSED CLASS COUNSEL ARE ADEQUATE UNDER RULE 23(G). ................. 15

CONCLUSION................................................................................................. 15

i

## **TABLE OF AUTHORITIES**

**CASES**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 14

*Baby Neal for and by Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ................................................ 15

*Baffa v. Donaldson*, *Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52 (2d Cir. 2000) ........................ 15

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...................................... 10

*Davis v. City of New York*, 296 F.R.D. 158 (S.D.N.Y. 2013) ................................................ 13, 14

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ...................................................... 13

*Escalera v. N.Y.C. Hous. Auth.*, 425 F.2d 853 (2d Cir. 1970) ...................................................... 12

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012) ...................................................... 14

*Frontier Ins. Group, Inc., Sec. Litig.*, 172 F.R.D. 31 (E.D.N.Y. 1997) ...................................... 13

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ............................................................ 11

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992) .......................................... 13

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128 (2d Cir. 2015). .................................................. 12

*Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87 (S.D.N.Y. 2013)................................. 11

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) .............................................................. 9, 14

*Nicholson v. Williams*, 205 F.R.D. 92 (E.D.N.Y. 2001) .............................................................. 12

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir. 2014) .............. 10

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ................................................................ 10, 13

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001) .............. 10

*V.W. v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017) ............................................................ 11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................... 12, 14

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23(a)……………………..………………………………………………*passim*

Fed. R. Civ. P. 23(b)(2)……………………………………………………………… *passim*

Fed. R. Civ. P. 23(g) ........................................................................................................ 15

N.Y. Civ. Rights Law § 79-L.............................................................................................. 5

N.Y. Exec. Law § 995-b .................................................................................................... 6

N.Y. Exec. Law §§ 995(7), 995-c(3)(a)............................................................................ 6

N.Y. Exec. Law §§ 995–995(f)........................................................................................... 5

## PRELIMINARY STATEMENT

The plaintiffs move for class certification in this action challenging New York City's policy and practice of secretly taking and analyzing the DNA of people whom the police suspect of committing a crime without a warrant or court order and maintaining this DNA in an index where it is perpetually compared to past and future crime scene evidence. For years now, New York City Police Department ("NYPD") detectives have targeted unsuspecting New Yorkers, including young children, by bringing them into interrogation rooms that have been prepared in advance to capture saliva, skin cells, or other genetic material. The NYPD sends these DNA samples to the Office of Chief Medical Examiner ("OCME"), which analyzes the samples, creates a DNA profile, and maintains it in an index of people suspected of criminal activity ("the Suspect Index") for comparison against crime scene DNA evidence in perpetuity. Through this practice, the City has seized the DNA of thousands of unsuspecting, primarily Black and Latinx New Yorkers, and turned them into permanent criminal suspects.

The proposed class consists of all people who have had or will have their DNA surreptitiously taken and analyzed by the defendants without consent and without a warrant or court order and maintained in the City's Suspect Index. Class certification under Rule 23(b)(2) is the proper and well-established means of efficiently addressing civil rights violations. Every member of the proposed class suffers the same injury—the surreptitious taking, analyzing, and indexing of their DNA—and every member is entitled to the same relief. The plaintiffs seek declaratory and injunctive relief on behalf of the proposed class to end the defendants' policy and practice of surreptitiously taking, analyzing, and indexing people's DNA and to expunge their DNA profiles from the Suspect Index. The plaintiffs respectfully request that this Court grant their motion for class certification and certify a class pursuant to Rule 23(b)(2).

## BACKGROUND

### *The City's Policy and Practice of Secretly Collecting, Analyzing, and Indexing the DNA of Unsuspecting New Yorkers*

The NYPD has an established practice and procedure for secretly taking a person's involuntarily shed DNA for comparison against all crime scene evidence involving DNA. The NYPD Detective Guide ("the Guide") provides instructions for secretly taking a person's DNA when they are in a controlled environment, like a police precinct, and when they are in a non-controlled environment, like a coffee shop. *See* N.Y.C. Police Dep't, Detective Guide: Collecting DNA Exemplar Abandonment Suspect Samples in a Controlled Environment and in a Non-Controlled Environment 1–8 (2013) ("Detective Guide), Ex. A to Declaration of Philip Desgranges ("Desgranges Decl."). The Guide instructs detectives to clean a precinct's interrogation room by removing any used drinking containers or other trash and any used ashtrays, followed by using Clorox wipes to clean any tabletops, desks, and chairs, and placing an unused disposable ashtray on the table. *Id.* at 1. When a person is in the interrogation room, the Guide instructs detectives to "[p]rovide the suspect with an object that will be partially consumed (e.g., cigarette, chewing gum, apple) or a container filled with a beverage (e.g., water in a plastic cup, soda in a can, coffee in a Styrofoam cup, juice in a plastic bottle)." *Id.* It then instructs detectives to maintain constant observation of the person until they can collect the item. *Id.* After the interrogation, the Guide instructs detectives to collect the person's involuntarily shed DNA sample by putting on gloves and placing the object with the DNA sample in an evidence bag. *Id.* at 1–2.

For years now, detectives have followed the NYPD's instructions to target whomever they choose and secretly take their DNA. *See* Joseph Goldstein, *Before Lifting DNA, Meticulous Protocol*, N.Y. Times (Aug. 28, 2012), Ex. B to Desgranges Decl. In total, thousands of people have had their DNA taken by the NYPD pursuant to this NYPD policy and practice. N.Y.C.

Council Hr'g Tr. 30:7–13 (Feb. 25, 2020) (regarding DNA collection and storage in N.Y.C.), Ex. E to Desgranges Decl.; *see also* Local DNA Index System (LDIS) Statistics, N.Y.C. Office Chief Med. Exam'r (Mar. 1, 2022), ("March 2022 LDIS Statistics"), Ex. I to Desgranges Decl. According to NYPD policy and practice, detectives have the discretion to take the DNA of any adult whom they suspect of committing any crime, and the discretion to take the DNA of any minor they suspect of committing a felony or certain specified misdemeanors. N.Y.C. Council Hr'g Tr. 78:5–15, Ex. E to Desgranges Decl.; Detective Guide at 1–4, Ex. A to Desgranges Decl.; *see also New York City Police Department Announces Reforms to DNA Collection Policies*, N.Y.C. Police Dep't (Feb. 20, 2020), ("*NYPD Announces Reforms*"), Ex. G to Desgranges Decl. No warrant or court order is required. *See* Detective Guide at 1–4, Ex. A to Desgranges Decl. No supervisor approval or other additional process is required. N.Y.C. Council Hr'g Tr. 78:5–15, 158:4–13, Ex. E to Desgranges Decl. Detectives only have to obtain supervisor approval before taking the DNA of a minor suspected of committing a misdemeanor that is not specified in the Guide. *See NYPD Announces Reforms*, Ex. G to Desgranges Decl.

Even when someone has been asked and explicitly refused to consent to providing a DNA sample, NYPD detectives have circumvented that refusal by simply taking the person's DNA. Detectives even circumvent refusals by parents and children to take a child's DNA. In a February 2020 New York City Council hearing, senior NYPD officials admitted to giving NYPD detectives the discretion to secretly take a child's DNA after the child and their parent have refused to provide it. N.Y.C. Council Hr'g Tr. 152:12–158:13, Ex. E to Desgranges Decl.

After detectives secretly collect an object with a person's DNA sample, they deliver it to OCME. Detective Guide at 2–4, Ex. A to Desgranges Decl.; N.Y.C. Office Chief Med. Exam'r, Forensic Biology Evidence and Case Management Manual: Case Acceptance and Evidence Sign-

in 1–4 (2022), Ex. C to Desgranges Decl. OCME, pursuant to its own published manuals, then analyzes the DNA sample, which includes extracting the DNA, creating a DNA profile, and comparing it against DNA evidence in the case in which the person is a suspect. *See* N.Y.C. Office Chief Med. Exam'r, Forensic Biology Evidence and Case Management Manual: Evidence Examination 45–46 (2021), Ex. J to Desgranges Decl.; N.Y.C. Office Chief Med. Exam'r, Forensic Biology Evidence and Case Management Manual: Case Acceptance and Evidence Sign-in 3–4, Ex. C to Desgranges Decl. OCME then, again pursuant to its own published manuals, uploads the person's DNA profile to the Suspect Index to continuously compare the person's DNA profile against all past and future crime scene DNA evidence. N.Y.C. Office Chief Med. Exam'r, Forensic Biology CODIS Manual: Profile Management 9–11 (2022) ("CODIS Profile Management"), Ex. D to Desgranges Decl. Once uploaded to the Suspect Index, the person's DNA profile can remain there indefinitely, even if that person's charges are dismissed. *See NYPD Announces Reforms*, Ex. G to Desgranges Decl.

OCME officials know that the NYPD routinely takes the involuntarily shed DNA of suspects without a warrant or court order and that the Suspect Index it maintains is comprised of such DNA. *See* N.Y.C. Council Hr'g Tr. 48:12–50:16, Ex. E to Desgranges Decl. In written testimony submitted to the New York City Council in February 2020, Dr. Howard Baum, the former Assistant Laboratory Director of OCME, and creator of the original OCME local database system, publicly raised ethical and civil liberties concerns regarding the NYPD's tactics for obtaining DNA samples and the transformation of the Suspect Index into "a vast repository of DNA from dragnets, surreptitious collection, and collection from children." Testimony of Dr. Howard Baum, (Feb. 25, 2020), Ex. F to Desgranges Decl. Nonetheless, OCME has continued its partnership with the NYPD to subject people's DNA to continuous genetic lineups without their

knowledge or consent. *See* N.Y.C. Council Hr'g Tr. 50:9–50:16, Ex. E to Desgranges Decl.; *see also NYPD Announces Reforms*, Ex. G to Desgranges Decl.

The City's practice of hoarding the DNA of unsuspecting New Yorkers in an unauthorized and unregulated Suspect Index ignores state law privacy protections applicable to all New Yorkers, including suspects and arrestees. Under New York Civil Rights Law 79-L, New York State prohibits genetic testing, including "DNA profile analysis," of any person's biological material known to contain DNA without the person's written informed consent, unless permitted by court order or under state law provisions authorizing such testing for people convicted of crimes. N.Y. Civ. Rights Law § 79-L.

OCME also operates the City's Suspect Index in violation of the New York State Legislature's comprehensive DNA laws and its regulatory structure. Through Article 49-B of the Executive Law, the New York State Legislature created the New York State DNA Index System ("SDIS") and the laws governing state and local forensic DNA laboratories. *See* N.Y. Exec. Law §§ 995–995(f). Under Article 49-B, local laboratories such as OCME are barred from maintaining a local "Known" index, which store DNA profiles of known persons, separate from SDIS. *Id.* § 995-c. Yet OCME has nonetheless maintained its own "Known" index, the Suspect Index. *See* CODIS Profile Management, Ex. D to Desgranges Decl.; *see also* Local DNA Index System (LDIS) Statistics, N.Y.C. Office Chief Med. Exam'r (June 2, 2021) ("June 2021 LDIS Statistics"), Ex. H to Desgranges Decl.

OCME not only maintains a "Known" index in violation of Article 49-B, it includes DNA profiles in the index that Article 49-B disallows. *See* CODIS Profile Management, Ex. D to Desgranges Decl.; *see also* March 2022 LDIS Statistics, Ex. I to Desgranges Decl. The New York State Legislature limited SDIS's "Known" DNA profiles to people convicted of certain crimes.

N.Y. Exec. Law §§ 995(7), 995-c(3)(a). Despite this, the NYPD collects, and OCME analyzes and permanently indexes, DNA samples collected from children, suspects, and arrestees, circumventing New York State's clear legal mandate. *See NYPD Announces Reforms*, Ex. G to Desgranges Decl.; CODIS Profile Management at 9–11, Ex. D to Desgranges Decl.

OCME's Suspect Index is also unregulated by any independent body. New York's SDIS, for example, not only operates under federal regulation and FBI oversight, it also operates under state regulations and the independent oversight of the New York State Commission on Forensic Science. N.Y. Exec. Law § 995-b. The Commission was established under Article 49-B to develop minimum standards for all forensic laboratories in New York. *Id.* §§ 995-a, 995-b(1). But the Commission has no authority over OCME's creation and operation of LDIS. *Id.* § 995-b (describing the powers and duties of the Commission).

In February 2020, under pressure from the City Council, the NYPD announced reforms to its DNA retention policies, with the central change being that the NYPD promised to review the DNA profiles in the Suspect Index and notify OCME if it authorized, pursuant to its own criteria, that profiles can be removed. *See NYPD Announces Reforms*, Ex. G to Desgranges Decl. The NYPD announced that it would conduct an initial review of all suspect profiles that are at least two years old. *Id.* After that review, every four years the NYPD will review the suspect profiles that are at least four years old. *Id.* And for any new profiles added to the Suspect Index, the NYPD will review those profiles upon reaching their second year of existence in the index. *Id.*

Under the NYPD's unilaterally developed review criteria, the NYPD will not recommend that an individual's profile be removed if the profile is eligible for inclusion in SDIS because of a criminal conviction, if the individual is a suspect in an ongoing police investigation or prosecution,

or if "no judicial conclusion was reached on the person's innocence." *Id.* The NYPD retains sole discretion to determine when these criteria for retaining someone's DNA are met. *Id.*

The NYPD also announced that individuals who were acquitted in the case for which their DNA was taken can submit a certificate of disposition to OCME to seek the removal of their DNA profile from the Suspect Index. *Id.* However, they announced no plans to notify individuals whose DNA was taken surreptitiously that their DNA was placed in the Suspect Index. *See id.* The NYPD and the local District Attorney's office both have unregulated discretion to approve or veto removal requests. *See id.*

The City's Suspect Index has continued to grow, despite the NYPD's promised reforms. From June 2, 2021, the date of the first OCME report following the NYPD's initial audit, to March 1, 2022, the date of OCME's most recent report, the Suspect Index has grown from 28,660 to 31,826 profiles. *Compare* June 2021 LDIS Statistics, Ex. H to Desgranges Decl., *with* March 2022 LDIS Statistics, Ex. I to Desgranges Decl. That represents an increase of 3,166 individuals or almost a dozen New Yorkers per day. These samples have been searched without suspicion by comparing them against at least 29,492 DNA profiles in the forensic index, which stores DNA profiles collected from crime scene evidence, and will continue to be searched against any future evidence. *See* March 2022 LDIS Statistics, Ex. I to Desgranges Decl.

### *Putative Class Representatives*

Putative class representatives Shakira Leslie and Shamill Burgos like all members of the putative class, have had their DNA surreptitiously taken and analyzed by the defendants without consent and without a warrant or court order and maintained in the City's Suspect Index. Desgranges Decl. ¶ 6. In 2019, Ms. Leslie was sitting in the back seat of a friend's car and leaving a cousin's birthday party, when the NYPD pulled the car over for a purported traffic infraction. The NYPD ordered all four passengers, including Ms. Leslie, along with the driver out of the car

to be searched and then reported that the front seat passenger possessed a firearm in a fanny pack. Ms. Leslie possessed no contraband, but the police still arrested her and brought her to the precinct for questioning. Ms. Leslie was charged with possessing the weapon the NYPD found in the possession of the front seat passenger.

At the precinct, the NYPD deprived Ms. Leslie of food and water for over 12 hours before they finally brought her into an interrogation room and offered her a cup of water that she drank. The NYPD used the cup of water as a ruse to secretly take Ms. Leslie's DNA without her knowledge or consent and without a warrant or court order. After receiving Ms. Leslie's DNA sample from the NYPD, OCME analyzed the DNA, generated Ms. Leslie's profile, and compared it to DNA found on evidence recovered in the case, which did not match. Ms. Leslie was never indicted for any crime in the case and ultimately all charges against her were dismissed. OCME still placed her DNA profile into the Suspect Index, where, to this day, it is compared without suspicion against all past and new NYPD crime scene evidence involving DNA.

In 2019, Shamill Burgos was sitting in the front passenger seat of a friend's car that was parked in the lot of an apartment complex. Mr. Burgos' friend had just bought the car and Mr. Burgos was checking it out. An unmarked NYPD car then drove up, two officers came out with their hands on their weapons, and they ordered everyone to get out of the car. NYPD officers then searched the car and reportedly found a gun inside of a fanny pack in the trunk of the car. The police arrested Mr. Burgos and brought him to a precinct for questioning. After being transferred to a different precinct, he was eventually brought to an interrogation room, where officers handed him a cup of water and a cigarette. He smoked the cigarette and drank the water.

After escorting Mr. Burgos out of the interrogation room, NYPD officers collected his used cigarette and took his DNA without his knowledge. Mr. Burgos never offered, and was never

asked, to consent to have his DNA taken. And the NYPD did not obtain a warrant or court order before secretly taking his DNA and sending the sample to OCME to perform DNA testing. He was never indicted in the case and his charges were eventually dismissed. Despite that, OCME analyzed Mr. Burgos' DNA, generated a suspect profile, and placed his DNA profile into the Suspect Index, where it is compared without suspicion against all past and new crime scene evidence involving DNA.

## ARGUMENT

The plaintiffs move for certification of the following class: all people who have had or will have their DNA surreptitiously taken and analyzed by the defendants without consent and without a warrant or court order and maintained in the City's Suspect Index. The Court should certify this class because it meets the requirements of Rule 23(a). Specifically, Rule 23(a) is satisfied here because: (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law and fact are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(2) is satisfied by a showing that defendants have "acted or refused to act on grounds that apply generally to the class, so that injunctive or declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). As the Second Circuit explained, district courts must give these requirements "liberal rather than restrictive construction[.]" *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (internal quotation marks and citations omitted). District courts are afforded broad discretion in certifying a class because a district court "is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever

warranted." *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## I.   PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(A).

### A.   The Proposed Class Is Numerous.

The plaintiffs' proposed class satisfies the requirement that the class be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). In the Second Circuit, a class of 40 or more members is presumptively numerous, *see Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), and there is no requirement that plaintiffs establish a precise number of class members, *see Robidoux v. Celani*, 987 F.2d 931, 935–36 (2d Cir. 1993) (holding that plaintiffs need not define the exact size or identity of class members to obtain class certification, and instead may "show some evidence of or reasonably estimate the number of class members") (internal quotation marks and citations omitted). In addition to the numerical analysis, the Second Circuit considers other contextual factors: "(i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014) (citing *Robidoux*, 987 F.2d at 936).

Based on the numbers alone, the proposed class meets the numerosity requirement. NYPD officials admitted under sworn testimony that at least half of the approximately 32,000 suspect DNA samples in the Suspect Index were obtained through surreptitious collection.[1] N.Y.C. Council Hr'g Tr. 27:19–29:18, 30:7–11, Ex. E to Desgranges Decl. Thus, by the defendants' own

---

[1] As of March 1, 2022, there are exactly 31,826 suspect DNA samples in the Suspect Index. *See* March 2022 LDIS Statistics, Ex. I to Desgranges Decl.

admission, the proposed class consists of thousands of people whose DNA was surreptitiously taken and analyzed by the defendants without consent and without a warrant or court order and maintained in the City's Suspect Index.[2] *See id.* at 27:19–32:8. A proposed class of this size plainly satisfies the numerosity requirement.

The proposed class not only satisfies the numerosity requirement because of its size, but also because joinder of all potential class members is impracticable based on the contextual factors. The proposed class consists of individuals whose DNA was secretly taken because the police suspected they committed a crime. Most of these individuals do not have the ability to sue independently because they do not know that defendants took their DNA, analyzed it, and maintained it in the Suspect Index and because they have limited financial resources. *See, e.g.*, *Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87, 94 (S.D.N.Y. 2013) (granting class certification motion, in part, because "potential class members may not be aware of any violations of their rights, and may not have the time or resources to bring suit on their own.").

Even if some putative class members were able to bring their own cases, class certification would promote judicial economy by avoiding multiple suits that would raise the same issues and seek the same injunctive relief. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting how "[t]he class-action device saves the resources of both the courts and the parties") (internal quotation marks and citations omitted). Finally, numerosity is established because the case involves future class members, making the joinder of class members impracticable. *See, e.g.*, *V.W. v. Conway*, 236 F. Supp. 3d 554, 574 (N.D.N.Y. 2017) (noting that plaintiffs' class "include

---

[2] Later in their City Council testimony, NYPD officials claimed that the relevant number is approximately half of 7,000 suspect DNA samples because many individuals within the City's Suspect Index have criminal convictions. *See id.* at 30:14–31:22. But that claim is wrong because the City has no authority to index the DNA of people with criminal convictions, as state law only authorizes one statewide index for such people. *See* N.Y. Exec. Law §§ 995-c, 995(6). Regardless, even under the NYPD's narrow view, a class of approximately half of 7,000 people plainly satisfies numerosity.

all future juvenile pre-trial detainees" which is "the sort of revolving population that makes joinder of individual members a difficult proposition.").

### B.    Questions of Law and Fact Are Common to the Proposed Class.

The questions of law and fact raised here are "common to the class," Fed. R. Civ. P. 23(a)(2), because their "resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). The common questions of law and fact to be resolved here are: whether the defendants have the policy and practice of surreptitiously taking and analyzing unsuspecting people's DNA and maintaining it in the Suspect Index, and whether that policy and practice results in the violation of the class members' Fourth Amendment and statutory rights under Article 49-B of the Executive Law.

The key to commonality—that the truth or falsity of a question "will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)—is present in this case. Resolution of the legality of the defendants' policy and practice of surreptitiously taking, analyzing, and indexing unsuspecting people's DNA will resolve the issue for the entire proposed class "in one stroke." *See, e.g.*, *Escalera v. N.Y.C. Hous. Auth.*, 425 F.2d 853, 867 (2d Cir. 1970) (finding that "[a]lthough the facts leading to the [housing authority] action in the case of each named plaintiff were different, the procedures used in each type of action were identical. This provides the common question of law and fact for the members of the respective classes.").

The commonality requirement is fully met in cases, like this one, seeking declaratory and injunctive relief to remedy constitutional violations. *See Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001) ("There is an assumption of commonality where plaintiffs seek certification of an injunctive class under Rule 23(b)(2) to right alleged constitutional wrongs."). And in the context

of policing, courts routinely find common questions of law and fact where, as here, "policies and practices are promulgated by senior officials and determine the specific ways in which officers perform[.]" *Davis v. City of New York*, 296 F.R.D. 158, 166 (S.D.N.Y. 2013); *see also* Detective Guide, Ex. A to Desgranges Decl.; *NYPD Announces Reforms*, Ex. G to Desgranges Decl.

### C. The Claims of the Named Plaintiffs are Typical of the Proposed Class.

Rule 23's requirement that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), is satisfied where, as here, "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented[.]" *Robidoux*, 987 F. at 936–37. Factual differences between the criminal charges or the NYPD's suspicions of the named plaintiffs and members of the proposed class "will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (internal quotation marks and citation omitted). Ms. Leslie and Mr. Burgos challenge the defendants' surreptitious taking, analyzing, and indexing of people's DNA, all of which is directed at and affects both the named plaintiffs and the proposed class.

### D. The Named Plaintiffs Will Fairly and Adequately Represent the Class.

The adequacy requirement under Rule 23(a)(4) "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit[.]" *In re Frontier Ins. Group, Inc.,*

13

*Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (internal quotation marks omitted). Here, all the representatives of the class have been subjected to the same challenged practice by the defendants. Ms. Leslie and Mr. Burgos brought this suit to end the defendants' surreptitious taking, analyzing, and indexing of unsuspecting people's DNA, and the named plaintiffs have no foreseeable conflicts of interest with other class members. Desgranges Decl. ¶ 6.

## II.      PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(B)(2).

The proposed class meet the Rule 23(b)(2) requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). According to the Supreme Court, civil rights cases, like this one, are "prime examples" of Rule 23(b)(2) class actions. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Likewise, the Second Circuit has recognized that "'[c]ivil rights cases seeking broad declaratory or injunctive relief for a large and amorphous class . . . fall squarely into the category' of [Rule] 23(b)(2) actions." *Marisol A.*, 126 F.3d at 378 (quoting *Jeanine B. ex rel. Blondis v. Thompson*, 877 F. Supp. 1268, 1288 (E.D. Wis. 1995)). This civil rights case is no different than others seeking broad declaratory and injunctive relief. In fact, courts have routinely certified (b)(2) classes in civil rights cases involving similar claims. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 177 (S.D.N.Y. 2012) (finding Rule 23(b)(2) satisfied for a class of people challenging on unreasonable search and seizure grounds the City's stop and frisk program); *Davis*, 296 F.R.D. at 167 (finding Rule 23(b)(2) satisfied for a class of people challenging on unreasonable search and seizure grounds the City's trespass enforcement practices in public housing buildings).

Rule 23(b)(2) also applies here because "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Here defendants are acting

on grounds generally applicable to the proposed class because the defendants are surreptitiously taking, analyzing, and indexing their DNA. As a result, a single injunction ending this practice and expunging class member DNA profiles from the Suspect Index would provide all the relief sought by plaintiffs. *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (noting the Rule 23(b)(2) "requirement is almost automatically satisfied in actions primarily seeking injunctive relief").

### III.     PROPOSED CLASS COUNSEL ARE ADEQUATE UNDER RULE 23(G).

Proposed class counsel, attorneys from the Legal Aid Society, are "qualified, experienced and able to conduct the litigation," *Baffa v. Donaldson*, *Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000), and they satisfy the requirements for class counsel in Rule 23(g). First, plaintiffs' attorneys have done significant work researching the claims in this action, and drafting and filing the complaint. Desgranges Decl. ¶ 5. Second, plaintiffs' attorneys have extensive experience in class action litigation, and have previously represented classes of plaintiffs seeking systemic reform in federal court class action lawsuits. *See* Desgranges Decl. ¶¶ 3–4 (listing cases). Plaintiffs' attorneys also have a deep knowledge of constitutional law and the criminal legal system. Desgranges Decl. ¶¶ 3–4. Finally, plaintiffs' attorneys have already devoted significant resources to developing and maintaining this litigation, as evidenced by the staffing of this case, and will continue to do so as the case proceeds. Desgranges Decl. ¶ 5.

### CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that this Court grant this motion for class certification, certify the plaintiff class, appoint Shakira Leslie and Shamill Burgos representatives of the class, and appoint the undersigned counsel as class counsel.

Dated: March 21, 2022
     New York, N.Y.                  Respectfully submitted,

*s/ Philip Desgranges*

_____

Philip Desgranges
J. David Pollock
Brittany Thomas
Anna Blondell
Allison Durkin
Lisa Freeman
Corey Stoughton
The Legal Aid Society
199 Water Street
New York, NY 10038
212-577-3398
pdesgranges@legal-aid.org
jpollock@legal-aid.org
bthomas@legal-aid.org
ablondell@legal-aid.org
adurkin_fellow@legal-aid.org
lafreeman@legal-aid.org
cstoughton@legal-aid.org

*Attorneys for Plaintiffs*