UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

SHAKIRA LESLIE and SHAMILL BURGOS on behalf
of themselves and all others similarly
situated,                                                  **MEMORANDUM AND ORDER**

              Plaintiffs,                        22 Civ. 2305 (NRB)

       - against -

CITY OF NEW YORK; KEECHANT SEWELL, Police
Commissioner for the City of New York, in
her official capacity; KENNETH COREY, Chief
of Department for the New York City Police
Department, in his official capacity; JAMES
ESSIG, Chief of Detectives for the New York
City Police Department, in his official
capacity; EMANUEL KATRANAKIS, Deputy Chief
in the Forensic Investigations Division of
the New York City Police Department, in his
official capacity; and DR. JASON GRAHAM,
Acting Chief Medical Examiner for the City
of New York, in his official capacity,

              Defendants.

-------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Two named plaintiffs, Shakira Leslie ("Leslie") and Shamil

Burgos ("Burgos" and together "plaintiffs"), initiated this

lawsuit pursuant to 42 U.S.C. § 1983 on behalf of themselves and

all others similarly situated against defendants City of New York

(the "City"), New York Police Department ("NYPD") Commissioner

Keechant Sewell ("Sewell"), NYPD Chief of Department Kenneth Corey

("Corey"), NYPD Chief of Detectives James Essig ("Essig"), NYPD

Deputy Chief of the Detectives Bureau and commanding officer of NYPD's Forensic Investigations Division Emanuel Katranakis ("Katranakis"), and Acting Medical Examiner for NYPD's Office of Chief Medical Examiner ("OCME") Jason Graham ("Graham," and collectively "defendants").  See ECF No. 1 (the "Complaint" or "Compl.").   Plaintiffs seek injunctive and declaratory relief stemming from defendants' alleged violations of the Fourth Amendment to the United States Constitution and New York Executive Law Article 49-B.  See id.  Before the Court is defendants' motion to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  See ECF No. 45. For the following reasons, defendants' motion is denied.

## I.   BACKGROUND[1]

### A. New York State's DNA Indexing Framework

Since the 1990s, federal and state governments have maintained a national system to facilitate DNA crime scene comparisons -- known collectively as the Combined DNA Index System ("CODIS") -- which was created by, and is regulated through, federal and state law.  Compl. ¶ 28.  CODIS is an umbrella system of DNA indexes: the National DNA Index System ("NDIS"), State DNA

---

[1] The following facts are drawn from the Complaint, documents incorporated by reference in the Complaint, possessed and relied upon by plaintiffs in bringing suit, or of which we may take judicial notice.  "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); accord Graham v. Select Portfolio Servicing, Inc., 156 F. Supp. 3d 491, 499 (S.D.N.Y. 2016).

Index Systems ("SDIS"), and Local DNA Index Systems ("LDIS").  Id. ¶ 29.  Each index system categorizes DNA samples into smaller, discrete indexes.  Id.  Relevant here are "Known" indexes, which store DNA profiles of known persons, and "Forensic Unknown" indexes, which store DNA profiles collected from crime scene evidence.  Id.

Initially enacted in 1994, Article 49-B of the Executive Law established New York's SDIS, authorized a regulatory structure for its operation, and provided certain restrictions on the establishment of DNA laboratories and the collection of New Yorkers' DNA.  Id. ¶ 30, 32; N.Y. Executive Law Article 49-B.

### B. NYPD DNA Collection and the Suspect Index

According to the allegations in the Complaint, NYPD officers are instructed to surreptitiously collect items used by suspects that are partially consumed and contain DNA, such as cigarettes, chewing gum, and beverage containers.  Compl. ¶¶ 15–17.  Detectives maintain discretion to obtain DNA, without a warrant or court order, from any adult whom they suspect of committing a crime and from any minor they suspect of committing a felony or certain specified misdemeanors.  Id. ¶ 21.[2]

After DNA samples are collected from suspects, they are sent to OCME, which analyzes them, creates a DNA profile of each

_____

[2] Detectives must, however, obtain supervisor approval before taking the DNA of a minor suspected of committing a misdemeanor that is not specified in NYPD's Detective Guide.  Id.

suspect, and places those profiles in its own "Known" index (the "Suspect Index"). Id. ¶ 23. Once in the Suspect Index, the NYPD continuously compares each DNA profile to crime scene DNA samples. Id. An individual's DNA can remain in the Suspect Index for years, even if charges are dismissed. Id. ¶¶ 23, 50.

Plaintiffs allege that, unlike the state and federal DNA index systems described supra, the Suspect Index violates the Fourth Amendment and New York Executive Law Article 49-B. Id. ¶¶ 28-54. Specifically, according to plaintiffs: (1) the City's practices of taking individuals' DNA, maintaining their DNA in its Suspect Index, and analyzing their DNA against crime scene evidence violate the Fourth Amendment; and (2) Article 49-B precludes localities like the City from maintaining a DNA index comprised of arrestees and mere suspects, as opposed to those convicted of felonies and criminal misdemeanors. Id. at ¶¶ 30-33, 74-75, Requested Relief.

### C. The Named Plaintiffs

On July 3, 2019, plaintiff Shakira Leslie was sitting in the back seat of a friend's car when the NYPD pulled the vehicle over for a purported traffic violation. Id. ¶ 55. Officers searched the car and found a firearm in a fanny pack, which belonged to the front seat passenger. Id. Leslie was searched, and although the NYPD did not find contraband on her, she was arrested, brought to the precinct for questioning, and charged with possessing the weapon. Id. ¶ 56. Because Leslie was not given food or water

during the 12 hours before officers brought her into an interrogation room, she immediately drank when officers offered her a cup of water. Id. ¶ 57. The NYPD later collected the cup, took her DNA without her knowledge, and generated a DNA profile, which it placed in the Suspect Index. Id. ¶ 58-59. Ultimately, Leslie was not indicted and all charges against her were dismissed. Id. ¶ 60. However, her DNA profile remained in the Suspect Index when the instant suit was filed, nearly three years after her arrest. Id. ¶¶ 60, 62.

On September 7, 2019, plaintiff Shamil Burgos was sitting in the front passenger seat of a friend's car when officers approached in an unmarked NYPD car, ordered everyone out of the vehicle, and found a gun in the trunk. Id. ¶ 63. Burgos was arrested and brought to the precinct for questioning, where he took a cigarette and water offered by officers. Id. ¶ 64. Like Leslie, although Burgos was never indicted and all charges were dismissed, the NYPD collected his DNA without his knowledge and placed his DNA profile in the Suspect Index. Id. ¶ 65. Burgos's DNA also remained in the Suspect Index through the filing of the instant suit. Id. ¶¶ 65-68.

### D. NYPD's 2020 Reforms

In February 2020, the NYPD announced reforms to its DNA retention policies, specifically committing to: (1) an initial full audit and review of every profile that had been in the Suspect

Index for at least two full years; (2) further NYPD audits every four years; and (3) a review process in which any new DNA profiles added to the Suspect Index would be eligible for review after reaching their second full year index.  Id. ¶ 50.  The NYPD also announced that individuals who were acquitted in the case for which their DNA was taken could submit a certificate of disposition to OCME to seek removal of their DNA profile from the Suspect Index. Id. ¶ 52.  Although the NYPD and the local District Attorney's office retain full discretion over DNA removal under these reforms, the NYPD will generally recommend removal of an individual's profile from the Suspect Index upon review, unless: (1) the profile is eligible for inclusion in SDIS because of a criminal conviction; (2) the individual is a suspect in an ongoing police investigation or prosecution; or (3) "no judicial conclusion was reached on the person's innocence."  Id. ¶¶ 51–52.

### E. The Instant Action and Removal of Plaintiffs' DNA from the Suspect Index

Plaintiffs filed suit on March 21, 2022, seeking: (1) permanent injunctive relief preventing defendants from "subjecting plaintiffs and the putative class to the unconstitutional and unlawful practices" described in the Complaint, and ordering defendants to expunge all DNA profiles in the Suspect Index; and (2) a declaration "that the City's practice of secretly taking, analyzing and maintaining peoples' DNA in its

Suspect Index for comparison against crime scene evidence constitutes an unreasonable search in violation of the Fourth Amendment absent a warrant or court order permitting the search." See Compl. Relief Requested.[3]

After plaintiffs filed the Complaint, the NYPD conducted an "expedited" review of plaintiffs' DNA profiles "on the direction of counsel." See Declaration of Emanuel Katranakis ("Katranakis Decl.") ¶ 18, ECF No. 46-6. Leslie's attorneys had not requested removal of her DNA from the Suspect Index prior to this review. However, Burgos's attorney had in 2019, and his request had been denied without explanation. See Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Br.") at 6, ECF No. 47; Declaration of Kyla Wells in Opposition to Defendants' Motion to Dismiss ("Wells Decl.") ¶¶ 8-9, ECF No. 56. On May 19, 2022, the NYPD removed plaintiffs' DNA profiles from the Suspect Index as a result of its "expedited review." Declaration of Melanie L. Rios ("Rios Decl.") ¶¶ 25-26, ECF No. 46-1; Katranakis Decl. ¶¶ 18-19. Defendants assert that, had review of plaintiffs' profiles not been expedited, the NYPD would have reviewed Leslie's profile in June 2022 and Burgos's profile in January 2023, and both profiles would have been recommended for removal. Def. Br. at 7; Katranakis Decl. ¶ 19.

---

[3] The same day, plaintiffs also filed a motion for class certification, ECF No. 9, which the Court denied on June 13, 2022 without prejudice to its renewal following the resolution of the instant motion to dismiss. ECF No. 36.

Defendants filed the instant motion to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on July 15, 2022, along with a memorandum in support and associated declarations and exhibits, ECF No. 45-47. According to defendants, plaintiffs lacked standing when the Complaint was filed, and even assuming plaintiffs had standing when they commenced this suit, their claims are now moot after defendants removed plaintiffs' DNA from the Suspect Index.  See Def. Br. at 1-2.  In the alternative, defendants argue that the Court should not exercise supplemental jurisdiction over plaintiffs' state law claim brought pursuant to N.Y. Executive Law Article 49-B.  Id. at 2.  Plaintiffs opposed and filed a memorandum ("Pl. Opp.") and declaration on August 22, 2022, ECF No. 55-56, and defendants submitted a reply memorandum ("Def. Reply") with an associated declaration on September 2, 2022, ECF No. 63.  The Court also accepted an amicus curiae brief (the "Amicus Br.") from the Policing Project at New York University School of Law ("the Policing Project"), ECF No. 61.

In addition, on January 20, 2023, the Court requested that the parties submit supplemental briefing on whether the doctrine of Pullman abstention applies to this case.  ECF No. 64; see Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 500 (1941).[4]

---

[4] Federal courts are permitted to raise the issue of abstention sua sponte.  See Catlin v. Ambach, 820 F.2d 588, 591 (2d Cir. 1987).

The parties submitted initial responses on February 3 and February 4, 2023, ECF No. 65 ("Pl. Pullman Br."), ECF No. 66 ("Def. Pullman Br."). Plaintiffs filed their reply on February 10, 2023, ECF No. 68 ("Pl. Pullman Reply"), and defendants filed their reply on February 14, 2023, ECF No. 69 ("Def. Pullman Reply").

## II.   LEGAL STANDARD

"A case is properly dismissed . . . when the district court lacks the statutory or constitutional power to adjudicate it." Makarova, 201 F.3d at 113; Ford v. D.C. 37 Union Local 1549, 579 F.3d 187, 188 (2d Cir. 2009). Under Rule 12(b)(1), to survive a motion to dismiss for lack of standing, the plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." Amidax Trading Grp. V. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).

Defendants' challenge to the Court's jurisdiction is largely based on the allegations of the Complaint. To the extent that either side proffers limited extrinsic evidence in support of their respective positions, that evidence is uncontroverted and does not require the Court to engage in fact-finding. See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 57 (2d Cir. 2016) (district court needs to make findings of fact "[i]f the extrinsic evidence presented by the defendant is material and controverted"). As such, our only task is to determine whether the allegations in the Complaint, along with any limited and undisputed extrinsic

evidence, affirmatively and plausibly suggest that the Court has subject matter jurisdiction to hear this case.  In so doing, we "accept[] as true all material [factual] allegations of the complaint, and draw[] all reasonable inferences in favor of the plaintiff[s]."  Id. (internal quotation marks and citation omitted); accord Viacom Int'l Inc. v. Armstrong Interactive, Inc., No. 18-cv-6117 (NRB), 2019 WL 3890138, at *3 (S.D.N.Y. Aug. 19, 2019); see also Warth v. Seldin, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

### III.   DISCUSSION

**A. Standing**

Defendants first seek dismissal of the Complaint on the ground that plaintiffs lack standing under Article III.  To satisfy Article III standing, a plaintiff bears the burden of establishing: (1) that she has suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal

quotation marks omitted).[5]  A named plaintiff in a putative class action must allege that she has "personally . . . been injured, not that injury has been suffered by other, unidentified members of the class."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976) (internal quotation marks omitted).  We conclude that plaintiffs have met their burden on each of the three necessary elements.

### 1. Injury in Fact

First, plaintiffs have established an injury in fact.  It is undisputed that defendants collected and analyzed plaintiffs' DNA without their knowledge, consent, warrant, or court order, and maintained their DNA in the Suspect Index, where it was analyzed against forensic crime scene evidence for years.  See generally Compl.; Def. Br. at 2–11.  That is sufficient to establish an actual, concrete injury for standing purposes.

The Second Circuit's decision in American Civil Liberties Union v. Clapper, 785 F.3d 787 (2d Cir. 2015), is instructive.  There, non-profit civil rights and liberties organization plaintiffs had standing to contest the National Security Agency's metadata collection program because they were Verizon subscribers.  Id. at 799, 801–03.  Since it was "not disputed that the government collected telephone metadata

---

[5] The Court hereinafter refers to these requirements as: (1) "injury in fact"; (2) "traceability"; and (3) "redressability."

associated with the appellants' telephone calls," "[plaintiffs] surely ha[d] standing to allege injury from the collection, and maintenance in a government database, of records relating to them." Id. at 801.[6]  Likewise, it is undisputed that NYPD officers collected plaintiffs' "records" -- here, their DNA -- and defendants not only maintained the DNA in a government database, but also compared it against crime scene evidence on an ongoing basis through the filing of this suit.  Defendants' argument that plaintiffs' injuries are speculative is therefore unavailing.  See Clapper, 785 F.3d 787, 801-03; see also Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 210 (4th Cir. 2017) (injury-in-fact requirement satisfied when "there[ was] nothing speculative about [plaintiff's injury]-the interception of [plaintiff's] communications," which was "an actual injury that has already occurred").

We also reject defendants' contention that plaintiffs' alleged injury is "insubstantial," Def. Br. at 13, given plaintiffs' claim of being "worried[,] scared[,]" and "troubled" by the City treating them as "permanent suspects in all crimes."

---

[6] Other circuits are in accord that government collection of plaintiffs' records is sufficient to establish an injury in fact.  See, e.g., Schuchardt v. President of the United States, 839 F.3d 336, 345-46 (3d Cir. 2016) (injury in fact established when attorney alleged that an electronic surveillance program operated by the NSA violated the Fourth Amendment by intercepting, accessing, monitoring, and storing his emails); Sanchez v. Los Angeles Dep't of Transportation, 39 F.4th 548, 554 (9th Cir. 2022) (injury in fact established when plaintiffs alleged that Los Angeles's warrantless collection of real-time location data for leased motorized electric scooters violated the Fourth Amendment).

Compl. ¶¶ 62, 68.  The Supreme Court has held that "[v]arious intangible harms can also be concrete.  Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. . . . Those include, for example, . . . intrusion upon seclusion." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021).  In addition, "those traditional harms may also include harms specified by the Constitution itself," id., such as violations of the Fourth Amendment.

Defendants also contend that, in seeking injunctive and declaratory relief, plaintiffs "cannot rely on [their] past injury to satisfy the injury requirement but must show a likelihood that [they] . . . will be injured in the future."  Def. Reply at 2 (quoting Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 788 F. App'x 85, 86 (2d Cir. 2019), Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998)).  However, "[s]tanding is determined at the time a complaint is filed, whereas the ongoing feasibility of injunctive relief . . . is a question of mootness, not standing."  Robinson v. Blank, No. 11-cv-2480 (PAC) (DF), 2013 WL 2156040, at *3 (S.D.N.Y. May 20, 2013) (quoting Jones v. Goord, 435 F. Supp. 2d 221, 255 (S.D.N.Y. 2006)) (internal quotation marks omitted).  At the time of the Complaint, plaintiffs' DNA was included in the Suspect Index, where, as alleged, it was being compared against crime scene evidence.

Compl. ¶¶ 60, 62, 65-68.  That is sufficient to satisfy the injury-in-fact requirement. Defendants' mootness arguments are addressed separately <u>infra</u>.

### 2. *Traceability*

Second, plaintiffs' injury is fairly traceable to defendants' conduct.  To establish traceability, a plaintiff "must demonstrate a causal nexus between the defendant's conduct and the injury." <u>Chevron Corp. v. Donziger</u>, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotation marks omitted).  At the motion to dismiss stage, plaintiffs' burden on traceability is "relatively modest."  <u>State v. United States Dep't of Com.</u>, 315 F. Supp. 3d 766, 785 (S.D.N.Y. 2018) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 171 (1997)); <u>accord</u> <u>Rothstein v. UBS AG</u>, 708 F.3d 82, 92 (2d Cir. 2013).

Plaintiffs have met their burden here by alleging a causal connection between defendants' alleged conduct -- establishing the Suspect Index -- and plaintiffs' alleged injury, <u>i.e.</u>, having their DNA taken, stored in the Suspect Index for years, and compared against crime scene evidence on an ongoing basis.

Defendants nonetheless contend that plaintiffs cannot satisfy the traceability requirement because, if given the opportunity, defendants would have granted plaintiffs' individual requests to remove their DNA profiles from the Subject Index, particularly after the NYPD enacted its 2020 reforms.  Def. Br. at 12.  As an

initial matter, plaintiffs' ability to request removal at some point prior to the suit bears little relevance to whether a sufficient causal connection exists between defendants' conduct and the harm alleged by plaintiffs.   Regardless, defendants' argument is clearly belied by the history of this case: Burgos <u>did submit</u> a request for removal of his DNA from the Suspect Index through counsel, and that request was denied.   Wells Decl. ¶¶ 8-9.   Given that -- and because both named plaintiffs' DNA remained in the Suspect Index for almost three years, including over two years after NYPD's 2020 reforms were announced -- there is no certainty that plaintiffs' DNA would inevitably have been purged in due course.   Compl. ¶¶ 50, 62, 68; Rios Decl. ¶¶ 25-26; Katranakis Decl. ¶¶ 18-19.   Defendants' arguments against traceability are therefore also unavailing.

### 3. *Redressability*

Last, plaintiffs' injury is redressable by the Court.   To satisfy redressability, "it must be likely that a favorable judicial decision will prevent or redress the injury."   <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009).   Although redressability must be "likely, as opposed to merely speculative," <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. 167, 181 (2000), it "is not a demand for mathematical certainty," <u>Mhany Mgmt., Inc. v. Cty. of Nassau</u>, 819 F.3d 581, 602 (2d Cir. 2016)

(quoting Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 143 (3d Cir. 2009)).[7]

Defendants argue that injunctive relief cannot redress plaintiffs' injuries, because any alleged injuries are no longer current after plaintiffs' DNA was removed from the Suspect Index. As previously mentioned, it is axiomatic that the Court analyzes standing at the time the suit is filed. See Lujan, 504 U.S. at 571 n.4 (explaining that standing is "assessed under the facts existing when the complaint is filed"); Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 69 (1987) (Scalia, J., concurring) ("Subject-matter jurisdiction depends on the state of things at the time of the action brought . . . .") (internal quotation marks omitted); accord Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991). Plaintiffs' DNA remained in the Suspect Index when the Complaint was filed, and as alleged, was being compared to crime scene evidence at the time, which is all that is necessary. See Compl. ¶¶ 7-8, 55-68. Defendants' redressability argument again devolves into mootness, which requires personal interest throughout the litigation. See, e.g., Donziger, 833 F.3d at 123-24 (standing "bears close affinity"

---

[7] Redressability thus does not require that a favorable decision would provide a plaintiff with complete relief. Lujan, 504 U.S. at 569 n.4; Larson v. Valente, 456 U.S. 228, 244 n.15 (1982); accord Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs., 337 F. Supp. 3d 308, 322-23 (S.D.N.Y. 2018).

to mootness, but is distinct) (quoting <u>Warth</u>, 422 U.S. at 499 n.10).

Accordingly, plaintiffs have satisfied all of the required Article III standing elements.[8]

### B. Mootness

Defendants next argue that this case has been mooted by their post-filing removal of the named plaintiffs' DNA from the Suspect Index, which was done "on the direction of counsel."  Def. Br. at 15-19; Katranakis Decl. ¶ 18.[9]  Plaintiffs dispute defendants' position because of two exceptions to the mootness doctrine: the "inherently transitory" exception and the "voluntary cessation" exception.  Pl. Opp. at 15-19.  We agree with plaintiffs and conclude that defendants' post-filing actions did not moot plaintiffs' claims and instead triggered both exceptions.

---

[8] The Court will not address defendants' arguments that plaintiffs lack standing concerning their allegations which reference "juveniles and IGG [Investigative Genetic Genealogy]."  <u>See</u> Def. Br. at 13-14.  These arguments are, at a minimum, premature, and plaintiffs do not bring standalone claims with respect to either IGG or juveniles.  We accept plaintiffs' position that its allegations with respect to IGG, at this stage, merely provide context for their Fourth Amendment claim and are not the basis for separate claims.  Pl. Opp. at 14.  Likewise, any arguments regarding whether juveniles can be members of the putative class are more appropriately addressed at the class certification stage.  <u>Id.</u> at 15.

[9] "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  <u>New York City Emps.' Retirement Sys. v. Dole Food Co., Inc.</u>, 969 F.2d 1430, 1433 (2d Cir. 1992) (internal quotation marks omitted).  "When this occurs, the Constitution's case or controversy requirement [under Article III, Section 2] is not satisfied and a federal court lacks subject matter jurisdiction over the action."  <u>Id.</u>  The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit."  <u>Cook v. Colgate University</u>, 992 F.2d 17, 19 (2d Cir. 1993).

1. _Inherently Transitory Exception_

The inherently transitory exception allows a plaintiff's claims to "'relate back' to the time of the filing of the complaint with class allegations." Salazar v. King, 822 F.3d 61, 73 (2d Cir. 2016). Under that exception, a case will not be moot if: "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." Id. at 73 (internal quotation marks omitted); see also Robidoux v. Celani, 987 F.2d 931, 939 (2d Cir. 1993) ("Even where [a] class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy."). A plaintiff "need not show that every hypothetical plaintiff's claim faces certain dismissal." Bellin v. Zucker, 6 F.4th 463, 474 (2d Cir. 2021). Rather, there must merely be "a significant possibility that any single named plaintiff would be released prior to class certification." Id. (emphasis in original) (quoting Zurak v. Regan, 550 F.2d 86, 92 (2d Cir. 1977)). In addition, "[t]he critical question" for this exception "is whether the court will have time to rule on a motion for class certification brought by

a plaintiff who has standing to bring a particular claim before the claim will become moot." Salazar, 822 F.3d at 74.

Defendants contend that the first Salazar prong is not satisfied because the NYPD systematically evaluates DNA that is entered into the Suspect Index for removal after two years, a "timeline [that] is much longer" than the average of three months it took for plaintiffs' claims to be addressed in Salazar. See Def. Br. at 18-19; Salazar, 822 F.3d at 74. However, because defendants' timeline for removal is self-imposed, defendants can depart from their general policies and expedite review to remove any subsequently named plaintiffs' DNA from the Suspect Index to avoid class certification. See Compl. ¶ 52. This concern is not theoretical given that defendants removed Leslie's and Burgos's DNA "on the direction of counsel" less than two months after those plaintiffs filed suit. Katranakis Decl. ¶ 18. Defendants cannot simultaneously argue that the two named plaintiffs' claims are moot because the NYPD expedited removal of their DNA, but they would not depart from their two-year timeline again to remove future plaintiffs' DNA before the class certification stage. Given the discretionary nature of NYPD's removal policies and the history of this action, there is a "'significant possibility' that any plaintiff who brings the claims [plaintiffs] assert[] here would have [their] request[s] . . . resolved before a decision on class certification could be made." Bellin, 6 F.4th at 474 (quoting

19

Zurak, 550 F.2d at 92); see also Robidoux, 987 F.2d at 939 (inherently transitory exception was applicable when the government department at issue "w[ould] almost always be able to process a delayed application before a plaintiff can obtain relief through litigation").[10]

As for the second Salazar prong, there will undoubtedly be a "constant class" of individuals whose DNA is placed in the Suspect Index by defendants and compared to crime scene DNA. See Amador v. Andrews, 655 F.3d 89, 100 (2d Cir. 2011) ("Whether claims are inherently transitory is an inquiry that must be made with reference to the claims of the class as a whole as opposed to any one individual claim for relief."). Thus, as plaintiffs' claims on behalf of the purported class are inherently transitory, the exception to the mootness doctrine is met.

### 2. *Voluntary Cessation Exception*

The voluntary cessation exception provides a separate and sufficient basis for plaintiffs to overcome mootness. Voluntary cessation of a challenged activity renders that case moot, but only if defendants "demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim

---

[10] The Supreme Court has also noted that when defendants take actions to moot individual named plaintiffs' claims "before an affirmative ruling on class certification c[an] be obtained," it effectively requires "multiple plaintiffs to bring separate actions," which "obviously would frustrate the objectives of class actions" and "would invite waste of judicial resources by stimulating suits brought by others claiming aggrievement." Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980).

relief or events have completely and irrevocably eradicated the effects of the alleged violation." Mhany Mgmt., 819 F.3d at 603-04 (internal quotation marks omitted).  Defendants face "both a stringent and a formidable burden" with respect to this inquiry.  Id. at 604 (internal citations omitted).

Here, the challenged practice of collecting, maintaining, and analyzing DNA in the Suspect Index continues for the putative class.  In this regard, the Second Circuit has held that district courts faced with a putative class action may not "declar[e] an action moot based solely on relief provided to a plaintiff on an individual basis." Radha Geismann, M.D., P.C. v. ZocDoc, Inc., 909 F.3d 534, 542-43 (2d Cir. 2018); see also Blondell v. Bouton, No. 17-CV-372 (RRM) (RML), 2019 WL 12338323, at *8 (E.D.N.Y. Mar. 29, 2019) (defendants' attempt to moot class litigation by paying named plaintiffs royalties did not "rectif[y] the alleged absence of any adequate system for the identification and payment of non-featured performers, let alone made it 'absolutely clear' that the alleged breach of fiduciary duties has ceased").  There is no indication that defendants plan to discontinue the Suspect Index, a complex system they have built and maintained for many years.  The Court also agrees with plaintiffs that mooting this action would allow defendants to frustrate any attempted class litigation, as they have already attempted to do here.  See ZocDoc, Inc., 909 F.3d at 543 ("A

conclusion otherwise would risk placing the defendant in control of a putative class action, effectively allowing the use of tactical procedural maneuvers to thwart class litigation at will.").

In addition, although defendants are correct that the factual circumstances of Mhany Management differ from the instant action, that case nonetheless establishes that the "suspicious timing and circumstances" of a party's voluntary cessation weigh against a finding of mootness. 819 F.3d at 604; accord Am. Council of Blind of New York, Inc. v. City of New York, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020); see also United States v. N.Y.C. Transit Auth., 97 F.3d 672, 676 (2d Cir. 1996) ("[I]t is significant that the change of policy was instituted on the eve of the lawsuit."). Here, defendants made no effort to remove plaintiffs' DNA profiles for years but conducted an expedited review after plaintiffs filed suit. Katranakis Decl. ¶ 18; Rios Decl. ¶¶ 17–18, 25–26. It is notable that defendants' expedited review "reversed a prior decision refusing to remove Mr. Burgos'[s] DNA from the Suspect Index . . . when Mr. Burgos'[s] circumstances had not changed since that request, except for his participation in this suit." Pl. Opp. at 19. Defendants therefore cannot meet the "very heavy burden" required to establish that their voluntary removal of plaintiffs' DNA from the Suspect Index moots this case. See Comer v. Cisneros, 37 F.3d 775, 800 (2d Cir. 1994).

In sum, plaintiffs meet both the "inherently transitory" and "voluntary cessation" exceptions to the mootness doctrine. Because plaintiffs have also established standing for the reasons discussed _supra_, defendants' 12(b)(1) motion must be denied.  We now turn to the remaining issues: whether the Court should abstain from this action entirely, and whether we should decline to exercise supplemental jurisdiction over the plaintiffs' state law claim under Article 49-B.

### C. Pullman Abstention

Our review of the parties' submissions raised a separate, overarching question that was not initially briefed: namely, whether the doctrine of _Pullman_ abstention is applicable to this case.[11]  After evaluating the parties' supplemental briefing on that question and the applicable case law, we conclude that the criteria for abstention are not met here.  Our reasoning on _Pullman_ abstention also informs our conclusion, _infra_, that it is inappropriate at this time to decide whether we must (or should)

---

[11] Under _Railroad Commission of Texas v. Pullman Co._ and its progeny, "federal courts should abstain when litigants challenge state actions on federal constitutional grounds in federal court and the answer to an unsettled question of state law might eliminate the need to decide the federal constitutional question or materially alter the way the federal court would view that question."  17A _Moore's Federal Practice_ § 122.20 (Matthew Bender 3d Ed.).  "The policy behind _Pullman_ was to avoid friction between federal and state authorities in those cases where the federal court judgment could only be an advisory 'forecast' of how the state's highest court would finally interpret state law."  _Pharm. Soc. of State of New York, Inc. v. Lefkowitz_, 586 F.2d 953, 956 (2d Cir. 1978).

exercise supplemental jurisdiction over plaintiffs' state law claim.

In the Second Circuit, "[a]bstention under the <u>Pullman</u> doctrine may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue." <u>Vt. Right to Life Comm., Inc. v. Sorrell</u>, 221 F.3d 376, 385 (2d Cir. 2000) (internal quotation marks omitted). However, "[s]atisfaction of all three criteria does not automatically require abstention," and "'[t]he doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'" <u>Id.</u> (quoting <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 813 (1976)). Indeed, "when federal jurisdiction is proper, abstention is the exception, not the rule." <u>All. of Am. Insurers v. Cuomo</u>, 854 F.2d 591, 599 (2d Cir. 1988).

First, we do not construe Article 49-B as "unclear." "The requirement that the state law must be ambiguous before federal courts abstain ensures that federal courts avoid a decision that guesses at what a state court will do in the future, since a federal court's rough forecast may later be displaced by an authoritative state adjudication." <u>United Fence & Guard Rail Corp.</u>

v. Cuomo, 878 F.2d 588, 595 (2d Cir. 1989).  Thus, "a federal court should abstain only when the chance of error is reasonably certain, and then only when abstention reduces the likelihood of error." Id.  Here, Article 49-B is clearly worded insofar as it does not expressly authorize the creation of local DNA indexes.  See Article 49-B.  Thus, the potential state law question is whether local indexes are permissible because the statute does not expressly prohibit such indexes.[12]  However, "[a]uthorization issues are part of the business of courts" such that "the federal court is as competent as its state counterpart to evaluate" this question, and further interpreting Article 49-B is "not so knotty that a federal court decision would [be] merely a speculative forecast."  United Fence & Guard Rail Corp., 878 F.2d at 595-96; see also McRedmond

---

[12] Our understanding is confirmed by the New York Supreme Courts that have upheld local indexes as permissible and have been careful to do so while stating that, although Article 49-B does not authorize local indexes, they are nonetheless not expressly prohibited by the statute.  See People v. Belliard, 70 Misc. 3d 965, 970 (Sup. Ct. 2020) (holding that "nothing in [state law or regulations] authorizes local public DNA laboratories to 'index' DNA profiles," but Article 49-B "contains no prohibition against such indexing either"); People v. White, 60 Misc. 3d 304, 307-10 (Sup. Ct. 2018) (holding that "[w]hile the provisions of Executive Law, article 49-B, . . . only allow a DNA sample to be included in the New York State DNA data bank upon conviction of a designated offense, they do not explicitly prohibit OCME from entering a lawfully obtained DNA sample into its own local database," and collecting 12 other decisions to same effect).

Other New York Supreme Courts have held that local indexes are prohibited by Article 49-B because authorization for local indexes is absent from the statutory text.  See, e.g., People v. K.M., 54 Misc. 3d 825, 830 (Sup. Ct. 2016) (local DNA indexes that include people not convicted of any crime "run afoul of [the state law] which allows inclusion of a DNA profile into a wide-ranging database only after conviction").  We do not believe that disagreement at the lower state court level as to whether the absence of authorization language implies assent to local indexes in turn means that the statute itself is ambiguous for purposes of evaluating Pullman abstention, particularly as there is no dispute here that the statute does not expressly authorize the creation of local indexes.

v. Wilson, 533 F.2d 757, 761–62 (2d Cir. 1976) ("[W]here a state statute is unambiguous the court must perform its adjudicative duty and has no right to abstain merely because a state court decision might render a federal adjudication unnecessary."); Lefkowitz, 586 F.2d at 957 ("When a state statute appears clear on its face, Pullman abstention is not favored.").

We also reject defendants' argument that it is "unsettled" whether New York Civil Rights Law § 79-1, which concerns genetic testing of biological materials, is "applicable to criminal investigations and proceedings." See N.Y. Civ. Rights Law § 79-l(1)(a); Def. Pullman Br. at 2-3. As plaintiffs write, "[t]he clear and unambiguous terms in the statute show that it does" apply to such investigations and proceedings. See Pl. Pullman Reply at 3. We are likewise unpersuaded by the notion that both Article 49-B and Civil Rights Law § 79-1 are ambiguous merely because the New York Court of Appeals has not addressed them. State law issues are not "rendered 'unclear' merely because no state court has yet construed them." Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus, 60 F.3d 122, 126 (2d Cir. 1995); accord Wisconsin v. Constantineau, 400 U.S. 433, 438-39 (1971). Thus, defendants do not meet the first Pullman factor.

Turning to the second condition for Pullman abstention, plaintiffs' Fourth Amendment claim does not "depend on" the resolution of their state law claim. See Vt. Right to Life Comm.,

221 F.3d at 385.  A federal claim does not "depend on" a state law claim if it is not "logically necessary to decide the state law issues first, before reaching the constitutional claim[] [and] the constitutional claim is alternative to, rather than dependent upon, the state law claims." Canaday v. Koch, 608 F. Supp. 1460, 1467 (S.D.N.Y.), aff'd sub nom. Cannady v. Valentin, 768 F.2d 501 (2d Cir. 1985).  Here, the Fourth Amendment issues can be addressed before reaching any discussion of Article 49-B.  We construe plaintiffs' Fourth Amendment claim as divisible into three parts, each of which will require a separate analysis: (1) the taking of DNA without knowledge or consent, and which may occur by trick; (2) the indexing and maintenance of that DNA in the Suspect Index; and (3) the analysis of DNA against crime scene evidence.  See Compl. Relief Requested.  Determining whether any (or all) of these three actions constitute unreasonable searches will necessitate analysis under Fourth Amendment jurisprudence, not an interpretation of Article 49-B.  Thus, it is not "logically necessary" to decide the Article 49-B issue first, and defendants do satisfy the second Pullman factor.  See Canaday, 608 F. Supp. at 1467.

Finally, Article 49-B is not "susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue," as would satisfy the third Pullman condition.  See Vt. Right to Life Comm., 221 F.3d at 385 (internal

quotation marks omitted).  Second Circuit precedent is clear that abstention is unwarranted "when the state court construction of the statute will not and cannot avoid the necessity for constitutional adjudication." Naprstek v. City of Norwich, 545 F.2d 815, 817–18 (2d Cir. 1976) (citing Kusper v. Pontikes, 414 U.S. 51, 55 (1973)).  That is the case here, where there is no interpretation of Article 49-B that would moot the issues of whether defendants' practices of (1) taking and (2) analyzing plaintiffs' DNA violate the Fourth Amendment.

In addition, we note that a federal court's duty to adjudicate a plaintiff's claim "has been repeatedly recognized as carrying special force" in § 1983 claims, as Congress "'imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims.'" McRedmond, 533 F.2d at 760 (quoting Zwickler v. Koota, 389 U.S. 241, 248 (1967)).  Indeed, "'important federal rights' can 'outweigh[]' the interests underlying the Pullman doctrine." Vt. Right to Life Comm, 221 F.3d at 385 (quoting United Fence & Guard Rail Corp., 878 F.2d at 593).

Accordingly, Pullman abstention is not warranted in this case.

28

### D. Supplemental Jurisdiction

Defendants argue that we should not exercise supplemental jurisdiction over plaintiffs' state law claim under Article 49-B because plaintiffs' state law claim is not closely related to their Fourth Amendment claim, and "the claim raises a novel or complex issue of State law." Def. Br. at 19–20; Def. Reply Br. at 8–10. According to defendants, asserting supplemental jurisdiction here would deprive state courts of the opportunity to develop state law and conflict with the principles of comity and federalism. Id.; see 28 U.S.C. § 1367.

As noted above, plaintiffs' Fourth Amendment claims are analytically independent of the statutory claim. Moreover, the resolution of the Fourth Amendment claims may impact the contours of the statutory claim. Accordingly, we reserve decision on defendants' argument that we should decline to exercise supplemental jurisdiction over plaintiffs' state law claim under Article 49-B. See Rounseville v. Zahl, 13 F.3d 625, 631 (2d Cir. 1994) ("[T]he issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation.") (quoting United Mine Workers of America v. Gibbs, 383 U.S. 715, 727 (1966)); accord Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 445 (2d Cir. 1998).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss is denied.  The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 45.[13]


**SO ORDERED.**

DATED:    New York, New York
          March 23, 2023

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[13] The Court acknowledges that plaintiffs requested oral argument.  <u>See</u> ECF No. 57.  However, given our holding and the purely legal nature of the argument, the Court has determined that oral argument is not necessary under the circumstances.