UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAKIRA LESLIE, on behalf of herself and all others similarly situated,

    Plaintiff,

-against-

CITY OF NEW YORK, et al.,

    Defendants.

No. 22-cv-02305-NRB

**Local Civil Rule 56.1 Statement**

    Under Local Civil Rule 56.1, Defendants submit the following statement of material facts as to which Defendants contend there is no genuine issue to be tried:

    1.    The New York City Office of the Chief Medical Examiner ("OCME") was established in 1918 and was the first government agency of its kind in the United States. (O'Connor Decl. ¶ 9.)

    2.    OCME identifies the manner and cause of death in specified cases and provides state-of-the-art forensic analysis. (O'Connor Decl. ¶ 9.)

    3.    DNA analysis at OCME is done by the Department of Forensic Biology (the "Laboratory"). (O'Connor Decl. ¶ 10.)

    4.    OCME's Laboratory has been conducting forensic DNA testing since 1992. (O'Connor Decl. ¶ 10.)

    5.    The Laboratory is accredited in the field of Forensic Science Testing to conduct testing on biological samples using Nuclear and Mitochondrial DNA analysis methods as well as body fluid identification by ANSI-ASQ National Accreditation Board ("ANAB") under the American Society of Crime Lab Directors/Laboratory Accreditation

Board ("ASCLD/LAB") International Program, and by the New York State Division of Criminal Justice Services. (O'Connor Decl. ¶ 11.)

6. The Laboratory received its first ASCLD/LAB accreditation in 1995 and has been continuously accredited to conduct Forensic Science Testing since that time. (O'Connor Decl. ¶ 11.)

7. DNA, an acronym for deoxyribonucleic acid, is organized into structures called chromosomes. (O'Connor Decl. ¶ 19.)

8. The 46 chromosomes that make up a person's DNA are unique to that person. (O'Connor Decl. ¶ 19.)

9. Humans constantly shed countless DNA molecules onto objects they touch, into the air when they exhale, and onto the ground on which they walk. (Tambone Decl. Ex. K at 58:15-59:14.)

10. Within chromosomes are genic or "coding" regions, and non-genic or "non-coding" regions. (O'Connor Decl. ¶ 20.)

11. Only the genic regions contain a person's genes, which are the essential codes that determine a person's various physical traits such as body shape, hair color, eye color, or susceptibility to disease. (O'Connor Decl. ¶ 20.)

12. OCME and other forensic laboratories worldwide use a process called "PCR/STR testing" to create a DNA profile from a DNA sample. (O'Connor Decl. ¶ 21.)

13. PCR is the acronym for "polymerase chain reaction," the process by which a trained analyst amplifies (copies) DNA to generate DNA profile results. (O'Connor Decl. ¶ 22.)

14. STR is the acronym for "Short Tandem Repeats," which describes a characteristic of every person's DNA in which short segments of DNA are repeated a number of times in tandem, or in a row. (O'Connor Decl. ¶ 23.)

15. That these STR patterns are found in every person's DNA, coupled with the unique nature of each person's DNA, is the key to how DNA identification works. (O'Connor Decl. ¶ 24.)

16. In the 1990s, the Federal Bureau of Investigation ("FBI") created a software program known as the Combined DNA Index System, or CODIS. (O'Connor Decl. ¶ 12.)

17. CODIS is an umbrella system of other DNA indices, including the National DNA Index System (NDIS) maintained by the FBI, State DNA Index Systems (SDIS) maintained by all 50 states, and Local DNA Index Systems (LDIS) maintained at the city, county, or other local regional level. (O'Connor Decl. ¶ 12.)

18. New York City's LDIS, which is maintained by OCME, is one of nine LDIS laboratories in New York State. (O'Connor Decl. ¶ 14.)

19. OCME's LDIS contains multiple indices. (O'Connor Decl. ¶ 17.)

20. One of these indices, known as the "subject index," is used to maintain the DNA profiles of suspects that meet OCME's criteria for entry into LDIS. (O'Connor Decl. ¶ 17.)

21. CODIS contains 5,879,537 arrestee DNA profiles as of April 2025; California alone has contributed 1,061,684 arrestee DNA profiles to CODIS. *CODIS – NDIS Statistics*, FED. BUREAU OF INVESTIGATION, https://le.fbi.gov/science-and-lab/biometrics-and-fingerprints/codis/codis-ndis-statistics (last visited July 9, 2025).

22. The FBI has standardized DNA profile analysis in the United States by mandating that DNA profiles uploaded to CODIS contain analysis results from certain "core" locations, or loci, within STRs. (O'Connor Decl. ¶ 25.)

23. These core loci mandated by the FBI (the "CODIS loci") were purposefully selected from the non-genic, or non-coding, regions of DNA chromosomes, and do not reveal any physical or medical traits about a person. (O'Connor Decl. ¶ 25.)

24. The FBI initially identified 13 CODIS loci; as of 2017, the FBI requires analysis from 20 CODIS loci. (O'Connor Decl. ¶ 25.)

25. Most laboratories, including OCME's, use commercially produced DNA typing "kits" to perform DNA testing. (O'Connor Decl. ¶ 26.)

26. The kit currently used by OCME is designed to generate data from the 20 CODIS loci, plus two additional loci from the non-coding region of the chromosome, for a total of 22 loci. (O'Connor Decl. ¶ 26.)

27. None of the 22 loci reveal any physical or medical traits about a person. (O'Connor Decl. ¶ 26.)

28. Around 3:10 a.m. on July 3, 2019, New York City Police Department ("NYPD") officer Devernier Smith was on patrol with other officers in the Bronx. (Fenton Decl. Ex. E at PD – 00011.)

29. The officers observed the driver of a silver four-door sedan drive in a bike lane and then through a red light. (Fenton Decl. Ex. E at PD – 00011.)

30. The officers pulled over the car, which was occupied by five people; Plaintiff Shakira Leslie was sitting in the middle of the backseat, between two other passengers. (Tambone Decl. Ex. I at 29:18-30:15.)

31. The officers ordered the occupants to exit the car one by one; first the driver, Leslie's cousin Kymani Johnson, then the front-seat passenger, Leslie's cousin Tamarc Johnson. (Tambone Decl. Ex. I at 32:7-17.)

32. As Tamarc exited the car, Smith shouted to the other officers that he noticed a gun behind Tamarc's fanny pack, and he recovered the firearm from her. (Tambone Decl. Ex. I at 33:1-17; Fenton Decl. Ex. E at PD – 00011.)

33. After inspecting the gun, police determined that it was loaded and had a defaced serial number. (Fenton Decl. Ex. E at PD – 00011, PD – 00028; *id.* Ex. H.)

34. Leslie and the other four occupants of the car were arrested for possessing the loaded firearm with a defaced serial number. (Fenton Decl. Ex. E at PD – 00040.)

35. After Leslie was arrested sometime after 3:10 a.m., she was transported to the 41st Precinct in the back of a police car. (Tambone Decl. Ex. I at 35:12-37:1.)

36. At the precinct, as part of the booking process, police took Leslie's jewelry and ID card and collected her fingerprints. (Tambone Decl. Ex. I at 35:12-37:1.)

37. After the booking process she was taken to a cell and handcuffed to a bench, where she fell asleep. (Tambone Decl. Ex. I at 35:12-37:1.)

38. She slept until shortly before 10:10 a.m., when Officer Smith and two detectives, Richard McClain and Ramon Salcedo, woke her up and took her to an interview room. (Tambone Decl. Ex. I at 35:12-37:1; *see generally id.* Ex. L.)

39. The interview room's video cameras show the three officers accompany Leslie into the interview room, and that a white disposable cup is sitting on a table in the room before the four of them enter. (Tambone Decl. Ex. L.)

5

40. After Officer Smith removes Leslie's handcuffs, McClain informs Leslie of her *Miranda* rights, which she waives. (Tambone Decl. Ex. L.)

41. Leslie then answers McClain's questions during a short interview, denies knowing that the defaced gun was in the car, and states that she first learned about the gun when she heard one officer shout to the others that he had seen it as Tamarc exited the car. (Tambone Decl. Ex. L.)

42. After about five minutes of questions, the following exchange occurs:

DET. MCCLAIN: Tamarc and—

LESLIE: Kymani.

DET. MCCLAIN: —Kymani, they're you're cousins?

LESLIE: [nods head]

DET. MCCLAIN: OK. And you don't know who had the gun on them?

LESLIE: No. I've never seen the gun.

DET. MCCLAIN: And you've never seen the gun.

LESLIE: No [unintelligible].

DET. MCCLAIN: Any questions?

DET. SALCEDO: [shakes head]

DET. MCCLAIN: You want some water?

LESLIE: I'm good.

DET. MCCLAIN: You sure?

LESLIE: Yeah [unintelligible].

DET. MCCLAIN: Be a while before you get something to drink.

LESLIE: [unintelligible] [drinks water, places cup on table]

DET. MCCLAIN: [unintelligible] keep drinking.

>    LESLIE: [drinks water, places cup on table]
>
>    DET. MCCLAIN: What kind of car was y'all in?
>
>    LESLIE: I don't know the name of Kymani's car, it's a silver car though.

(Tambone Decl. Ex. L at timestamp 10:16:14 to 10:17:10.)

43. After the interview, McClain returned to the interview room and collected the disposable cup that Leslie drank from and placed back on the table. (Tambone Decl. Ex. L.)

44. NYPD vouchered the disposable cup as evidence and transferred it to OCME with a request to compare the DNA on the cup Leslie discarded with DNA taken from the defaced firearm. (Fenton Decl. Exs. F, G.)

45. From the gun, OCME successfully created a DNA profile from the gun's "trigger/trigger guard" reflecting the genetic identity of an unknown male person. (O'Connor Decl. Ex. D at OCME-00055.)

46. From the disposable cup, OCME successfully created a complete single-source DNA profile reflecting the genetic identity of a known female person (i.e., Leslie). (O'Connor Decl. Ex. C at OCME-00003; Tambone Decl. Ex. K at 60:13-19.)

47. After comparing the two profiles, OCME concluded that Leslie was "excluded as a contributor" to the DNA sample OCME retrieved from the gun. (O'Connor Decl. ¶ 29; Ex. C at OCME-00003.)

48. After an initial appearance, Leslie appeared for at least one future court appearance. (Tambone Decl. Ex. I at 66:1-24.)

49. Leslie testified that the DNA profile created by OCME "helped [her] case" because the profile effectively "cleared [her] of any wrongdoing for the crime [she] was

arrested for," and all charges against her were dropped. (Tambone Decl. Ex. I at 55:16-56:12; 66:19-24.)

50. Kymani Johnson—who Leslie lived with at the time of the arrest—ultimately pleaded guilty to a crime related to the defaced firearm. (Tambone Decl. Ex. I at 50:4-51:13.)

51. OCME compared Leslie's DNA profile with the DNA profiles in OCME's LDIS and there were no matches. (O'Connor Decl. Ex. C at OCME-00008.)

52. OCME maintained Leslie's DNA profile in the "subject index" within OCME's LDIS, where OCME maintains the DNA profiles from suspects that meet OCME's criteria for entry into LDIS. (O'Connor Decl. ¶ 17; Ex. C at OCME-00008.)

53. At her May 14, 2025 deposition, Leslie testified that a DNA sample consists of genetic material, and described the DNA sample at issue in this case as her "saliva." (Tambone Decl. Ex. I at 41:11-43:11.)

54. Leslie testified that a DNA profile is created by OCME after analyzing the DNA sample. (Tambone Decl. Ex. I at 42:1-6.)

55. Leslie testified that on "countless" occasions in her life, she has used a glass at a restaurant and left some of her saliva behind in the glass for the restaurant to take care of. (Tambone Decl. Ex. I at 47:10-48:1.)

56. Leslie testified that she is not asserting a privacy interest in her genetic material when she uses a cup or glass at a restaurant. (Tambone Decl. Ex. I at 47:10-48:1.)

57. Leslie testified that she had never thought about her DNA before her July 3, 2019 arrest. (Tambone Decl. Ex. I at 44:3-46:25.)

58. Leslie testified that she did not tell the police she thought her saliva was private. (Tambone Decl. Ex. I at 44:3-46:25.)

59. Leslie testified that after she placed the disposable cup on the interview room table where she found it, she believed it "would be thrown out" by someone other than herself. (Tambone Decl. Ex. I at 43:12-44:2.)

60. Leslie testified, "Sitting here today I don't know what the [DNA] profile is." (Tambone Decl. Ex. I at 61:9-14.)

61. Because Leslie does not know what the DNA profile is, she also does not know whether the DNA profile reveals any of the "deeply personal characteristics" described in Paragraph 38 of the Amended Complaint. (Tambone Decl. Ex. I at 61:15-62:7.)

62. Any public forensic laboratory that is authorized to upload DNA profiles to CODIS must follow the FBI Quality Assurance Standards ("FBI QAS"), and the accreditation process evaluates this adherence. (O'Connor Decl. ¶ 13.)

63. The FBI QAS implement the criteria pursuant to which state and local databases may participate in CODIS. (O'Connor Decl. ¶ 15.)

64. OCME's LDIS is eligible to participate in CODIS because it meets the FBI QAS criteria. (O'Connor Decl. ¶ 15.)

65. The New York State Division of Criminal Justice Services also requires laboratories in New York State to adhere to the FBI QAS in order to be accredited by the New York State Commission on Forensic Science (the "Commission"). (O'Connor Decl. ¶ 14.)

66. OCME's Laboratory and its LDIS would not be permitted to operate without accreditation by ANAB, the Commission, and the FBI QAS. (O'Connor Decl. ¶ 15.)

67. Like other local DNA laboratories, OCME's Laboratory must also pass regular intensive audits to ensure compliance with federal laws and regulations. (O'Connor Decl. ¶ 16.)

68. These audits are performed by forensic scientists, either internal or external to the laboratory, and serve to identify compliance with established standards. (O'Connor Decl. ¶ 16.)

69. The audit criteria overlap between and are consistent with both the FBI QAS and the corresponding ANAB elements. (O'Connor Decl. ¶ 16.)

70. ANAB and the Commission are fully aware of OCME's LDIS, which they have regularly approved and reapproved through their accreditations. (O'Connor Decl. ¶ 18.)

Dated: New York, New York
July 9, 2025

**MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
*Attorney for Defendants*

By: /s/ Nicholas R. Tambone
    Nicholas R. Tambone
    Assistant Corporation Counsel
100 Church Street
New York, NY 10007
Tel. (212) 356-8767
ntambone@law.nyc.gov