*N. Boger and M. Ozer*

*Forensic Science International 349 (2023) 111744*

sewer system. This makes humans living in large populations an excellent environment for implementing a wastewater eDNA monitoring system. By placing eDNA monitoring devices in the sewer system, the DNA of a specific individual can be targeted, and the device can trigger an alert when detected. To begin understanding this concept, we will start by explaining the device itself.

### 5.1. Device considerations

The exact details of how to build the DNA testing device are beyond the scope of this paper. Currently, various methods of collecting and examining DNA are available. The final device used will largely depend on the needs of the group implementing the project and whether the devices used will be positioned below or above ground. The financial cost of the project will be lightly discussed but not emphasized. The initial cost is expected to be high, as funds will need to be allocated to research and development of the device itself. However, as with most all technology, the devices are expected to become smaller, cheaper to manufacture, and more efficient and effective at accomplishing their tasks once established. In the meantime, much can be determined as to what the device will need to function properly and collect and analyze the samples. First, the device must be secure to protect the equipment and the software within. If it can be tampered with or destroyed, it could lead to more than just missing the collection of DNA samples, but possibly a threat to the network with which the device connects to and reports information. The device needs to have access to influent wastewater, which is wastewater that has not yet reached the wastewater treatment plant.

### 5.2. Sewer systems

"Sewer System means pipelines or conduits, pumping stations, force mains, vehicles, vessels, conveyances, injection wells, and all other constructions, devices, and appliances appurtenant thereto used for conducting sewage or industrial waste or other wastes to a point of ultimate disposal or disposal to any water of the state," (LawInsider.com Dictionary). Sewer systems vary based on many factors. The age of a city and its size are two major factors to consider, as it can mean that old materials are in use and replacement of the materials is most likely not an option. San Francisco (Fig. 7) [12] is an example of a large city with a brick sewer system. This city was founded in 1776 and incorporated in 1850. The age and population density of this city make repairs and modifications difficult. This analysis will not dig too much into the technical workings of modern sewer systems.

What is important to know for our analysis is that these systems consist of many different sizes and lengths of pipes and tunnels to control and direct the flow of wastewater. There are two major types of sewer systems (Separate sewer systems and Combined sewers).



**Fig. 8.** Philadelphia Sewer Flow.

Separate sewer systems are designed to carry only sanitary sewer, although, during wet weather, stormwater can infiltrate the sewer through cracks, joints, and utility access holes. Combined sewers have only one pipe that conveys a mix of stormwater and wastewater. During dry weather, a combined sewer is a separate sewer [23]. Since sewer systems are designed to be able to capture rainwater flows, they usually contain flows of a far smaller volume than their maximum capacity, as shown in Fig. 8 [30]. It is important to keep this in mind when considering device design. If the device does not have access to water to sample, it cannot perform DNA analysis. Therefore, the device must be located where flows provide ample water volume if positioned below ground. If this is not possible, it may be necessary to pump water to the device to ensure ample water volume is continuous.

### 5.3. Device location

The device needs to collect water samples to detect the programmed targets' DNA. So, to begin with, the device needs to be located in a place where it will receive a steady flow of influent wastewater. Two options seem to be the best for device placement. Option one would be placing the device in the sewer system itself. This comes with benefits and drawbacks. Placing the device underground can provide a measure of insulation from the weather. Rain, snow, wind, and hale can all be blocked by placing the device in a subterranean environment. Temperature extremes will also be blunted underground. This option also protects against humans tampering with the device, as they will not have physical access to it. This location comes with downsides, however. The isolated environment can make it difficult to access the device should maintenance needs arise. It may also initially make the device difficult to supply with power and increase difficulties in transmitting signals to and from the device. The isolated environment may also invite criminals to attempt to tamper with or steal the device.

Option two involves placing the DNA monitoring device above ground, as Fig. 9 illustrates both options. Option A is the underground option and Option B shows the above-ground device. Option



**Fig. 7.** A San Francisco Sewer Tunnel. Tunnel.



**Fig. 9.** Above and Below Ground Placement.

*N. Boger and M. Ozer*

*Forensic Science International 349 (2023) 111744*



**Fig. 10.** City Level Detection.

B pumps the wastewater upwards to the above ground device, runs through the testing device, and then flows back down into the sewer system. This option provides easier device access and possibly better overall security. Since the water can be pumped over a reasonable distance, it could even lead to the device being placed indoors. An indoor placement would allow for the easiest access, maintenance, and environmental control and provide the highest level of security for the device. However, to maximize the potential of the device, it is best placed just after an area where several sewer system lines intersect. This level of device placement will be discussed next.

To maximize the potential of the device, the strategic placement of the device needs to be considered. Placing one device near the end of the sewer system, but before reaching the wastewater treatment plant (Fig. 10), allows for the bare minimum eDNA detection. Depending on the flow of the water and size of this municipality, this should be feasible in most situations, as illustrated in the literature review. However, this will be determined on a case-by-case basis by considering the distance the DNA needs to travel and the flow rate of the water. This level of detection would alert authorities of a city-level presence of the target DNA. For example, a real-world scenario could show that a child reported missing in Los Angeles was detected in Philadelphia.

Zone detection includes city-level detection but adds more devices throughout the area. Fig. 11 shows five devices placed in different locations throughout the municipality. The benefit of adding more devices upstream of the city-level device is that it allows for the next level of identifying the location of the source of where the DNA entered the sewer system. In addition to being able to tell that the specific DNA has been detected in the city, it can now point authorities toward the zone where the DNA was detected. This could help authorities narrow their search.

Ultimately, it will be up to the municipality to determine what detection level works best for them. Added detection will come with

an increased cost. However, more devices placed within the municipality allow for the pinnacle of detection, Fully Integrated Detection. As seen in Fig. 12, Fully Integrated Detection implements devices at all nodes within the municipalities sewer system. This allows authorities an even greater level of accuracy in determining the source of where the DNA entering the sewer system. This increased accuracy can save valuable time in locating the target. Over time, this detection level can also help authorities identify various threats of criminal activity. If a trend is seen where one device is constantly picking up traces of target DNA it could mean that a human trafficking ring, or a terrorist cell, is present. It could also lead to identifying a serial kidnapper. Device placement becomes key with this device placement strategy, and it may be difficult to implement one strategy of placing the devices above or below ground. Placing devices both above and below ground may become necessary with more devices.

## 6. Limitations

This research project is meant to explore the possibilities of how an eDNA detection system could look when used to help locate missing persons and persons of interest. While the possibilities are exciting, there are limitations that need to be considered to view the project in a balanced manner. These limitations will be discussed in this section.

### 6.1. Technological limitations

This concept is not known to be used anywhere in the world. As such, it is a look ahead at what is possible when technology is used to solve a problem. All technology must first be created before it can be used. It may take many years to realize this project and may require advances in multiple technological areas.

*N. Boger and M. Ozer*

*Forensic Science International 349 (2023) 111744*



**Fig. 11.** Zone Detection.



**Fig. 12.** Fully Integrated Detection.

### 6.2. Location limitations

It may be difficult for municipalities to install adequate devices due to the lack of available locations to situate the devices themselves. This paper mentions two possible scenarios for locating the testing devices. One option is to install the devices in the sewer system itself, and the other is to pump the water to an above ground location where it meets the testing device and is then re-incorporated into the sewer system. While these options may help place the devices in optimal locations within a given municipality, there may be areas where optimal device placement cannot be achieved. This could lead to gaps in the system and prevent maximum efficiency from being realized.

*N. Boger and M. Ozer*

*Forensic Science International 349 (2023) 111744*

### 6.3. Financial limitations

Research and development costs will play a significant role in realizing this concept. The financial cost could be significant depending on how much customization of current equipment is needed to make the concept viable. Along with the initial costs, implementing and maintaining the devices could be prohibitive initially, as the system works better as devices and municipalities are added. However, as is seen with most all technology, as progress marches forward, technology costs decline as devices are built better and at less cost. Therefore, it would be expected that the devices needed to implement this concept would experience the same cost decrease over time.

### 6.4. Environmental limitations

The environment may impact whether a municipality can adopt this concept below ground. The main concern here would be extreme cold weather resulting in the freezing of the flow of wastewater. This could be remediated with heaters and pumps placed in line with the wastewater flow. Placing the devices above ground and pumping the wastewater to them may also alleviate this. As addressed in the literature review section, high temperatures degrade DNA. High temperatures coupled with low flow rates could result in the DNA degrading before it reaches the testing device. This could be remediated by installing more devices closer to entry sources within the sewer system.

### 6.5. Concentration limitations

As mentioned in the Pilliod et al. study, the concentration of eDNA in the environment is influenced by the concentration of the source of the eDNA and how long the source was in the environment. This can decrease the odds of successful detection based on these factors. For example, someone passing through the monitored municipality may stop at a location and wash their hands for 30 s. This act will release their eDNA into the sewer system and may lead to positive detection. However, this short release of eDNA will be more difficult to detect than someone who took a 30-minute bath. Also, an individual that is passing through town and decides to take a 30-minute bath before leaving town and continuing on to another city will be more difficult to detect than the eDNA of someone that provides multiple eDNA releases per day in the target environment by taking a 30-minute bath, brushing their teeth, washing their hands a few times during the course of the day, and using the restroom several times per day and doing so on day after day basis due to habituating in the target municipality. While all these scenarios may provide successful detections, the greater the concentration of eDNA in the environment will lead to increased detection rates.

### 6.6. Security limitations

Given the nature of the device, it will need to be both physically and logically secured. Therefore, great lengths should be taken to secure the device, and it should be designed assuming it will be physically stolen. Designing the hardware and software with this assumption will ensure that the software is not easily compromised, which could result in a project-wide hack or corruption of software.

### 6.7. Limitations of scale

Detection rates will increase as more municipalities adopt the system, and efficiency will increase as each municipality adds more detection devices within its territory. However, this could lead to lackluster performance early on, as it would be expected that few municipalities adopt the system in its early stages.

### 6.8. Population location

Not everyone lives in densely populated urban environments, which is the optimum use case for this system. Those living in rural areas will likely utilize septic systems to treat their waste, which are not connected to a collection system. Therefore, the mass-analysis that helps make this concept feasible will not be able to be utilized in areas with low population density.

### 6.9. A deterrent with repercussions

As the system grows and successful detections of target DNA increase, the system's reputation may force criminals out of densely populated areas that incorporate DNA detection in their sewer systems and into areas where the system is not being used or where waste is treated in septic systems. This deterrent of criminal behavior may be seen as a victory for large municipalities, but it may also undermine the overall goal of helping to find missing persons and persons of interest. Limiting the knowledge of the program to the public to aid the goals of law enforcement may need to be considered.

### 6.10. Contamination factor

In many areas of DNA analysis, contamination can ruin the validity of testing results. However, it is believed that contamination will not be an issue with this system, as the goal is not to accurately represent all the DNA within the sample, but to merely detect the presence of specific targeted DNA sequences.

### 6.11. Legal limitations

It is imperative that the device only detects DNA programmed into the system and does not store and identify all DNA in the sample being tested. This concept is likely to be met with resistance by those who value privacy, and if this aspect is not managed properly it could result in entire municipalities refusing to adopt the concept. In addition, the inability to ensure that only target DNA is identified could result in legal hurdles and lawsuits.

## 7. Conclusion

Locating missing persons and persons of interest can take lots of time, as the nation is large and has many places to look. Using technology to track their eDNA in sewer systems can help narrow the search, find a missing person more quickly, and help law enforcement personnel conserve resources. Studies show that eDNA can persist in a wastewater environment long enough to be detected. By using devices to detect the eDNA of targeted individuals, and placing these devices strategically in a sewer system, not only can missing persons and persons of interest have their location narrowed down to the municipality they are in, but high integration levels of these devices can potentially narrow down the search to a specific neighborhood. These devices are highly innovative, and it is suggested that a collaboration be formed between a university and some of the industry leaders in DNA analysis, such as Promega and Thermo Fisher Scientific. This collaboration can ensure that the custom-made device can meet the requirements needed to bring the project to fruition. The technology is believed to be already in existence or close to being realized. Once the first devices are built, declining costs of technology should be expected. As prices lower, more municipalities can adopt the device and the system will function better due to increased coverage. Due to the expected high initial cost to implement the program, it is recommended that large cities adopt the eDNA detecting system first. Large cities' correspondingly high population density should allow for several

*N. Boger and M. Ozer*    *Forensic Science International 349 (2023) 111744*

successful eDNA detections, which will further increase buy-in from other municipalities.

## Funding

N/A.

## Ethical Approval

N/A.

## Author Statement

We would like to express our gratitude to the anonymous reviewers for their valuable comments and suggestions that helped improve the quality of this manuscript.

## CRediT authorship contribution statement

**Nathaniel Boger & Murat Ozer:** All authors have reviewed and approved the final version of the manuscript, and they take full responsibility for its content.

## Declaration of Competing Interest

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

## Acknowledgments

N/A.

## References

[1] T.C. Barnes MA, Environmental conditions influence eDNA persistence in aquatic systems, Environ. Sci. Technol. 48 (3) (2014) 1819–1827, https://doi.org/10.1021/es404734p

[2] J.A. Baz-Lomba, M.J. Reid, K.V. Thomas, B. Kasprzyk-Hordern, Advancing the wastewater-based epidemiology for monitoring substance use among European populations: results of the SEWPROF project, Sci. Total Environ. 652 (2019) 482–490.

[3] A.W. Bivins, D. North, A. Ahmad, W. Ahmed, E. Alm, F. Been, A. Nagler, Wastewater-based epidemiology: Global collaborative to maximize contributions in the fight against COVID-19, Environ. Sci. Technol. 54 (13) (2020) 7754–7757.

[4] B. Budowle, S.E. Schmedes, E.J. Bajda, J.A. Siegel, C.J. Sprecher, Forensic DNA analysis: current practices and emerging technologies. national institute of justice, Journal 279 (2018) 12–19 https://nij.ojp.gov/library/publications/forensic-dna-analysis-current-practices-and-emerging-technologies.

[5] L.J. Cai, Tracking human sewage microbiome in a municipal wastewater treatment plant, Appl. Microbiol. Biotechnol. 98 (7) (2014) 3317–3326, https://doi.org/10.1007/s00253-013-5402-z

[6] N.F.-G. Centazzo, Wastewater analysis for nicotine, cocaine, amphetamines, opioids and cannabis in New York City, Forensic Sci. Res. 4 (2) (2019) 152–167, https://doi.org/10.1080/20961790.2019.1609388

[7] C.S. David S. Pilliod, Factors influencing detection of eDNA from a stream-dwelling amphibian, Mol. Ecol. Resour. (2013), https://doi.org/10.1111/1755-0998.12159

[8] K. Deiner, H.M. Bik, E. Mächler, M. Seymour, A. Lacoursière-Roussel, F. Altermatt, Environmental DNA for wildlife biology and biodiversity monitoring, Trends Ecol. Evol. 32 (10) (2017) 843–854, https://doi.org/10.1016/j.tree.2017.06.005

[9] T. Dejean, A. Valentini, A. Duparc, S. Pellier-Cuit, F. Pompanon, P. Taberlet, C. Miaud, Persistence of environmental DNA in freshwater ecosystems, PLoS One 7 (12) (2012) e50460.

[10] H. Doi, -site eDNA Detect. Species Using Ultra-rapid Mob. PCR (2020), https://doi.org/10.1101/2020.09.28.314625

[11] G.F. Ficetola, C. Miaud, F. Pompanon, P. Taberlet, Species detection using environmental DNA from water samples, Biol. Lett. 4 (4) (2008) 423–425.

[12] Fracassa, D. (2017, 10 21). SF embarking on major projects to bolster sewer system. Retrieved from San Francisco Chronicle: https://www.sfchronicle.com/bayarea/article/SF-embarking-on-major-projects-to-bolster-sewer-12296228.php.

[13] J. Geng, X. Liu, Q. Zhou, J. Jiang, Environmental DNA degradation dynamics and its impact on the detection of invasive species in aquatic ecosystems, Sci. Total Environ. 714 (2020) 136771.

[14] Graham, E., & Adamowicz, M. (2015). Effects of Different Types of Water on the Degradation Rate of Human DNA in Bone and Tissue.

[15] R. Hinlo, D. Gleeson, M. Lintermans, E. Furlan, J. Griffiths, Detection of endangered Macquarie perch (Macquaria australasica) in an upland reservoir using environmental DNA (eDNA) sampling, Aquat. Conserv.: Mar. Freshw. Ecosyst. 27 (1) (2017) 137–145.

[16] J.H. Kim, H.J. Kim, Y. Cho, Evaluation of DNA degradation rate in post-mortem human tissues, Leg. Med. 29 (2017) 8–11.

[17] M. Kumar, V.K. Tyagi, A. Sharma, A.A. Khan, P. Pandey, A. Pathak, Advances in the field of sewage-based drug testing—A comprehensive review, Sci. Total Environ. 670 (2019) 1109–1125.

[18] Z. Lin, L. Zhu, Q. Zhou, Environmental DNA (eDNA) detection in sewage sludge: a proof-of-concept study, Environ. Sci. Pollut. Res. Int. 26 (12) (2019) 11631–11636.

[19] A. Maruyama, K. Nakamura, H. Yamanaka, M. Kondoh, T. Minamoto, The release rate of environmental DNA from juvenile and adult fish, PLoS One 9 (12) (2014) e114639.

[20] D. Moyer, Improving Water-Quality through Real-Time, Contin. Monit. Innov. Res. Tool. extensive Appl. Potential (2004).

[21] M.S. Newton RJ, Sewage reflects the microbiomes of human populations, mBio 6 (2) (2015) e02574, , https://doi.org/10.1128/mBio.02574-14

[22] Promega. (2022, April). Spectrum CE System. Madison, WI, Unite States of America. Retrieved from https://www.promega.com/products/forensic-dna-analysis-ce/analysis/.

[23] B.K. Rathnayake D, The role of pH on sewer corrosion processes and control methods: a review, Sci. Total Environ. 782 (2021) 146616, , https://doi.org/10.1016/j.scitotenv.2021.146616

[24] T. Takahara, T. Minamoto, H. Yamanaka, H. Doi, Z.I. Kawabata, Estimation of fish biomass using environmental DNA, PLoS One 8 (5) (2013) e73225.

[25] X.S. Tangyi Qian, Effects of temperature on the timeliness of eDNA/eRNA: a case study of fenneropenaeus chinensis, Water Org. 14 (7) (2022), https://doi.org/10.3390/w14071155

[26] Thermo Fisher. (2022). Thermo Scientific NanoDrop Products. Retrieved from https://www.thermofisher.com/us/en/home/industrial/spectroscopy-elemental-isotope-analysis/molecular-spectroscopy/uv–vis–spectrophotometry/instruments/nanodrop.html.

[27] P.F. Thomsen, E. Willerslev, Environmental DNA – an emerging tool in conservation for monitoring past and present biodiversity, Biol. Conserv. 183 (2015) 4–18.

[28] P.F. Thomsen, J. Kielgast, L.L. Iversen, P.R. Møller, M. Rasmussen, E. Willerslev, Detection of a diverse marine fish fauna using environmental DNA from seawater samples, PLoS One 7 (8) (2012) e41732.

[29] Y. Zhang, T. Tobino, T. Iida, S. Ishii, Quantitative evaluation of the fate of human fecal microbiota and antibiotic resistance genes during wastewater treatment, Sci. Total Environ. 668 (2019) 185–192.

[30] Zhorov, I. (2015, 7 8). Keystone Crossroads: The state of sewer pipelines in Pennsylvania. Retrieved from WHYY: https://whyy.org/articles/keystone-crossroads-the-state-of-sewer-pipelines-in-pennsylvania/.

**BIOLOGY**

# When DNA Implicates the Innocent

The criminal justice system's reliance on DNA evidence, often treated as infallible, carries significant risks

..................................

By Peter Andrey Smith on June 1, 2016



*Credit: RAFE SWAN Alamy*

In December 2012 a homeless man named Lukis Anderson was charged with the murder of Raveesh Kumra, a Silicon Valley multimillionaire, based on DNA evidence. The charge carried a possible death sentence. But Anderson was not guilty. He had a rock-solid alibi: drunk and nearly comatose, Anderson had been hospitalized—and under constant medical supervision—the night of the murder in November. Later his legal team learned his DNA made its way to the crime scene by way of the paramedics who had arrived at Kumra's residence. They had treated Anderson earlier on the same

Case 1:22-cv-02305-NRB    Document 144-50    Filed 08/08/25    Page 7 of 15

day—inadvertently "planting" the evidence at the crime scene more than three hours later. The case, presented in February at the annual American Academy of Forensic Sciences meeting in Las Vegas, provides one of the few definitive examples of a DNA transfer implicating an innocent person and illustrates a growing opinion that the criminal justice system's reliance on DNA evidence, often treated as infallible, actually carries significant risks.

As virtually every field in forensics has come under increased scientific scrutiny in recent years, especially those relying on comparisons such as bite-mark and microscopic hair analysis, the power of DNA evidence has grown—and for good reason. DNA analysis is more definitive and less subjective than other forensic techniques because it is predicated on statistical models. By examining specific regions, or loci, on the human genome, analysts can determine the likelihood that a given piece of evidence does or does not match a known genetic profile, from a victim, suspect or alleged perpetrator; moreover, analysts can predict how powerful or probative the match is by checking a pattern's frequency against population databases. Since the mid-1990s the Innocence Project, a nonprofit legal organization based in New York City, has analyzed or reanalyzed available DNA to examine convictions, winning nearly 200 exonerations and spurring calls for reform of the criminal justice system.

Like any piece of evidence, however, DNA is just one part of a larger picture. "We're desperately hoping that DNA will come in to save the day, but it's still fitting into a flawed system," says Erin E. Murphy, a professor of law at New York University and author of the 2015 book *Inside the Cell: The Dark Side of Forensic DNA*. "If you don't bring in the appropriate amount of skepticism and restraint in using the method, there are going to be miscarriages of justice." For example, biological samples can degrade or be contaminated; judges and juries can misinterpret statistical probabilities. And as the Anderson case brought to light, skin cells can move.

Since 1997, when researchers first showed that it was possible to gather genetic information about a person based on skin cells they had left on an object, this type of trace evidence, also known as touch DNA, has been increasingly collected from surfaces such as door and gun handles. (In some jurisdictions, such as Harris County, Texas, the number of touch DNA cases submitted for laboratory analysis increased

557

more than threefold between 2009 and 2013, often as a means of identifying possible perpetrators for burglaries and thefts.) Commercial companies now sell kits to law-enforcement agencies that can generate a full genetic profile of an individual from as few as three to five cells. Independent labs and scientists working on such projects as identifying long-deceased individuals also employ the kits.

Until recently, this type of DNA has been regarded as incontrovertible proof of direct contact. But a growing number of studies show that DNA does not always stay put. For example, a person who merely carried a cloth that had been wiped across someone else's neck could then transfer that person's DNA onto an object he or she never touched, according to a study published earlier this year in the *International Journal of Legal Medicine*. Similarly, Cynthia M. Cale, a master's candidate in human biology at the University of Indianapolis, recently reported in the *Journal of Forensic Sciences* that a person who uses a steak knife after shaking hands with another person transfers that person's DNA onto the handle. In fact, in a fifth of the samples she collected, the person identified as the main contributor of DNA never touched the knife. Cale and her colleagues are among several groups now working to establish how easily and how quickly cells can be transferred—and how long they persist. "What we get is what we get," Cale says, "but it's how that profile is used and presented that we need to be cautious about."

At the forensics meeting in Las Vegas, Kelley Kulick, a public defender for the County of Santa Clara, presented the idea that Anderson's DNA hitched a ride on the medics' uniforms. Just how often transferred DNA ends in a wrongful accusation is unknown. "Although clear cases appear to be quite uncommon, I think it's probably more prevalent than we think," says Jennifer Friedman, a public defender in Los Angeles and DNA specialist. "The problem is that what we don't see frequently is the ability to definitely prove that transfer occurred."

The erroneous interpretation of touch DNA for Anderson has now also become a contentious issue for two co-defendants on trial for the Kumra murder, Kulick says. No doubt DNA evidence remains an invaluable investigative tool, but forensic scientists and legal scholars alike emphasize that additional corroborating facts should be required to determine guilt or innocence. Like all forms of evidence, DNA is only

558

one circumstantial clue. As such, Anderson's case serves as a warning that a handful of wayward skin cells should not come to mean too much.

ADVERTISEMENT

ABOUT THE AUTHOR(S)

Scientific American is part of Springer Nature, which owns or has commercial relations with thousands of scientific publications (many of them can be found at www.springernature.com/us). Scientific American maintains a strict policy of editorial independence in reporting developments in science to our readers.

© 2016 SCIENTIFIC AMERICAN, A DIVISION OF NATURE AMERICA, INC.

ALL RIGHTS RESERVED.



**Lukis Anderson's hand.** CARLOS CHAVARRÍA

# Framed for Murder By His Own DNA

We leave traces of our genetic material everywhere, even on things we've never touched. That got Lukis Anderson charged with a brutal crime he didn't commit.

FEATURE ▪ FILED 7:00 a.m. ▪ 04.19.2018

How DNA Evidence Framed Lukis Anderson for Murder | The Marshall Project

By **KATIE WORTH**
Design and development by
**GABE ISMAN** and **ALEX TATUSIAN**

When the DNA results came back, even Lukis Anderson thought he might have committed the murder.

"I drink a lot," he remembers telling public defender Kelley Kulick as they sat in a plain interview room at the Santa Clara County, California, jail. Sometimes he blacked out, so it was possible he did something he didn't remember. "Maybe I did do it."

Kulick shushed him. If she was going to keep her new client off death row, he couldn't go around saying things like that. But she agreed. It looked bad.

This investigation was published in partnership with Frontline (PBS) and Wired.

Before he was charged with murder, Anderson was a 26-year-old homeless alcoholic with a long rap sheet who spent his days hustling for change in downtown San Jose. The murder victim, Raveesh Kumra, was a 66 year old investor who lived in Monte Sereno, a Silicon Valley enclave 10 miles and many socioeconomic rungs away.

Listen to an AUDIO VERSION of this story:

Around midnight on Nov. 29, 2012, a group of men had broken into Kumra's 7,000 square foot mansion. They found him watching CNN in the living room, and tied him, blindfolded him, and gagged him with mustache print duct tape. They found his companion, Harinder, asleep in an upstairs bedroom, hit her on the mouth, and tied her up next to Raveesh. Then they plundered the house for cash and jewelry.

After the men left, Harinder, still blindfolded, felt her way to a kitchen phone and called 911. Police arrived, then an ambulance. One of the paramedics declared Raveesh dead. The coroner would later conclude that he had been suffocated by the mustache tape.

Three and a half weeks later, the police arrested Anderson. His DNA had been found on Raveesh's fingernails. They believed the men struggled as Anderson tied up his victim. They charged him with murder. Kulick was appointed to his case. As they looked at the DNA results, Anderson tried to make sense of a crime he had no memory of committing.

561



Photos from the crime scene, clockwise from top left: Raveesh Kumra's fingernail clippings; a pile of latex gloves found in the sink; the ransacked Kumra mansion; and mustache-print duct tape used to tie up the victims. SAN MATEO COUNTY CRIME LABORATORY AND LOS GATOS MONTE SERENO POLICE DEPARTMENT

"Nah, nah, nah. I don't do things like that," he recalls telling her. "But maybe I did."

"Lukis, shut up," Kulick says she told him. "Let's just hit the pause button till we work through the evidence to really see what happened."

What happened, although months would pass before anyone figured it out, was that Lukis Anderson's DNA had found its way onto the fingernails of a dead man he had never even met.

Back in the 1980s, when DNA forensic analysis was still in its infancy, crime labs needed a speck of bodily fluid    usually blood, semen, or spit    to generate a genetic profile.

That changed in 1997, when Australian forensic scientist Roland van Oorschot stunned the criminal justice world with a nine paragraph paper titled "DNA Fingerprints from Fingerprints." It revealed that DNA could be detected not just from bodily fluids but from traces left by a touch. Investigators across the globe began scouring crime scenes for anything—a doorknob, a countertop, a knife handle    that a perpetrator may have tainted with incriminating "touch" DNA.

But van Oorschot's paper also contained a vital observation: Some people's DNA appeared on things that they had never touched.

In the years since, van Oorschot's lab has been one of the few to investigate this phenomenon, dubbed "secondary transfer." What they have learned is that, once it's out in the world, DNA doesn't always stay put.

In one of van Oorschot's experiments, for instance, volunteers sat at a table and shared a jug of juice. After 20 minutes of chatting and sipping, swabs were deployed on their hands, the chairs, the table, the jug, and the juice glasses, then tested for genetic material.

562

Although the volunteers never touched each other, one third wound up with another's DNA on their palm. A third of the glasses bore DNA of volunteers who did not touch nor drink from them.

Then there was the foreign DNA—profiles that didn't match any of the juice drinkers. It turned up on about half of the chairs and glasses, and all over the participants' hands and the table.

The only explanation: The participants unwittingly brought with them alien genes, perhaps from the lover they kissed that morning, the stranger with whom they had shared a bus grip, or the barista who handed them their afternoon latte.

In a sense, this isn't surprising: We leave a trail of ourselves everywhere we go. An average person may shed upward of 50 million skin cells a day. Attorney Erin Murphy, author of "Inside the Cell," a book about forensic DNA, has calculated that in two minutes the average person sheds enough skin cells to cover a football field. We also spew saliva, which is packed with DNA. If we stand still and talk for 30 seconds, our DNA may be found more than a yard away. With a forceful sneeze, it might land on a nearby wall.

To find out the prevalence of DNA in the world, a group of Dutch researchers tested 105 public items    escalator rails, public toilet door handles, shopping basket handles, coins. Ninety one percent bore human DNA, sometimes from half a dozen people. Even items intimate to us—the armpits of our shirts, say    can bear other people's DNA, they found.

The itinerant nature of DNA has serious implications for forensic investigations. After all, if traces of our DNA can make their way to a crime scene we never visited, aren't we all possible suspects?

Forensic DNA has other flaws: Complex mixtures of many DNA profiles can be wrongly interpreted, certainty statistics are often wildly miscalculated, and DNA analysis robots have sometimes been stretched past the limits of their sensitivity.

But as advances in technology are solving some of these problems, they have actually made the problem of DNA transfer worse. Each new generation of forensic tools is more sensitive; labs today can identify people with DNA from just a handful of cells. A handful of cells can easily migrate.

A survey of the published science, interviews with leading scientists, and a review of thousands of pages of court and police documents associated with the Kumra case has elucidated how secondary DNA transfer can undermine the credibility of the criminal justice system's most-trusted tool. And yet, very few crime labs worldwide regularly and robustly study secondary DNA transfer.

This is partly because most forensic scientists believe DNA to be the least of their field's problems. They're not wrong: DNA is the most accurate forensic science we have. It has exonerated scores of people convicted based on more flawed disciplines like hair or bite-mark analysis. And there have been few publicized cases of DNA mistakenly implicating someone in a crime.

But, like most human enterprises, DNA analysis is not perfect. And without study, the scope and impact of that imperfection is difficult to assess, says Peter Gill, a British forensic researcher. He has little doubt that his field, so often credited with solving crimes, is also responsible for wrongful convictions.

"The problem is we're not looking for these things," Gill says. "For every miscarriage of justice that is detected, there must be a dozen that are never discovered."

The phone rang five times.

"Are you awake?" the dispatcher asked.

"Yeah," lied Cpl. Erin Lunsford.

"Are you back on full duty or you still light duty?" she asked, according to a tape of the call.

Lunsford had been off crutches for two weeks already, but it was 2:15 a.m. and pouring rain. Probably some downed tree needed to be policed. "Light duty," Lunsford said.

"Oh," she said. "Never mind."

"Why, what are you calling about?" he asked.

"We had a home invasion that turned into a 187," she said. Cop slang for murder.

"Shit, seriously?" Lunsford said, waking up. Lunsford had served all 15 of his professional years as a police officer at the Los Gatos  Monte Sereno Police Department, a 38  officer agency that policed two drowsy towns. He rose through the ranks and was working a stint in the department's detective bureau. He had mostly been investigating property crimes. Los Gatos, a wealthy bedroom community of Silicon Valley, averaged a homicide once every three or four years. Monte Sereno, a bedroom community of the bedroom community, hadn't had a homicide in roughly 20.

Lunsford got dressed. He drove through the November torrent. He spotted cop cars clustered around a brick and iron gate. An ambulance flashed quietly in the driveway. Beyond it, the lit

Kumra mansion.

Lunsford's boss told him to take the lead on the investigation. The on scene supervisor walked him through the house. Dressers emptied, files dumped. A cellphone in a toilet, pissed on. A refrigerator beeping every 10 seconds, announcing its doors were ajar. Raveesh's body, heavyset and disheveled, on the floor near the kitchen. His eyes still blindfolded.



Sgt. Erin Lunsford of the Los Gatos-Monte Sereno Police Department was the lead investigator in Kumra's murder.
CARLOS CHAVARRÍA FOR THE MARSHALL PROJECT

An investigator from the county coroner's office arrived and moved Kumra's body into a van. Lunsford followed her to the morgue for the autopsy. A doctor undressed the victim and scraped and cut his fingernails for evidence. Lunsford recognized Raveesh, a wealthy businessman who had once owned a share of a local concert venue. Lunsford had come to the Kumra mansion a couple times on "family calls" that never amounted to anything: "Just people arguing," he recalled. He had also run into him at Goguen's Last Call, a dive frequented by Raveesh as a regular and Lunsford as a cop responding to calls. Raveesh was an affable extrovert, always buying rounds; the unofficial mayor of that part of town, Lunsford called him.

In the coming days, as Lunsford interviewed people who knew the Kumras, he was told that Raveesh also had relationships with sex workers. Raveesh and Harinder had divorced around 2010 after more than 30 years of marriage, but still lived together.

While Lunsford attended the autopsy, a team of gloved investigators combed the mansion. They tucked paper evidence into manila envelopes; bulkier items into brown paper bags. They amassed more than 100.

Teams specializing in crime scene investigations were first assembled over a century ago, after the French scientist Edmond Locard devised the principle that birthed the field of forensics: A

565