224

## The Power of the Polymerase Chain Reaction (PCR)

Every effective forensic laboratory utilizes PCR to amplify minute amounts of DNA to derive an identifiable profile. PCR amplifies short tandem repeats (STRs) within a DNA sequence and electrophoresis then separates the STRs by length, and visualizes them as peaks on an electropherogram (Gilbert, 2010). Each individual (excluding identical twins) possesses a unique set of STR peaks that creates an identifiable profile. The standard analysis of a DNA sample requires around 200 picograms of DNA, or roughly 33 cells of DNA material (Gilbert, 2010). New methods will amplify DNA that cannot even be visualized; for example, low-copy-number analysis, which has the ability to generate at least partial profiles from just a few human cells.

Low-copy-number (LCN) analysis does have some downsides despite its impressive sensitivity levels. A 'drop-out' or 'drop-in' effect heavily distorts any type of effective analysis (Gilbert, 2010). STRs present in the original sample may 'drop-out' and fail to appear in subsequent visualization, while contaminants in the PCR may cause STRs to 'drop-in' to the results (Gilbert, 2010). Either phenomenon poses a risk to the integrity of the sample, as it alters the profile readout and may mislead the technician analyzing or comparing it.. A technician performing PCR analyses should strive for an accurate and contaminant-free amplification process rather than a semi-accurate hyper-amplification of samples likely to contain some form of contamination or distortion (Gilbert, 2010).

## The Amanda Knox Murder Trials

Contamination has the potential to affect a criminal investigation long after the crime occurs; a case introduced to the judicial system with contaminated evidence will in turn have a

THEMIS

Published by SJSU ScholarWorks, 2015

225

contaminated verdict. The Amanda Knox murder trials were held within the Italian justice system, but the contamination issues are nonetheless relevant to American systems and standards. Amanda Knox was suspected of murdering her roommate, Meredith Kercher, in 2007, despite DNA evidence linking another individual to the scene. Investigators ignored blood and fingerprint evidence to instead focus on several of Kercher's cells found on the blade of a kitchen knife found in the apartment shared by the women (Hogenboom, 2014). Knox's DNA was on the handle of the knife, and the identification of Kercher's DNA on the blade was enough for a conviction. Amanda Knox is now facing a third re-trial after her first two guilty-verdict trials were appealed and overturned. Experts are now arguing that Kercher's DNA was detected on the blade as a result of contamination during the evidence handling process (Hogenboom, 2014). If this was a true contamination event, then an enormous amount of Italy's resources have been spent fighting appeals and investigating Knox based on unsound forensic evidence. Over six years have passed since Kercher's murder. Claims of poor crime scene containment have created further controversy in the case, as sources noted multiple people entering and leaving the room where the murder occurred, and investigators without protective clothing (Hogeboom, 2014). Knox's defense further argue that appropriate laboratory procedures were not followed and certain evidence items were handed back and forth between investigators, possibly initiating contamination events (Hogenboom, 2014). These issues have drawn out the timeline, and still there hasn't been any closure or justice for those involved. If appropriate protocols were in place before this incident, fewer questions would remain about what actually took place that night in 2007. The Knox trials show the potential that

VOLUME III • 2015

226

contamination events have to wreak havoc in the judicial system; even a few cells can be the deciding factor in a conviction.

## Removing Unwanted DNA

There is no one-step method to remove contaminant DNA from a sample. A variety of sterilization techniques exist that utilize ionizing radiation or other chemical treatments (Shaw et al., 2008). Some of these methods are also hazardous and require extensive precautions and training to perform them.

## Comparison of Four Sterilization Methods

Shaw et al. (2008) compared the effectiveness of UV, gamma, and electron beam radiation as well as the reagent ethylene oxide to remove unwanted DNA contaminants. Using varying amounts of saliva on both porous and nonporous surfaces, all four methods were performed in triplicate and amplified with polymerase chain reaction (PCR). Sterilization with UV radiation did not degrade sufficient DNA from the sample; 100% of contaminated samples provided full DNA profiles following this technique. Gamma and electron beam sterilization was most effective with small volumes of DNA (1-2µL) but was not as effective with larger amounts. Only the electron beam radiation had the ability to remove all DNA contaminants with a 3% success rate. Ethylene oxide proved to be the most efficient of the researched techniques, with 13% of samples producing no DNA profiles upon analysis. No difference was found in the effect of surface (non-porous or porous) on subsequent sterilization and recovery of DNA profiles during this experiment. Researchers concluded conventional techniques used for sterilization do not guarantee complete, consistent removal of contaminant DNA. Ethylene glycol was found to be most effective of the tested techniques for DNA removal, and is recommended by the authors for

THEMIS

Published by SJSU ScholarWorks, 2015

Themis: Research Journal of Justice Studies and Forensic Science, Vol. 3 [2015], Art. 12

227

sterilization of laboratory equipment made of plastic or metal. The use of ethylene glycol is restricted to smaller items and is not a common method readily available to the average crime lab, but has the most promising results for removing any amplifiable DNA within a sample.

## Further Study into UV Irradiation and Reagent-based Decontamination

The UV radiation technique was further studied and compared to chemically based decontamination methods in 2009 (Preusse-Prange et al., 2009). Researchers found an increase in decontamination as distance lessened between the UV source and the sample, while exposure time (ranging from 5 minutes to 24 hours) had no effect. It was also determined that a shorter wavelength of UV light was able to reduce the presence of DNA in a sample with greater efficiency. Despite these results the authors of the study only attribute the tested methods to contamination reduction as opposed to complete elimination. The importance of avoiding contamination prior to any laboratory analysis is a vital issue as long as current technology is unable to fully eliminate contaminants.

## Removing PCR-Related Contaminants

Even if a few DNA molecules from a previous examination contaminate a PCR reaction, the amplification possibilities of the technology pose a risk for future analysis.

After a selected fragment of DNA is amplified, it will have dUTPs in it; something unamplified DNA does not possess. Crime labs couple PCR with an enzyme called uracil-N-glycosylase (UNG), which degrades any unwanted amplification products from the sample (Pruvost, Grange & Geigl, 2005). UNG can be activated and inactivated as the PCR reaction is performed to ensure any unwanted DNA fragments from

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312
586
6

228

previous analyses do not contaminate subsequent cycling. UNG-coupled PCR is an effective technique to reduce risk of contamination during the amplification process, and should be utilized as a preventative measure whenever possible in the forensic laboratory. Although UNG-coupled PCR removes contaminants related to PCR processing, it cannot degrade a contaminant that was present in the sample before the analysis was performed.

## Sources of DNA Contamination

### DNA Transfer Upon Manufacture

Manufacturers of DNA instruments and equipment must also take great care to avoid DNA contamination during the manufacturing process. Some major companies like Promega have taken steps to minimize the occurrence of contamination by including recommendations for elimination databases, automated contamination checks, and national logs for contamination events. If companies that manufacture the collection swabs or evidence bags required for sterile crime scene collections do not take certain measures to prevent contamination, extensive police resources could be wasted on possibly flawed forensic results.

### The Phantom of Heilbronn

Known as "The Woman Without a Face", the Phantom of Heilbronn was one of Germany's most-wanted women, leaving DNA evidence at 40 crime scenes, including various burglaries and six murders, across Europe between 1993 and 2009 (Spiegel, 2009). Countless resources were spent trying to locate the Phantom and bring her to justice, particularly after her DNA was found during the investigation of a police officer's homicide in Germany. It took over a decade for investigators to determine the true identity of the elusive Phantom. In 2008, French police swabbed the body of a burnt male to attempt a DNA

THEMIS

Published by SJSU ScholarWorks, 2015

229

identification of his body, and were surprised to find the DNA of the Phantom as well (Spiegel, 2009). After inquiry into the equipment being used to process the Phantom scenes, it was discovered the Phantom was in fact a Bavarian woman working in the factory that manufactured swabs for investigative use. Thousands of hours had been spent investigating a woman who had no involvement in any of the crimes, all due to contamination. The extensive investigation into the identity of the Phantom could have been avoided if standards similar to those suggested by Promega were implemented. A forensic laboratory with access to employee DNA databases and required contamination checks would have identified the donor in weeks rather than decades.

## DNA Transfer at the Crime Scene
### Fingerprint Brushes and Powder

Sources for DNA deposits at a crime scene can include any item that has come into contact with an individual or their bodily fluids (saliva, sweat, semen, etc.) (Blozis, 2010). Latent fingerprints often contain enough skin or sweat to provide a full DNA profile of the donor. Therefore, great attention must be given to the fingerprint brushes and powder used to lift these latent prints from a scene in order to avoid DNA contamination and cross-contamination. Nonetheless, it is common practice to use the same brush to powder different objects at different scenes (van Oorschot, Treadwell, Beaurepaire, Holding & Mitchell, 2005).

Squirrel-hair brushes are frequently used in the United States to process latent fingerprints with black powder. A 2005 study conducted by Van Oorschot et al. tested the potential for DNA transfer with used brushes and powder. Some of the brushes used were used in casework, but others were purposely contaminated

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

230

with handprints, saliva, blood, or a mixture of the three. After analysis, both full and partial DNA profiles were recovered from used brushes and used powders, and transfer was occasionally seen between brushed surfaces (van Oorschot et al., 2005). Transfer was also noted between several subsequently brushed sheets of plastic following contact with dried saliva stains as well. Van Oorschot et al. (2005) advise all powder should be removed from the sample before amplification is performed, as powder presence seems to inhibit the PCR process. Overall, fingerprint brushes were shown to accumulate DNA and redeposit it to subsequently brushed items; this problem will worsen as DNA typing methods become more sensitive. Van Oorschot et al. (2005) provided recommendations to prevent contamination through fingerprint brushes or powder:

- Use alternative techniques to develop fingerprints without making contact with the print.
- Use separate, disposable brushes for powdering each object to avoid transfer.
- Prepare and use separate aliquots of powder so the same container is not being used for long periods of time.
- Avoid all contact with biological samples when possible.
- Develop more extensive sterilization methods for fingerprint brushes.
- Avoid applying powder to areas that you believe may be swabbed later for DNA collection.
- Pay attention to the type and condition of surface being brushed.

Glass fiber and bird feather fingerprint brushes are used more commonly in European countries. There, like American jurisdictions, brushes are typically used by departments for

THEMIS

231

several weeks and up to months at different crime scenes (Proff, Schmitt, Schneider, Foerster & Rothschild, 2005). Secondary transfer of DNA was also seen with both used and purposely contaminated brushes of this type, and research found that certain individuals could be considered "good DNA shedders" (2005, p. 602). The larger the area being powdered, the greater the likelihood of DNA transfer. Contamination while using these types of brushes was avoided if brushes were changed out between important exhibits or crime scenes. Proff et al. (2005) also suggested development of decontamination procedures for glass fiber and bird feather brushes, as current protocols are insufficient to prevent contamination.

**Evidence Packaging and Transport**

Departments have a large variety of evidence packaging materials to choose from. Each manufacturer provides standards for handling their products, but it is ultimately up to the department to develop a collection protocol for exhibits (Goray et al., 2012). In some cases, when an exhibit reaches the laboratory for analysis, the DNA has been "lost" or has been transferred to other areas of the evidence or its packaging due to improper evidence containment choices or other technician ignorance (2012). Goray et al. (2012) researched the potential for DNA transfer within evidence packaging through multiple trials with various packaging and scenarios (multiple exhibits in one bag, paper or plastic containment, etc.) and concluded that transfer is a likely occurrence (2012). Several tested scenarios showed issues with loose packaging, deposits on cotton material, and the collection of multiple exhibits in one bag. The strongest recommendation of Goray et al. (2012) was to package all evidence items separately. The evidence technician cannot be sure about the source of DNA at collection; therefore, all

VOLUME III • 2015

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

232

evidence should be packaged individually and supplemented with observations at the time of retrieval to prevent later confusion during analysis.

## DNA Transfer at the Forensic Laboratory

Even if the packaged evidence arrives at the forensic laboratory without contamination, preventive measures must continue to ensure no foreign DNA is deposited during analysis.

**Exhibit Examination**

Physical examination of an evidence item requires contact between the technician's tools and the exhibit. According to the aforementioned Locard's Exchange Principle, trace evidence of that contact will exist. In one study, mock forensic casework was performed to simulate examination with forceps, scissors, and gloves and varying contact times. Szkuta, Harvey, Ballantyne & van Oorschot (2013) found that DNA was transferred for all tools in all scenarios, the only exception being the forceps under brief-contact conditions. The tools analyzed were shown to have a greater contamination risk if used incorrectly; contact between tools and exhibit areas to be tested for DNA should be avoided if possible. If this cannot be accomplished, all tools that come in contact with suspected DNA samples must be sterilized or replaced immediately (Szkuta et al., 2013). The high potential for DNA transfer seen with forceps, scissors, and gloves highlights the necessity for heightened awareness of contamination even in a "sterile" laboratory.

Another study performed by Finnebraaten, Graner, and Hoff-Olsen (2008) examined the hypothesis that a speaking individual could contaminate an exhibit he or she is sitting or standing over. Subjects dressed in full protective equipment without a facemask repeated a sentence for 5 minutes and 1 minute in both the standing and sitting position. Full DNA

THEMIS

233

profiles were derived from the standing test group, but partial profiles were more prevalent (Finnebraaten et al., 2008). The presence of even a partial profile from speaking individuals in a workspace raises concerns about the same kind of contamination of evidence occurring at the crime scene. Extra care must be taken when handling evidence without appropriate protective equipment; even speaking has the potential to compromise the subsequent interpretation of evidence items.

## DNA Transfer in the Superglue Chamber

A superglue chamber is used in the forensic laboratory to develop latent fingerprints for easier visualization and analysis. Superglue is heated and turned to vapor in a controlled chamber with the evidence item. The superglue will bind to latent prints present on the object and make them visible. Because the chamber contains vaporized particles, movement of particulates within it is very possible. Gibb, Gutowski & van Oorschot (2012) swabbed a superglue chamber that had been in use without cleaning for several years. The chamber was then cleaned and tested again after certain numbers of fumigations had been performed. It was shown in this preliminary research that DNA has the potential to accumulate and transfer within the chamber. Gibb et al. (2012) suggested new standards to prevent DNA buildup and subsequent transfer:

- Incorporate filters or UV lights into chambers to degrade DNA between fumigations.
- Clean the chamber with appropriate reagents between fumigations.
- Place blotting paper at the bottom of the chamber that is changed out with each new fumigation.

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

592

12

234

- Maintain a staff DNA database to quickly rule out foreign contaminants, and a log for all employees to fill out when the chamber is used.

- Regularly take swabs from the chamber and analyze them to ensure no DNA is accumulating.

### DNA Transfer During Autopsy

Contamination can occur as a body is transported to the morgue as well as during autopsy (Schwark, Poetsch, Preusse-Prange, Kamphausen & von Wurmb-Schwark, 2011). Schwark et al. (2011) investigated what kind of DNA transfer was possible within an autopsy environment. Common tools used for each autopsy were tested for the presence of DNA profiles after sterilization; these items included measuring sticks, tables, neck rests, and forceps. A high contamination risk during forensic post-mortem examinations was found to exist and transfer between the table and the body being autopsied (Schwark et al., 2011). The only sanitation solution that fully removed DNA contaminants from autopsy tables was commercial bleach cleaner). Schwark et al. (2011) recommend monitoring autopsy tables for DNA material in between examinations to ensure that contaminants are not transferred over, or collecting DNA profiles from the deceased to have a database to refer back to in case contamination occurs.

THEMIS

Published by SJSU ScholarWorks, 2015

Themis: Research Journal of Justice Studies and Forensic Science, Vol. 3 [2015], Art. 12

235

*Table 1*

*Recommendations to Reduce Contamination in Forensic Science*

| Location of Contamination | Contaminated Object(s) | Contaminant Prevention |
|---|---|---|
| **Manufacturer** | Equipment used for sterile crime scene collections | -Maintain DNA databases with employee profiles<br>-Perform quality checks to ensure no contamination in final product. |
| **Crime Scene** | Fingerprint brushes and powder | - Decrease contact between latent print and developer; any brush that touches suspected biological material must be replaced<br>- Use disposable or sterilized fingerprint brushes<br>-Prepare small powder aliquots |
| | Evidence packaging | - Individually package <u>all</u> evidence collected from a scene<br>- Avoid use of loose packaging |
| **Forensic Laboratory** | Forceps, scissors, gloves | - Sterilize / replace all items that come into contact with biological samples<br>- Increase awareness of contamination risk when handling evidence |
| | Superglue chamber | - Use filters/UV rays to degrade DNA between analyses<br>- Clean chamber with appropriate reagents<br>- Regularly test the interior of chamber for contaminants |
| **Morgue** | Autopsy table and related equipment | - Sterilize surfaces and objects used for multiple cases with commercial bleach cleaner<br>- Create DNA database for deceased individuals processed at the facility |

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

594

14

236

## Conclusion

Research compiled worldwide over the past decade has focused on areas of forensic science vulnerable to DNA contamination. Researchers have identified a lack of standards and appropriate protocols as the primary problem. Table 1 shows known contamination sources and the research-recommended remedies for associated contamination events. If not addressed, DNA contamination will continue to beget financial and social costs, including potential convictions of innocent people. As the DNA technology advances in sensitivity, greater consideration must be given to the possibility of contamination, and its resultant consequences, by adopting firmer protocols regarding DNA evidence.

Further research devoted to the prevention of contamination should investigate a more universal reagent to remove all DNA from forensic collection and analysis equipment before use. A controlled method to remove DNA contaminants that can be utilized as needed – from the crime scene to the morgue – will decrease the overall prevalence of contamination events in forensic science. Contaminant DNA research is also needed in the area of crime scene equipment used in evidence collection, such as swabs and evidence bags. The development of sterile, recyclable equipment would be of great use to financially-strained departments.

## References

Blozis, J. (2010). Forensic DNA evidence collection at a crime scene: An investigator's commentary. *Forensic Science Review, 22(2),* 121-130.

THEMIS

Published by SJSU ScholarWorks, 2015

237

Finnebraaten, M., Graner, T., & Hoff-Olsen, P. (2008). May a speaking individual contaminate the routine DNA laboratory? *Forensic Science International: Genetics Supplement Series 1*, 421-422.

Gibb, C., Gutowski, S.J., van Oorschot, R.A.H. (2012). Assessment of the possibility of DNA accumulation and transfer in a superglue chamber. *Journal of Forensic Identification, 62(5)*, 409-424.

Gilbert, N. (2010). DNA's identity crisis. *Nature, 464*, 347-348.

Goray, M., van Oorschot, R.A.H., & Mitchell, J.R. (2012). DNA transfer within forensic exhibit packaging: Potential for DNA loss and relocation. *Forensic Science International: Genetics, 6*, 158-166.

Hampikian, G. (2012). Too much information. *Chemistry and Industry, 11*, 23.

Hogenboom, M. (2014, January 30). Kercher trial: How does DNA contamination occur? *BBC News*. Retrieved from http://www.bbc.com/news/science-environment-24534110

Preusse-Prange, A., Renneberg, R., Schwark, T., Poetsch, M., Simeoni, E., & von Wurmb-Schwark, N. (2009). The problem of DNA contamination in forensic case work-How to get rid of unwanted DNA? *Forensic Science International: Genetic Supplement Series 2*, 185-186.

Proff, C., Schmitt, C., Schneider, P.M., Foerster, G., & Rothschild, M.A. (2006). Experiments on the DNA contamination risk via latent fingerprint brushes. *International Congress Series, 1288*, 601-603.

Pruvost, M., Grange, T., Geigl E. (2005). Minimizing DNA contamination by using UNG-coupled quantitative real-

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

238

time PCR on degraded DNA samples: Application to ancient DNA studies. *BioTechniques, 38(4)*, 569-575.

Schwark, T., Poetsch, M., Preusse-Prange, A., Kamphausen, T., & von Wurmb-Schwark, N. (2011). Phantoms in the mortuary – DNA transfer during autopsies. *Forensic Science International, 216*, 121-126.

Shaw, K. et al. (2008). Comparison of the effects of sterilization techniques on subsequent DNA profiling. *International Journal of Legal Medicine, 122*, 29-33.

Spiegel Online International (2009, March 26). Q-Tip-Off: Police fear 'serial killer' was just DNA contamination. *Spiegel Online International*. Retrieved from http://www.spiegel.de/international/germany/q-tip-off police-fear-serial-killer-was-just-dna-contamination-a-615608.html

Szkuta, B., Harvey, M.L., Ballantyne, K.N., & van Oorschot, R.A.H. (2013). The potential transfer of trace DNA via high risk vectors during exhibit examination. *Forensic Science International: Genetics Supplement Series 4*, 55-56.

van Oorschot, R.A.H., Ballantyne, K.N., & Mitchell, J.R. (2010). Forensic trace DNA: A review. *Investigative Genetics, 1(14)*, 1-96.

van Oorschot, R.A.H., Treadwell, S., Beaurepaire, J., Holding, N.L., & Mitchell, R.J. (2005). Beware the possibility of fingerprinting techniques transferring DNA. *Journal of Forensic Sciences, 50(6)*, 1-5.

THEMIS

Published by SJSU ScholarWorks, 2015

Themis: Research Journal of Justice Studies and Forensic Science, Vol. 3 [2015], Art. 12

239

*Carly Balk graduated with her bachelor's degree in Forensic Biology from San Jose State University in 2014. She is currently pursuing her master's degree in Forensic Science through a distance learning program based at the University of Leicester, UK. During the summer months, she coordinates camps for children and teens that focus on forensic topics like DNA analysis and crime scene investigation. After finishing her master's degree, Carly plans to continue her academic endeavors in forensic science through research, field work and teaching.*

https://scholarworks.sjsu.edu/themis/vol3/iss1/12
DOI: 10.31979/THEMIS.2015.0312

598

18

*Australian Journal of Forensic Sciences*, 2015
Vol. 47, No. 4, 428–439, http://dx.doi.org/10.1080/00450618.2015.1004195



# DNA contamination minimisation – finding an effective cleaning method

Kaye N. Ballantyne[a,b]*, Renato Salemi[c], Fabio Guarino[c], James R. Pearson[a],
Dale Garlepp[d], Stephen Fowler[c] and Roland A.H. van Oorschot[a]

[a]*Office of the Chief Forensic Scientist, Victoria Police Forensic Services Department, Macleod,
Victoria, Australia;* [b]*School of Psychological Sciences, La Trobe University, Bundoora, Victoria,
Australia;* [c]*Biology Division, Victoria Police Forensic Services Department, Macleod, Victoria,
Australia;* [d]*Business Services Division, Victoria Police Forensic Services Department, Macleod,
Victoria, Australia*

(*Received 19 October 2014; accepted 10 December 2014*)

Recent environmental monitoring studies have highlighted a need to confirm cleaning procedures are performing to suitable levels for highly sensitive STR kits such as PowerPlex 21. To ensure that DNA contamination minimisation procedures are adequate, we have investigated the efficacy of sodium hypochlorite and a commercial, non-corrosive alternative, Virkon, at a range of concentrations for their DNA decontamination ability. Cleaning solutions were trialled across a range of body fluids and surface types, to cover the variety of potential contamination circumstances encountered within typical forensic laboratories. Given all factors tested, it was concluded that a 1% solution of sodium hypochlorite, sprayed on the surface and left for 5 min before drying and wiping with 70% ethanol, was able to remove DNA, saliva, blood, semen and skin cells from both smooth and pitted surfaces. However, safety testing revealed that the combination of hypochlorite and ethanol produced levels of gaseous chlorine at or above the recommended exposure limits. Subsequently, a cleaning protocol of 1% hypochlorite followed by distilled water was tested for efficacy, and subsequently introduced throughout the laboratory.

**Keywords:** DNA contamination minimisation; sodium hypochlorite; forensic; decontamination

## Introduction

The increasing sensitivity of forensic DNA typing techniques, whilst immensely beneficial for evidentiary analyses, is creating increased challenges to contamination prevention and minimisation during evidence collection and analysis. With PowerPlex 21 now standard across Australia, full 21-locus STR profiles can be obtained from as little as 100 pg[1], compared with 0.6 ng–1.25 ng with older systems such as Profiler Plus[2]. In addition to the increased sensitivity of amplification, continuous DNA interpretation systems such as STRmix[3] are able to deconvolute more complex and highly mixed profiles than previous semi-quantitative systems, allowing the detection of contamination in more samples than ever before.

Contamination has been shown to be one of the most common causes of error in forensic DNA analyses, and can have significant and irreversible consequences for

---

*Corresponding author. Email: kaye.ballantyne@police.vic.gov.au

© 2015 Australian Academy of Forensic Sciences

correct attribution of the source of the DNA[4]. Contamination events have been potentially involved in high profiles cases such as Farah Jama[5], Jaidyn Leskie[6,7] and Margaret and Seana Tapps[8] (Victoria, Australia), the Avenger of Zuuk[4] (the Netherlands), Jane Mixer[9] (Michigan USA), Profile N[10] (New Zealand), and Adam Scott[11] (Manchester, UK) to name just a few. In many of these instances, cross-case contamination is thought to have occurred through spatial and temporal proximity of examinations, with indications that DNA was transferred through contact with surfaces and/or tools used to examine both cases. Alternatively, contamination is thought to have occurred from a staff member during examination, or through the presence of background DNA on surfaces. A recent estimation of error rates in forensic DNA analysis from the Netherlands Forensic Institute found that contamination was one of the most common causes of error, with 0.11% of cases showing detectable contaminants across a 5-year period[4].

Previously, we have shown that the transition to the new STR typing methods results in increased detection of background DNA around the forensic laboratory[12]. The percentage of surfaces, equipment and consumables that showed detectable STR profiles increased from 23% with Profiler Plus to 69% with PowerPlex 21, with high risk items such as gloves, forceps and stickers all carrying detectable amounts of DNA. Furthermore, current cleaning protocols in use were found to be insufficient to remove contaminating DNA to levels suitable for PowerPlex 21. A review of cleaning procedures was therefore instigated, aiming to find a cleaning method suitable for use across the laboratory.

There is a surprising lack of empirical research into effective cleaning procedures suitable for forensic environments. Although several papers have investigated decontamination of plasticware and consumables[13 16], and others the effect of cleaning solutions on the ability to recover DNA profiles or perform body fluid identification tests[17,18], there are only two studies we are aware of that systematically compared cleaning solutions for surfaces and equipment[19,20]. The first compared a 5% sodium hypochlorite solution followed by a 70% ethanol wipe with the commercial DNA ZAP (Life Technologies) product, finding that there was not a significant difference between the two solutions except at the lower RFU levels. The second compared 10% sodium hypochlorite with DNA-Exitus Plus (AppliChem), finding that the two methods were comparable. However, both were relatively small studies (seven and eight samples respectively), and either utilised an in-house amplification method, or quantification only, rather than amplification with a commercial STR kit. Further, studies available to date have not investigated a range of surface types, a range of body fluids, or a range of cleaning solution concentrations, all factors that could greatly impact on decontamination levels. Other studies investigating decontamination methods focused on UV-, beta- or gamma-irradiation, ethylene oxide treatment or autoclaving, none of which are suitable for large laboratory areas such as benches or hoods, or sensitive equipment.

Outside of the forensic literature, there is immense variation in the types of solutions recommended and used, with a wide array of commercial products available. For example, Eppendorf recommends cleaning their pipettes with 5% sodium hypochlorite[12], whilst Promega suggests the use of 2–3% sodium hypochlorite for the decontamination of tools[22]. A 10% hypochlorite solution has been recommended for Gilson pipettes[23]. Commercial preparations such as DNA-Exitus Plus, DNA-Away (MBP), Trigene Advance (Trigene), DNA-Off (Pure Biotech) and others most commonly provide agarose gel electrophoresis visualisation results based on nanograms or micrograms of DNA to demonstrate the effectiveness of their product, rather than PCR analysis of minute traces of body fluids and cellular material as encountered in

430                                      *K.N. Ballantyne* et al.

forensics. Based on the studies listed above, non-forensic decontamination studies[24,25], and manufacturer information, we evaluated the applicability and suitability of cleaning methods and solutions within the forensic laboratory.

Whilst many of the commercial solutions advertise that they are able to completely remove contaminating DNA, the cost of many of these solutions was deemed prohibitive, given the high frequency and extensive cleaning required between items and cases within routine examinations. Some commercial decontamination solutions have been shown to have similar effectiveness to sodium hypochlorite[19,20] (albeit at much higher cost), or to inhibit the DNA profiling process[17]. In others, the active ingredients listed are not known to have a detrimental effect on DNA, and as such are unlikely to provide complete decontamination.

Sodium hypochlorite is known to effectively decontaminate surfaces, and is the most commonly utilised cleaning reagent in laboratories. However, the minimum concentration necessary for effective decontamination is not known. In addition, it is highly corrosive, and can cause skin and eye irritation. Therefore, the use of Virkon (DuPont) was explored as an alternative. This solution, based on the active ingredients potassium peroxymonosulfate and sodium chloride, has previously been used within a forensic laboratory[17], and provides full documentation regarding its active ingredients, ability to destroy nucleic acids, and safety. Key features of Virkon include the non-corrosive nature of the solution, and the built-in colour indicator of activity level, ensuring that out-of-date or ineffective solutions are not used.

The ability for sodium hypochlorite and Virkon at various concentrations to clean different types of body fluids, cells and DNA from a range of surfaces was explored, with the goal of finding an efficient, powerful and cost-effective cleaning method for forensic laboratories.

## Methods and materials

### *Cleaning agent investigation*

#### *Optimal concentration*

The empirical testing of sodium hypochlorite and Virkon was carried out in a three-stage approach. Initially, varying concentrations of each cleaning solution (sodium hypochlorite – 0.05% (the concentration in use at the time of the study), 1%, 5%, 10% v/v and Virkon 1, 3 and 5% w/v, selected to provide a wide range of concentrations for testing) were tested to determine their ability to destroy 'naked' DNA and DNA within saliva, both as wet and dry stains. All cleaning solutions were used within a week of dilution, and stored at room temperature, with hypochlorite protected from light.

*Dried stain*: Saliva (10 µl) or extracted DNA (50 ng within 10 µl of DNA IQ (Promega) extraction buffer were pipetted onto sterile glass slides and dried for 24 h. An equal amount of cleaning agent was then added to the stain, and spread by pipetting thoroughly to ensure the entire surface was covered with cleaning agent. Slides were left at room temperature for 5 min, and then immediately swabbed (wet/dry swabbing method[26]) until the surface of the slide was clean.

*Wet sample*: 10 µl of saliva or DNA solution was placed directly into a sterile microcentrifuge tube, with 10 µl of the cleaning agent, and mixed thoroughly by pipetting.

All samples, including control deposits not treated with any cleaning agent, were then DNA profiled as described below, with all performed in triplicate.

*Australian Journal of Forensic Sciences*    431

*Surface decontamination*

Following selection of the optimal concentration of the cleaning solution (1% hypo-chlorite and 5% Virkon), each solution was evaluated for its use on both smooth and rough surfaces, with blood, semen and skin. Controlled areas ($10 \text{ cm}^2$) of smooth plastic, smooth steel and pitted plastic were used to simulate different environmental surfaces commonly encountered within the laboratory. For each surface, 10 μl of freshly drawn, non-coagulated blood, 10 μl of semen, or touch (hands were rubbed vigorously together before deposition; control samples showed approximately equal deposition between prints) were deposited and allowed to dry for 30 min (skin) to 2 h (blood and semen). Following this, each was cleaned by spraying the deposition thoroughly with the cleaning solution, left for 5 min, and wiped dry. All sodium hypochlorite samples were subsequently sprayed with 70% ethanol and wiped dry (as this is standard procedure with hypochlorite to remove chlorite residue to prevent corrosion). To enable direct comparison, half of the Virkon-cleaned samples were also cleaned with ethanol in the same manner. All surfaces were then swabbed in the standard wet/dry manner. All samples, including control deposits not treated with any cleaning agent, were then DNA profiled as described below, with all performed in triplicate.

*Effect of ethanol on cleaning effectiveness*

During initial implementation of the revised cleaning method, concerns were raised regarding the formation of hazardous gases (chloroform and/or chlorine). Following testing (described below), revised experiments were performed with 1% hypochlorite used to clean blood and skin cells deposited on smooth and pitted plastic as described above. Within these tests, half of the samples were cleaned with 1% hypochlorite as described above followed by a 70% ethanol clean, and half were cleaned with 1% hypochlorite followed by a distilled water clean. Subsequent testing regarding the effectiveness of a 5 min cleaning time utilised 1% hypochlorite with a distilled water clean, with the hypochlorite either left on the surface for 5 min or wiped dry immediately. The effect of cleaning time was tested on DNA, blood, saliva and skin deposited as described above on smooth plastic and steel, and on a selection of commonly used items from the laboratory (ruler, pen, keyboard, Hemastix bottle and a metal tape measure. All surfaces were then swabbed in the standard wet/dry manner. All samples, including control deposits not treated with any cleaning agent, were then DNA profiled as described below, with all performed in triplicate.

**DNA profiling**

Following sampling, DNA was extracted with DNA IQ (Promega) on a Biomek Nxp liquid handling platform (Beckman Coulter) to a final volume of 50 μl. Quantitation was performed with the Quantifiler Human DNA Quantification kit (Life Technologies), and STR amplification with the PowerPlex21 System (Promega) as per the manufacturer's recommendations on robotic platforms. All amplifications were analysed on the 3500xL Genetic Analyser (Life Technologies) according to standard laboratory methods, and analysed with GeneMapper ID-X with a baseline threshold of 175RFU, where any profiles without peaks above 175RFU were considered negative. The average number of alleles and peak height was calculated for each category – in some instances, negative profiles caused the average peak height to be below 175RFU. In all such

cases, two of the three replicates were negative, with the remaining replicate displaying low peak heights and numbers of alleles.

### Chloroform and chlorine testing

In response to health and safety concerns regarding the combination of hypochlorite and ethanol, testing was performed to determine if hazardous levels of chloroform and/or chlorine were being released during cleaning. Chloroform testing was performed in several stages. Initially, a stock 12.5% solution of hypochlorite was used. Separately, either 1 mL of hypochlorite, 1 mL of (absolute) ethanol, or a mixture of 1 mL of each was added to a 500 ml Schott bottle, and passive headspace collection with charcoal tubes was performed for 1.25–1.5 h. Analytes were extracted by gravity flow with 1 ml toluene, and analysed with GC-MS.

Subsequently, environment testing was performed within a small enclosed space (Perspex glovebox, 58×55×47 cm), and within the general laboratory (large open space). For the enclosed testing, the interior of the box was sprayed with hypochlorite until visibly wet, left for 5 min, wiped, sprayed with 70% ethanol and wiped again. A charcoal tube was suspended in the box after the 5 min incubation of hypochlorite (prior to wiping and ethanol application), and allowed to passively absorb the headspace for 2 h. Within the laboratory, charcoal tubes were hung above benches (15 cm above surface, approximately face-height for most examiners) during cleaning with 1% hypochlorite and 70% ethanol, as per standard laboratory procedures. Tubes were allowed to absorb for 1 h after cleaning, during which time the benches were not used. All tubes were processed for the presence of chloroform as described above.

The presence of chlorine was detected with a handheld gas monitor (able to read 0.01–50 ppm chlorine) whilst cleaning was conducted within a controlled environment. Chlorine levels were measured during the spraying of 0.25, 0.5, 0.75 and 1% hypochlorite, during the wiping/drying of hypochlorite, and during the spraying and wiping of 70% ethanol. In addition, the level of chlorine released during a secondary water spray and wipe, following a hypochlorite spray and wipe, was investigated, as well as a three-stage clean with hypochlorite, water and ethanol. Chlorine readings were taken at both bench level and standing height.

## Results and discussion

### Optimal concentration of cleaning agents

Initially, the effectiveness of sodium hypochlorite and Virkon was evaluated at a range of concentrations for their ability to destroy both wet and dry extracted DNA and saliva. The positive controls of dried DNA and saliva produced, as expected, full profiles with peak heights averaging 5000–6000 RFU (Figure 1). All deposits treated with 0.05% hypochlorite produced complete profiles, with average peak heights of ~6500 RFU, and with up to 150 ng of DNA recovered from treated deposits. However, increasing the concentration of hypochlorite to 1% or greater completely eliminated all DNA from both wet and dried stains.

In contrast, Virkon was not able to destroy all DNA, particularly in saliva where 36–39 alleles were observed from samples treated with 1% Virkon, 1–38 alleles with 3% Virkon, and 0–6 alleles with 5% Virkon. It was more effective with extracted DNA, with only one wet DNA sample showing four alleles with 3% Virkon treatment

*Australian Journal of Forensic Sciences*                                433



Figure 1.    The effect of cleaning agent and concentration on the average peak height of alleles observed in PP21. Each bar represents three replicates; error bars represent 95% standard deviation. Controls for wet DNA and wet saliva were not performed.

(Figure 1). It is theorised that the proteins, electrolytes and cellular components within saliva may be inhibiting the active ingredients within Virkon.

From these data, it was concluded that a 1% sodium hypochlorite solution is sufficient to destroy DNA, whilst a 5% Virkon provided maximum decontamination possible for the solution. It should be noted that a higher concentration of Virkon could not be tested, as the manufacturer recommends that 4% is the maximum concentration that can be made. However, we found that 5% w/v was able to be dissolved completely, and remained stable.

### Surface decontamination effectiveness

The two cleaning agents were subsequently tested for their ability to clean three different surfaces contaminated with three different body fluids. In addition, the effect of removal of Virkon residue with ethanol was tested. Substantial differences in cleaning efficacy were observed between the different conditions (Figure 2).

Hypochlorite with an ethanol wipe was able to effectively clean the contaminating body fluids on both smooth plastic and steel across all replicates. However, it was not able to completely decontaminate samples on pitted plastic, with low amounts of DNA recovered (<50 pg total) and small numbers of alleles in both blood and touch samples.

The use of Virkon alone proved to be ineffective on both blood and semen samples on all surfaces, with measureable DNA concentrations and positive amplifications in all categories. However, Virkon was most effective at removing touch deposits, with no positive amplifications for any skin samples treated with 5% Virkon alone, or 5% Virkon with ethanol.

The use of a secondary ethanol wipe subsequent to initial cleaning with 5% Virkon proved to produce contradictory results – in some cases, substantially more DNA was recovered following the use of ethanol. It is possible that as Virkon does not appear to destroy cellular DNA effectively (as seen during initial concentration testing), the ethanol may have acted as a surfactant and lysing agent, making the remaining DNA more accessible to swabbing. This did not occur with touch DNA, possibly as there is less initial DNA present, and because a higher proportion of DNA is not enclosed within

434                                    *K.N. Ballantyne* et al.



Figure 2.    The effect of cleaning agents on the number of alleles (bars; left axis) and average peak heights (diamonds; right axis) observed following PP21 amplification. Each category represents three replicates; error bars represent 95% standard deviation. Average peak heights below 175 RFU represent categories where two of the three samples did not display detectable alleles (peak height of zero).

cellular membranes and nuclei[27,28]. However, it should be noted that in all cases except blood on pitted plastic the peak heights were very low (<500 RFU), which indicates that the vast majority of the deposited sample was destroyed/wiped away during cleaning.

The results suggested that 1% hypochlorite, followed by a secondary ethanol wipe, would be the most effective cleaning method across the range of surfaces and body fluids encountered within the laboratory. As a consequence, this method was introduced within the Biology Division at VPFSD, and environmental monitoring was performed to confirm results obtained in controlled trials. Samples from cleaned items (*n*=24) showed a substantial drop in the amount of background DNA, with a three-fold reduction in the levels observed, compared with that seen from similar items with 0.05% hypochlorite. Although 33% of samples taken did display detectable levels of DNA (ranging from 1 to 5 alleles; peak heights all under 500 RFU), this represents a substantial decrease in contamination levels compared with those seen previously with 0.05% hypochlorite (53% of samples positive; 1–58 alleles; peak heights under 1200 RFU)[12]. In addition, surfaces cleaned with 1% hypochlorite, which did not have detectable profiles or quantitation results did not show low-level peaks below the 175 RFU threshold, whilst those cleaned with 0.05% showed up to 28 additional alleles below the threshold.

However, following the widespread introduction of 1% hypochlorite and ethanol, concerns were raised regarding potentially hazardous gases being produced. In particular, it was postulated that the two solutions were combining to produce chloroform, resulting in headaches and eye irritation amongst staff exposed. It is known that hypochlorite can combine with substances in use in DNA laboratories such as guanidine thiocyanate (a key component in DNA IQ extraction systems) to generate toxic gas, but the combination of hypochlorite and ethanol has not yet been investigated to our knowledge, despite its general use and wide acceptance. To explore this, a range of samples were taken from liquid hypochlorite, combined liquid hypochlorite and ethanol, sprayed and wiped hypochlorite and ethanol in confined spaces, and sprayed and wiped hypochlorite in open areas. Headspace collection of vapours followed by GC-MS analysis demonstrated that chloroform is produced in high concentration when 1%



Figure 3. Emission of chlorine (top panel) and volatile organic compounds (bottom panel) during the cleaning process. Readings were taken during the spraying of hypochlorite, ethanol and water, the wiping of each, and from the waste paper towel after cleaning. The red line indicates the recommended exposure limit for chlorine (WorkSafe Australia). Panels 1a and 2a demonstrate the release of chlorine and volatile compounds when hypochlorite and ethanol are used, panels 1b and 2b hypochlorite, water and ethanol, and panels 1c and 2c hypochlorite and water.

hypochlorite and ethanol are mixed as liquids at room temperature within a closed environment. However, even within a small closed environment, when used according to the standard cleaning method where the hypochlorite is dried thoroughly prior to the application of ethanol, no chloroform was detected. If, however, the ethanol is sprayed onto surfaces still wet with hypochlorite, chloroform is produced at approximately 6 ppm, below the WorkSafe Australia exposure standard for chloroform at 10 ppm. Within an open laboratory environment, no chloroform could be detected above or around benches being actively cleaned with hypochlorite and ethanol.

On the other hand, analysis showed that chlorine gas was being produced during the cleaning process, at times above the recommended exposure levels, albeit briefly. Extensive testing showed that no chlorine is released upon the spraying of the hypochlorite solution itself, but that it is the application of ethanol that enables the chlorine to become vaporised (Figure 3). The amount of chlorine released is relatively constant, with detectable levels being produced with both 0.25% and 1% hypochlorite and ethanol. If water is used as the secondary cleaning solution, no detectable chlorine is produced. Chlorine can be detected in low amounts from cleaning waste (paper towel) immediately after use, but at a level below the recommended maximum exposure.

In light of the chlorine testing, the cleaning ability of 1% hypochlorite followed by distilled water was investigated. In addition, the use of a lower concentration of hypochlorite (0.25%) was investigated to further limit the potential hazard. As before, blood and skin was deposited onto smooth and pitted plastic, and cleaned in the appropriate manner. The results in Figure 4 show that whilst there was no significant difference in the decontamination of surfaces between the ethanol- and water-treated samples ($p = 0.484$), ethanol performed slightly better in the decontamination of blood samples. The 0.25% failed to destroy the DNA to a level equivalent to 1% ($p=0.024$).

Subsequent environmental monitoring around the laboratory of 1% hypochlorite followed by a water wipe ($n=15$) indicated a slight increase in the level of DNA present on items compared with the use of an ethanol wipe (from 33% of items with detectable DNA to 41%), but peak heights remained low (<400 RFU), and the number of alleles (maximum of 7 observed) indicated that only trace levels of DNA were remaining on



Figure 4.    The effect of ethanol and hypochlorite concentration on the number of alleles (bars; left axis) and average peak heights (diamonds; right axis) observed following PP21 amplification. Each category represents three replicates; error bars represent 95% standard deviation. Average peak heights below 175 RFU represent categories where two of the three samples did not display detectable alleles (peak height of zero).



Figure 5.   The effect of leaving hypochlorite to soak on the surface for 5 min on the number of alleles (bars; left axis) and average peak heights (diamonds; right axis) observed following PP21 amplification. Each category represents three replicates; error bars represent 95% standard deviation. Average peak heights below 175 RFU represent categories where two of the three samples did not display detectable alleles (peak height of zero).

items, at levels that were unlikely to be detectable if transferred. Previous research has shown that the percentage transfer of dried biological material and touch DNA is very low, generally below 1%[29,30].

To further reduce the potential exposure to hypochlorite, the effect of the cleaning time, where hypochlorite is left on the surface being cleaned for at least 5 min, was also explored. Controlled deposits of DNA, blood, saliva and skin cells on smooth plastic and steel cleaned with and without the 5 min soak time showed that overall there was little effect of time (Figure 5). Although increased quantities of DNA were observed with blood, incomplete decontamination of two of the six samples containing 19 and 20 alleles each caused this increased average. All other samples on these substrates with blood were negative. Likewise, cleaning with a 5 min soak time did not appear as effective as immediate cleaning for saliva on smooth steel in one sample (11 alleles), although the other two replicates were negative. Overall, however, there were no significant differences in levels of contamination observed, when hypochlorite was left for 5 min or cleaned immediately, in quantities recovered, number of alleles or peak heights observed (all $p$-values > 0.25). Subsequent testing on commonly used items likewise showed little difference between cleaning times, with an average of 3.4 alleles with peak height of 300 RFU with immediate cleaning, and 4.9 alleles and 155 RFU with a 5 min wait. Based on these data, it can be concluded that the 5 min wait time is unnecessary, although care should be taken with visible deposits of blood and with surfaces that may contain small pits and cracks, which may be difficult to clean fully.

Following the testing described above, VPFSD has introduced a 1% hypochlorite plus subsequent water wipe method of cleaning throughout the laboratory, a method that has been shown to effectively decontaminate contaminated surfaces, and is safe for use.

### References

1. Ensenberger MG, Hill CR, McLaren RS, Sprecher CJ, Storts DR. Developmental validation of the PowerPlex(®) 21 system. Forensic Sci Int Genet. 2014;9:169–178.

438                                  *K.N. Ballantyne* et al.

2. Frank WE, Llewellyn BE, Fish PA, Riech AK, Marcacci TL, Gandor DW, et al. Validation of the AmpFlSTR profiler plus PCR amplification kit for use in forensic casework. J Forensic Sci. 2001;46:642–646.
3. Taylor D, Bright J-A, Buckleton J. The interpretation of single source and mixed DNA profiles. Forensic Sci Int Genet. 2013;7:516–528.
4. Kloosterman A, Sjerps M, Quak A. Error rates in forensic DNA analysis: definition, numbers, impact and communication. Forensic Sci Int Genet. 2014;12:77–85.
5. Vincent FHR. Inquiry into the circumstances that led to the conviction of Mr Farah Abdulkadir Jama. Victorian Department of Justice; 2010. Available from: https://assets.justice.vic.gov.au/.../vincentreportfinal6may2010.pdf
6. Thompson WC. Report to Victoria state coroner's inquest into death of Jaidyn Leskie, 2003. p. 10. Available from: www.bioforensics.com/articles/Thompsonreport.pdf
7. Krane DE. Report to Victoria state coroner's inquest into death of Jaidyn Leskie, 2003. p. 10. Available from: www.bioforensics.com/conference10/Workshop/Kranereport.pdf
8. Thompson WC. The potential for error in forensic DNA testing (and how that complicates the use of DNA databases for criminal identification). New York University: Council for Responsible Genetics; 2008. Available from: http://www.councilforresponsiblegenetics.org/pageDocuments/H4T5EOYUZI.pdf
9. Thompson WC. Tarnish on the "gold standard": understanding recent problems in forensic DNA testing. The Champion. 2006 Feb;30:10–16.
10. Strutt M. Legally scientific? a brief history of DNA evidence in the criminal justice system. Justice action; 2001. Available from: www.parliament.vic.gov.au/images/.../Forensics-Michael_Strutt_4.pdf
11. Rennison A Report into the circumstances of a complaint received from the Greater Manchester Police on 7 March 2012 regarding DNA evidence provided by LGC forensics [Internet]. Forensic Science Regulator; 2012. p. 15. Report No.: FSR-R-618. Available from: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/118941/dna-contam-report.pdf
12. Ballantyne KN, Poy AL, van Oorschot RAH. Environmental DNA monitoring: beware of the transition to more sensitive typing methodologies. Aust J Forensic Sci. 2013;45:323–340.
13. Gefrides LA, Powell MC, Donley MA, Kahn R. UV irradiation and autoclave treatment for elimination of contaminating DNA from laboratory consumables. Forensic Sci Int Genet. 2010;4:89–94.
14. Tamariz J, Voynarovska K, Prinz M, Caragine T. The application of ultraviolet irradiation to exogenous sources of DNA in plasticware and water for the amplification of low copy number DNA. J Forensic Sci. 2006;51:790–794.
15. Shaw K, Sesardić I, Bristol N, Ames C, Dagnall K, Ellis C, et al. Comparison of the effects of sterilisation techniques on subsequent DNA profiling. Int J Legal Med. 2008;122:29–33.
16. Archer E, Allen H, Hopwood A, Rowlands D. Validation of a dual cycle ethylene oxide treatment technique to remove DNA from consumables used in forensic laboratories. Forensic Sci Int Genet. 2010;4:239–243.
17. Bright J-A, Cockerton S, Harbison S, Russell A, Samson O, Stevenson K. The effect of cleaning agents on the ability to obtain DNA profiles using the IdentifilerTM and PowerPlex® Y multiplex kits. J Forensic Sci. 2011;56:181–185.
18. Harris KA, Thacker CR, Ballard D, Court DS. The effect of cleaning agents on the DNA analysis of blood stains deposited on different substrates. Int Congr Ser. 2006;1288:589–591.
19. Vandewoestyne M, Van Hoofstat D, De Groote S, Van Thuyne N, Haerinck S, Van Nieuwerburgh F, Deforce D. Sources of DNA contamination and decontamination procedures in the forensic laboratory. Int J Forensic Pract Res. 2011;2.
20. Arena A. DNA Exitus plus$^{TM}$ versus standard bleach solution for the removal of DNA contaminants on work surfaces and tools. Investig Sci J. 2010 Jul.
21. Eppendorf. Care and maintenance of Eppendorf pipettes [Internet]. North Ryde. [Cited 10 Oct 2014]. Available from: http://www.eppendorf.com/img/au/lhsc/care_maintenance_pipettes_eag.pdf
22. Sundquist T, Bessetti J. Identifying and preventing DNA contamination in a DNA-typing laboratory. Profiles in DNA. 2005;8:11–13.

23. Mandel Scientific Company Inc. Decontamination the Gilson Pipetman family of pipettes. [Internet]. Guelph, Canada. [Cited 10 Oct 2014]. Available from: http://www.mandel.ca/support/PipetteEducation/Decontamination_2011.pdf
24. Champlot S, Berthelot C, Pruvost M, Bennett EA, Grange T, Geigl E-M. An efficient multistrategy DNA decontamination procedure of PCR reagents for hypersensitive PCR applications. PloS One. 2010;5:e13042.
25. Kemp BM, Smith DG. Use of bleach to eliminate contaminating DNA from the surface of bones and teeth. Forensic Sci Int. 2005;154:53–61.
26. Pang BCM, Cheung BKK. Double swab technique for collecting touched evidence. Legal Med. 2007;9:181–184.
27. Kita T, Yamaguchi H, Yokoyama M, Tanaka T, Tanaka N. Morphological study of fragmented DNA on touched objects. Forensic Sci Int Genet. 2008;3:32–36.
28. Alessandrini F, Cecati M, Pesaresi M, Turchi C, Carle F, Tagliabracci A. Fingerprints as evidence for a genetic profile: morphological study on fingerprints and analysis of exogenous and individual factors affecting DNA typing. J Forensic Sci. 2003;48:586–592.
29. Goray M, Eken E, Mitchell RJ, van Oorschot RAH. Secondary DNA transfer of biological substances under varying test conditions. Forensic Sci Int Genet. 2010;4:62–67.
30. Lehmann VJ, Mitchell RJ, Ballantyne KN, van Oorschot RAH. Following the transfer of DNA: how far can it go? Forensic Sci Int Genet Supp Ser. 2013;4:e53–e54.

Copyright of Australian Journal of Forensic Sciences is the property of Taylor & Francis Ltd and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.