# EXHIBIT 36

International Journal of Legal Medicine (2025) 139:935–943
https://doi.org/10.1007/s00414-024-03395-w

**REVIEW**



# Do forensic genetic markers disclose more information about us than they should? (A review)

Carlota Manglano de la Fuente[1] · Sara Palomo-Díez[2,3]

Received: 26 June 2024 / Accepted: 6 December 2024 / Published online: 8 January 2025
© The Author(s), under exclusive licence to Springer-Verlag GmbH Germany, part of Springer Nature 2024

## Abstract

The 20 established STRs that make up the CoDIS package must comply with national and international privacy rights and legal policies. Current research reveals that it is possible that certain genetic markers, used in forensic contexts, may show information about other neighboring markers that could reflect certain private characteristics of individuals. Therefore, we will aim to find out, through a literature review, whether there may indeed be associations between some of the STRs alleles established by CoDIS and medical and phenotypic conditions, with the aim of checking whether this problem has a real basis. To carry out this review, a systematic search has been carried out in different databases, as well as a critical evaluation of the articles collected and a synthesis of all the relevant studies. The results generally show that private phenotypic data of the individual can be known from certain STRs established by CoDIS, due to their association with neighboring genes. However, most of the papers state that practically none of the established associations offer proof of causality, but rather a relationship between some STRs and a phenotype.

**Keywords** Forensic genetics · Data privacy · STRs · CODIS · Loci · Phenotype · Genotype · TH01

## Introduction

Forensic Genetics is a scientific discipline that has undergone great progress in recent times, which has established itself as one of the tools of unquestionable utility in investigations and judicial processes [1, 2]. Nevertheless, it is necessary to continue researching to avoid errors that may compromise the privacy and intimacy of individuals.

In order to obtain a genetic profile, only non-coding DNA is analyzed, since the information that can be obtained from its analysis cannot, in any case, refer to aspects of the health or inheritance of certain traits of the individual or their ancestors, which can provide intimate or personal information of the subjects [3, 4].

However, current reviews show that there is increasing evidence that the non-coding DNA sequences that are analyzed, such as STRs, may be involved in the regulation of other parts of the genome that are involved in private characteristics of the individual, and thus are associated with the phenotype and confidential information of individuals [4, 5].

### Approach, transcendence, and definition of the problem subject of the work

One of the central points in Forensic Genetics, as established in Article 4 of LO 10/2007 (in the case of Spain) or in the Genetic Information Nondiscrimination Act (GINA) of the United States of America (USA), for example, is that the markers used for identification should not in any case reveal medical or phenotypic information about individuals. This is crucial for the legal and ethical frameworks that guide how samples are taken, how they are stored in databases, and how they are accessed. Despite the importance of safeguarding the privacy of individuals through forensic genetic

✉ Sara Palomo-Díez
spalomod@ucm.es

1  Medicine Faculty, Complutense University of Madrid, Madrid, Spain

2  Health Legislation, Psychiatry and Pathology Department, Medicine Faculty, The Complutense University of Madrid, Madrid, Spain

3  Forensic Genetics and Human Population Genetics Research Group, Complutense University of Madrid, Madrid, Spain

936                                                                                                    International Journal of Legal Medicine (2025) 139:935–943

profiling, few studies have addressed the issue since CoDIS forensic markers were established in the 1990s [1, 2, 6, 7].

The 20 Short tandem repeats (STRs) that form the CoDIS package were specifically chosen due to their location within the non-coding regions of the genome to prevent genetic profiling from revealing private information [8], but this assumption currently needs to be revised, so forensic genetic loci may reveal information about gene expression variation; that also could show confidential information about individuals [6].

In 1997 the FBI (Federal Bureau of Investigation, USA) named 13 STR loci to form the CoDIS core, which were deliberately selected because of their high identifying potential, and because they were not associated with any private physical or medical characteristics of the individuals. In 2017, seven additional STRs were added to the CoDIS core loci, making up the 20 STRs currently used for identification [6, 8].

Recent studies have shown that some of this CoDIS loci, particularly those selected before the human genome was sequenced, are very close to some genes. There is now a need to investigate whether the genotypes at the CoDIS loci could reveal information about neighboring markers, which would raise concerns about the medical and phenotypic privacy of individuals and their relatives [6].

## Legislation on the use of genetic markers

Taking into account all this information we can establish that it is important from a legal point of view, that CoDIS genotypes do not reveal medical or phenotypic information [6].

In May 2005, it was ratified the Prüm Treaty. This treaty has been key because from this moment on, cross-border cooperation between countries was allowed, which implied, in the field of DNA, the possibility of sharing data at an international level.

As established by Sánchez [9], at the international level we can cite, among others, the important work carried out by the Council of Europe, to which we owe the approval of the Convention on Biomedicine and Human Rights of 1997, which establishes in Article 10, Sect. 1, that every person has the right to respect for his private life when it comes to information relating to his health; as well as Chapter IV on the human genome, which states that no person may be discriminated against based on his genetic heritage (Article 11), in addition to the general prohibition of genetic tests predictive of disease (Article 12), as well as interventions on the human genome to modify it (Article 13).

The Prüm Decision constitutes an important example of cross-border cooperation for the exchange of data kept at the national level. This Decision, in the genetic field, establishes

provisions regarding automated access to DNA profiles, allowing the signatory countries to share the genetic profiles contained in their databases, thus enabling greater resolution of cases [10, 11]. The scientific authorities responsible for establishing the development of DNA databases have been the DNA Working Group of the European Network of Forensic Science Institutes (ENFSI) in Europe and the FBI Laboratory in the United States [12].

In addition, there is also the Schengen Information System whose database holds DNA profiles. However, it is necessary to clarify that, for this purpose, there are several limitations established by this system, given that the DNA profile may include sensitive information (such as possible health problems). Therefore, DNA profiles stored in the SIS should contain: "only the minimum information that is strictly necessary to identify missing persons and information on health, racial origin, and any other sensitive information should be expressly excluded" [11].

At the international level, moreover, the Universal Declaration on the Human Genome and Human Rights proclaimed by UNESCO implies opposition against the abuse of the human genome while protecting human dignity [13]. It seeks to establish the ethical framework for activities related to the human genome, setting forth principles of a lasting nature, although without binding value. In this same line, in which respect for the privacy and intimacy of individuals prevails, we can also find the International Declaration on Human Genetic Data and the Universal Declaration on Bioethics and Human Rights, both carried out by UNESCO [13, 14, 15].

As can be seen, all laws and treaties, both national and international, focus on the protection of privacy and intimacy of individuals, highlighting the importance of this right and the need to safeguard it. So that it is essential to establish which markers are analyzed in DNA tests to check if they are indeed STRs that can show confidential information or not. The Council of the European Union following the recommendations of ENFSI, in 2009, approved the establishment of a set of 12 STRs markers. ENFSI periodically updates the recommendations on DNA database management, adjusting the criteria for the inclusion and deletion of DNA profiles, international exchange systems, or types of matches. The United States, for its part, in 2017 established the 20 loci that make up the CoDIS system, including the purposed by Europe before [10, 12, 16].

## Ethical issues that may be involved in this problem

The right to privacy and intimacy is one of those included in the Universal Declaration of Human Rights, therefore, it is an independent, inalienable, and non-transferable right, which must be respected and protected by all people, as well



as by the different legislations, both national and international [17]. The possibility of the existence of certain markers that may compromise this issue raises ethical questions at the medical, research, human, and social levels.

The use of DNA has been developing at an unstoppable pace with little time to evaluate all its consequences and applications. For this reason, its study must be considered from a multidisciplinary perspective that takes into account both the most important scientific and technical aspects as well as legal and ethical issues. On multiple occasions there is a tendency to trivialize DNA testing, arguing that it does not harm any human rights [13], since the incidence it has on physical integrity is minimal, however, this analysis can affect other more important rights and compromise a greater number of ethical issues [18].

Firstly, the privacy, intimacy, and confidentiality of the individual may be put at risk, and data that goes far beyond mere personal identification may become known. Although it is considered to be a minimally invasive test, it can be more invasive than others (such as fingerprinting) by jeopardizing these extremely important rights [18].

On the other hand, if the family or racial origin or certain phenotypic traits become known, we would be talking about the possibility of certain situations of discrimination and stigmatization, again violating fundamental rights inherent to human beings. The same could happen in the case that certain diseases or psychiatric disorders could be known through the genetic markers analyzed [18].

Furthermore, it must be considered that all these ethical issues are mainly incumbent on the individual from whom the DNA sample is analyzed, but also on third parties who are linked to this individual through genetic issues, thus compromising their privacy and intimacy in the same way [18].

## The bibliographic research

Under the objective of the present literature review, there have been selected 6 main articles [6, 19–22] that analyze different STR markers and look for a possible correlation between these or their neighbors and confidential medical or phenotypic characteristics of individuals. All the information obtained from these research articles has been analyzed, compared, and shared, to finally draw conclusions related to the sensitive genetic information that could be linked to the autosomal STRs currently used in the forensic field at an international level.

Regarding the different medical and personal information that could be extracted through STRs autosomal forensic analysis, we have found relations between some of these STRs and various diseases such as leukemia, cancer [5, 23–25], or even psychiatric pathologies such as schizophrenia [6, 21]. Also, other forensic genetic markers look to be associated with different phenotype characteristics. However, all these must be carefully analyzed, to determine if these relations have a real association or only a casual association.

## Associations between STRs for forensic use and neighboring genes

Bañuelos et al., [6] investigated whether the loci established by CoDIS could directly reveal information about the expression levels of neighboring genes. They remark that, although the CoDIS loci were chosen because at the time the researchers believed that no medical information would be revealed, their study has identified STRs whose genotypes are correlated with the expression of neighboring genes.

Their results build on previous work that found associations of the TPOX, TH01 and D2S1338 loci with other tissues [26] presented a study of STRs that revealed more than 28,000 associations between the number of STRs and expression of nearby genes).

Specifically, at first, the researchers observed six significant correlations among the following markers: D3S1358-LARS2; D18S51-KDSR; CSF1PO-CSF1R and TIGD6; D2S441-C1D; and FGA-PLRG1. Despite this, it was subsequently shown that the associations between: D3S1358-LARS2; D18S51- KDSR; and CSF1PO-CSF1R, were the result of a causal relationship, while the other associations were weak or spurious [6].

These results saw evidence that contradicts the assumption that genotypes established by CoDIS do not reveal private information about individuals, and, therefore, CoDIS loci can be used to obtain phenotypic information or medical expression of some genes.

Therefore, the analysis of the markers that commonly, and according to previous literature, showed more problems regarding the possibility of displaying confidential information was proposed, such as: CSF1R, LARS2 and KDSR.

CSF1R, which contains the STR CSF1PO in an intron, encodes a cytokine receptor that plays a key role in regulating microglia. Mutations in CSF1R lead to a variety of brain diseases, including leukoencephalopathy (which causes clumsiness, slurred speech, partial blindness and rapid deterioration of mental function), while inhibition of its function appears to improve some neuronal conditions, such as epilepsy, Alzheimer's disease and recovery from spinal cord injury. Furthermore, variation in CSF1R expression is associated with psychological and psychiatric diseases, such as depression and schizophrenia [6]. Since CSF1R expression



International Journal of Legal Medicine (2025) 139:935–943

is correlated with CSF1PO, the genotype established in CoDIS may be informative about all these conditions.

Regarding to LARS2, which contains the STR D3S1358 in an intron, encodes an RNA gene. Furthermore, it is considered an essential gene, as its mutations, which reduce or abrogate its function, have been associated with Perrault syndrome, MELAS syndrome and other conditions. On the other hand, KDSR, which is a neighbor of D18S51, encodes an enzyme involved in ceramide synthesis. Mutations in KDSR, which eliminate or decrease its enzymatic function, have been associated with a number of serious skin and platelet conditions [6]. These genetics studies again provide evidence that variation in LARS2 and KDSR expression affects a range of medical conditions, and thus may show sensitive information, and suggest that some loci established by CoDIS may reveal confidential medical information.

Wyner et al. [21] performed an analysis of a total of 57 studies that met their criteria, identifying that schizophrenia was the most frequently described trait with a total of 11 studies that, claimed to have found data on 14 different genetic polymorphisms potentially associated with eight loci. In addition, two articles specifically focused on the allele frequency among people who attempted suicide, resulting in a significantly higher frequency among ten different alleles from seven forensic loci [21].

The authors found that the diseases strongest associated with forensic loci were again schizophrenia and trisomies like Down syndrome.

Schizophrenia is a complex inherited mental health disorder characterized by delusions, hallucinations, and impaired social cognition. Schizophrenia is understood to be associated with multiple CODIS loci: FGA, TH01, VWA, D2S441, D2S1338, D8S1179, D16S539 and D18S51. Longer marker repeats at STRs D18S51 and D2S1338 were significantly more frequent in patients with this disease, a trend that is consistent with results observed in other major psychiatric disorders [21].

Nevertheless, the TH01 STR is the one most probably linked with schizophrenia. TH (tyrosine hydroxylase) is the rate-limiting enzyme involved in the biosynthesis of dopamine, epinephrine and norepinephrine; which act as neurotransmitters and hormones that help maintain the body's homeostasis [21].

Moreover, the TH01 STR has been also related with higher predisposition to violent behavior in some studies [27], maybe also related with the tyrosine hydroxylase metabolism.

Several articles highlight a strong relationship between different variations in TH expression and the development of neurological, psychiatric and cardiovascular diseases; the most prominent indicate that carriers of the TH01-7 allele (allele 7 of the TH01 marker) are more prone to depression;

and the TH01-8 allele was found more frequently in people with suicide attempts, depression or delusional disorder, neuroticism, anger, hostility and vulnerability (compared to those who did not carry the TH01-8 allele) [22]. In addition, the TH01-9 locus was associated with delusional disorder and extraversion. It is also noteworthy that the frequency of TH01-9.3 was higher in those who exhibited suicidal behavior. TH01 was also associated with other diseases such as sudden death syndrome and Parkinson's disease [22].

Moreover, TH01-10 was significantly overrepresented in individuals exhibiting violent behavior [3, 22, 28]. All of this may occur as the TH enzyme catalyzes the conversion of the precursor substance dopamine, norepinephrine and epinephrine [27].

In contrast to all this some contradictory associations were observed between TH01 and certain phenotypes, as none of the studies investigating TH01 identified any genotype directly associated with a disease; therefore, the authors conclude that the above associations should only be considered as possible or potential. Many of the traits associated with TH01 are multifactorial, meaning that they are affected by both genes and environment and should not be taken directly as causal [21].

The authors note that none of the 57 articles that were analyzed confirmed that a particular genotype was the sole cause of a phenotype. Furthermore, although some of the STRs were located within a functional gene, there was no study linking any region of these genes that included an STR to a disease [21].

The study by Wyner et al., [21] also collected some cases in which forensic STRs have been analyzed to see if certain cancer-related alleles could be detected [5, 21, 23, 25]. Of these, the study by Qi et al., [29] that investigated the presence of the D21S11-30.2 and D6S1043-18 (both CoDIS markers) alleles in a genetic profile could allow to detect predisposition to lung and liver cancer stands out [29].

Nevertheless, according to Wyner et al. [21], the risk of violating genetic privacy with this information is low, although it would be necessary to analyze how low and in what proportion it really is.

Alharbi et al. [19] studied STRs for forensic use in people with leukemia, observing that the blood of people with leukemia had more TH01-9.3 and TH01-9 alleles. The results of this study demonstrate that STRs markers could become useful in genetic studies of leukemia, but also show this information in cases where only the identity of the individual should be known. The main markers to which more attention should be paid because of this associative potential are: D21S11, TH01 and D19S433.

The most prominent of these is TH01, which many investigations have shown a strong association between it and its alleles with several diseases. The DNA profile studied



showed a strong link between TH01-9 and the presence of leukemia, which confirms the association between the allelic configuration of STR markers and this disease. Furthermore, these results are supported by previous studies that demonstrated strong relationships between TH01 and predisposition to several diseases [19], demonstrating that forensic STR markers can also provide more information than just identity.

From all the study and analysis performed by Wyner et al. [21], it is necessary to talk about causality and association, since the association of an STR with a phenotypic trait or a disease does not infer causality.

### Forensic STRs markers and their association with single nucleotide polimorphisms (SNPs)

Yang et al., [4, 22] studied those investigations in which it is assumed that the genotypes underlying some phenotypes could show confidential information as multiple markers are involved with other neighbors that are related to private data of the individual from linkage disequilibrium (LD). That LD between an STR and a SNP allows STR profiles to be connected to SNP profiles, and thus there is the possibility that STRs can predict phenotypes from SNPs [22]. According to the authors, the genotypes of most concern are related to phenotypic characteristics and biogeographic information (or genomic background). In this study, the authors analyze the association between STRs and three physical appearance characteristics (single or double eyelid, eyelid with or without epicanthus and loose or attached earlobe). After performing the analysis, the researchers found that there was hardly any association between the STRs studied with these facial characteristics except for two alleles: D2S1338-19 and FGA-18 [22].

As a conclusion to this study, the authors state that it is practically impossible to that STRs alone link phenotypic information and highlight the possibility that due to existing associations between phenotype-related SNPs and STRs, privacy rights of individuals may be violated if the whole genome is considered [22].

Similarly, Edge et al., [20] studies the legality of the use of forensic genetic markers stating that many investigations have examined phenotypic associations by matching associated SNPs with CoDIS markers. Some matches have such high match points that CoDIS genotypes could reveal SNP genotypes that, in turn, could reveal much more information than the CoDIS genotypes themselves, such as estimates about ancestry, medical conditions, and predictions about phenotype. In this regard, and contrary to the majority view of previous studies that CoDIS genotypes do not expose phenotypes, the authors of this research point out that if a person's profile is in a database such as CoDIS in principle

the phenotype can be known from the association between SNP and STR [20].

Kim et al. [30] have also shown that approximately 30–32% of parent-child pairs, and 35–36% of sibling pairs, can be identified from the SNPs of one member of the pair and the microsatellites (concretely the CODIS STRs markers) of the other. This suggests that just as it has been possible to perform familial searches in microsatellite databases using query SNP profiles, it may also be possible to search for SNP features (perhaps linked to private information about the individual) in microsatellite databases. It also shows that privacy issues arising from computations across multiple databases that do not share common genetic markers pose risks not only to database participants, but also to their close relatives [30].

### Progress in large-scale whole-genome sequencing techniques and next generation sequencing

In the field of case studies of linkage disequilibrium between SNPs and STRs, studies have been carried out in which a strong relationship between these two types of markers has been observed, leading in many cases to the association of some STRs with Mendelian disorders and complex traits, as well as with certain syndromes [31] and/or diseases. In these cases, it might be possible to associate determining STRs with physical traits determined by some SNPs in linkage disequilibrium with these STRs.

Indeed, genome-wide association studies (GWAS) have made it possible to establish LD relationships between SNPs and STRs, which have been further extended and deepened with the development of next-generation sequencing (NGS) technologies [32]. However, no such studies have been developed based on the CoDIS STRs used in forensic genetics, so there is a lack of specific data for this type of marker for forensic genetic identification. However, we need to consider the potential of these techniques should they ever be applied to forensically relevant genetic markers held in CoDIS; or be put in relation to this type of markers.

### Discussion

The data provided by the different investigations analyzed show important revelations that should be taken into account for future uses of forensic STR markers and DNA testing, so as not to infringe legal precepts that may involve an intrusion into the privacy and intimacy of individuals.

As an outstanding result of these studies, it is important to focus on the TH01 marker, which is undoubtedly the one most researcher refer to because of its association with many diseases, from mental conditions (such as schizophrenia) to



940                                                                                                International Journal of Legal Medicine (2025) 139:935–943

physical diseases (such as leukemia). This may be due to the fact that the TH enzyme is fundamental in many aspects of the human body, as it directly influences the nervous system, since it is responsible for catalyzing the production of neurotransmitters such as dopamine and adrenaline. Therefore, it influences emotion, learning, mood, behavior and is fundamental in the regulation of metabolism, since catecholamines (epinephrine (adrenaline), norepinephrine (noradrenaline) and dopamine) increase heart rate, blood pressure, respiratory rate, muscle strength and alertness; as well as regulating the amount of blood that goes to the main organs, such as the brain, heart and kidneys. In other words, this enzyme helps to maintain the homeostasis of the organism and is therefore associated with many fundamental parts of the human body, which makes the forensic marker associated with it, TH01, a possible indicator of different diseases (both physical and mental) of an individual.

Furthermore, this TH01 STR has been shown to be associated with tyrosine hydroxylase metabolism, which could be related to mental illnesses such as schizophrenia, or even violent behaviour [22]. It needs to be proven in more cases, but if this relationship were certain, in the case of using this STR marker in judicial processes involving violent crimes, this marker could provide useful information that could be considered in the process; with the ethical and loyal corresponding consequences.

Nevertheless, the TH01 STR is the one most probably linked with schizophrenia. TH (tyrosine hydroxylase) is the rate-limiting enzyme involved in the biosynthesis of dopamine, epinephrine and norepinephrine; which act as neurotransmitters and hormones that help maintain the body's homeostasis [27].

Moreover, the TH01 STR has been also related with higher predisposition to violent behavior in some studies [22], maybe also related with the tyrosine hydroxylase metabolism.

It is also noteworthy that one of the most frequently mentioned diseases in the different articles, beyond a physical disease, is a mental disease, specifically schizophrenia. The possibility of establishing that a subject has this disease from a DNA analysis has to do with the fact that it has a genetic etiology. Therefore, through linkage studies it would be possible to find out whether or not a certain gene is associated with this disease by studying a specific region of the chromosome that is thought to be associated. In addition, if the gene that transmits the disease is known, information can also be obtained from relatives of that person, that is to say, from third parties for whom no data should be available.

In both cases, despite being the forensic STR and the disease most frequently mentioned in the investigation, it appears that most of these investigations conclude that the associations found are not sufficient to jeopardize the

privacy of individuals, which extends to all other associations between forensic markers and phenotypes or diseases.

It seems that there are not so many doubts about the association between STRs and SNPs when analyzing the whole genome. Studies establish that it is possible to obtain information on private characteristics of individuals if a SNP associated with these characteristics is also associated with a forensic STR that could show this information.

Furthermore, the data proposed by Kim et al. [30] on the risk of identifying close relatives through SNPs raises an important topic for discussion, namely the use of SNP information databases for criminal identification purposes. Whether or not this is feasible depends on the legislation of each country, but there have already been several cases, especially in the United States, where forensic genealogy, by crossing databases of criminal interest with public databases, has been useful for identifying criminals (as in the case of the Gold State Killer or the case of Michelle Martinko) [17, 33, 34]. Similarly, this association between STRs and SNPs of clinical interest may lead to the identification of certain criminals through the genetic profiles of their relatives' SNPs in public genetic databases. In any case, the use of forensic genetic genealogy must be legally regulated [35].

These associations among STRs and SNPs are not also sensible to identifying potential criminals by the public external SNP databases, as mentioned. It is possible that also some STRs could revel personal private information related with SNP polymorphisms. This poses both a challenge and an opportunity, as it carries the risk of violating people's privacy and, at the same time, can help solve cases.

Therefore, it would be necessary to act in two ways:

On the one hand, from a technical point of view, assessing whether the STRs we are using are the most appropriate ones, or whether we should consider omitting any of those for which there is evidence of their potential contribution of private information; all the more so when this information may be relevant to a judicial decision because it implies a link to violent behavior or psychiatric pathologies. And on the other hand, in the case of the disclosure of data on family members, from a legislative point of view, it is necessary to regulate with rules where to set limits to protect privacy, but without hindering police investigations; and to assess what is a priority, without the possibility of identifying criminals or privacy. In this sense, the different legal systems of the different nations show remarkable discrepancies; in countries such as the United States, there is more freedom to act in this sense than in other European countries, such as Spain, where it is not possible to compare information between police and public databases [36].

As this work has shown, and as is evident from the results obtained, the association between forensic markers and confidential information about individuals, such as medical



conditions or phenotypic characteristics, exists. The data reveal that to a greater or lesser extent this possibility of compromising the privacy of individuals through DNA testing is real.

Furthermore, we must take into account that many of the associations observed in the TH01 marker are related to serious mental pathologies, such as schizophrenia. This is especially sensitive to take into consideration when it comes to judicial processes where the diagnosis of a disease of this type can be key in the final decisions of the judicial process and cannot be taken lightly.

However, it should be noted that despite the fact that most of the research establishes this association between forensic STRs and phenotypes or medical conditions, some of them do not assume that this same association is sufficient to jeopardize the fundamental right to privacy that all subjects have, considering that these associations that have emerged in their studies are low, weak or false positives, although it would be necessary to establish to what extent the association is not strong enough. Similarly, other studies affirm that, although these associations are real and stronger, there are many more things that interfere in the development of a disease or the formation of a phenotype than a gene associated with a genetic marker.

As a general summary of the results, it could be determined that the association between forensic markers and private characteristics of individuals, in general, does not infer causality (with the exception of genetic trisomies syndromes and the STRs: D21S11, D18S51 and D13S317; wo in these cases the presence of trhee alleles is indicative of the syndrome). That is, taking into account the trisomies exception, the fact that an STR is associated with some medical or phenotypic trait does not mean that the presence of that variant will produce an effect that in turn causes that disease or physical characteristic, because they are multifactorial.

## Conclusions

The aim of the present work was to clarify whether the loci established by CoDIS could reveal information about neighboring markers, questioning whether the DNA test only reveals information related to the identity of the individual and no other medical or phenotypic characteristics, which would imply a legal and ethical conflict over the privacy of individuals.

After reviewing the most recent research to confirm whether this approach has a real basis and whether there may be an intrusion into the confidential information of individuals, it can be established that most of the research suggests that there is an association between forensic STR markers and neighboring genes that may provide private

information, although what these studies also establish is that they cannot be taken as causal associations and therefore are not sufficient to intervene in the privacy of the subjects. There does seem to be a greater consensus that the associations between SNPs and STRs could reflect this confidential information.

Future research needs to focus on studying this association in more depth, as well as continuing research on forensic markers and neighboring genes to verify that these associations are low enough to affirm that the STRs established by CoDIS do not show confidential information, even though there may be an association between them and private medical or phenotypic information of individuals.

In any case, if a strong causal association was confirmed in any STR, as could be the case with TH01, the possibility of taking measures regarding the use of that genetic marker should be considered, in order to preserve the privacy of the individual.

**Acknowledgements** To the Universidad Complutense de Madrid.

**Author contributions** Carlota Manglano de la Fuente: Bibliographic search and selection. Analysis. Sara Palomo Díez: Research design. Supervision. Manuscript text editing.

**Funding** This work has not received funding.

**Data availability** This is a review without innedit data, so the data availability statement does not proceed. Nevertheless, the authors are available to provide any information via mail.

## References

1. Alonso AA (2004) Conceptos básicos de ADN forense. Nuevas técnicas de investigación del delito: Intervenciones Corporales y ADN, 1860–1871. ISSN-e 1888–7740
2. Gomes C, Palomo S, Baeza C, Arroyo E, López-Parra AM Tipos de polimorfismo y aplicaciones forenses. M. J. Anadón, A, Muñoz, Benito M (2022) (Coord.) en *Manual para el estudio de las Ciencias Forenses (pp. 283–305). Tébar Flores Editorial.* ISBN: 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-763-6
3. Pifarré Rubbel A (2019) Marcadores STR autosómicos de interés forense: amplificación y artefactos. Márquez, M. C. C., & Caballero, P. A. B. (Eds.) en *Genética forense. Del laboratorio a los tribunales* (pp. 161–188). Díaz de Santos. ISBN: 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- 213-4
4. Yang J, Chen J, Ji Q, Li K, Deng C, Kong X, Xie S, Zhan W, Mao Z, Zhang B, Yu Y, Li D, Cao Y, Cao D, Liu Q, Wu M, Chen F, Chen P (2022) Could routine forensic STR genotyping data leak personal phenotypic information? Forensic Sci Int 335:111311. https://doi.org/10.1016/j.forsciint.2022.111311
5. United Nations (1948) Universal Declaration of Human Rights. Adopted proclaimed by the General Assembly in its Resolution 217 A (iii), of December 10, 1948.*National Human Genome Research Institute Home| NHGRI.* (s. f.). https://www.genome.gov/
6. Bañuelos MM, Zavaleta YJA, Roldan A, Reyes RJ, Guardado M, Chavez Rojas B, Nyein T, Rodriguez Vega A, Santos M,



942                                                                                                                                    International Journal of Legal Medicine (2025) 139:935–943

Huerta-Sanchez E, Rohlfs RV (2022) Associations between forensic loci and expression levels of neighboring genes may compromise medical privacy. *Proceedings of the National Academy of Sciences*, *119* (40). https://doi.org/10.1073/pnas.2121024119

7. Katsanis SH, Wagner JK (2013) Characterization of the Standard and Recommended CODIS Markers. J Forensic Sci 58:S169–S172. https://doi.org/10.1111/j.1556-4029.2012.02253.x

8. Retz W, Rösler M, Supprian T, Retz-Junginger P, Thome J (2003) Dopamine D3 receptor gene polymorphism and violent behavior: relation to impulsiveness and ADHD-related psychopathology. J Neural Transm 110:561–572. https://doi.org/10.1007/s00702-002-0805-5

9. Sánchez YG (2008) La protección de los datos genéticos: el derecho a la autodeterminación informativa. DS: Derecho y salud 16(1):59–78. https://dialnet.unirioja.es/descarga/articulo/2570406.pdf

10. Council of Europe (1997) Convention for the Protection of Human Rights and Dignity of the Human Being with Respect to the Applications of Biology and Medicine (Convention Relating to Human Rights and Biomedicine), made in Oviedo on April 4, 1997. Ratified by Spain on April 4, 1997. Official State Gazette, 251, October 20, 1999.https://www.boe.es/boe/dias/1999/10/20/pdfs/A36825-36830.pdf

11. Council of Europe and European Court of Human Rights (ECHR) (2018) Handbook of European data protection legislation (2018 Edition).https://fra.europa.eu/sites/default/files/fra_uploads/fra-coe-edps-2018-handbook-data-protection_es.pdf

12. Alonso AA (2019) Las bases de datos de ADN de interés forense. Márquez, M. C. C., & Caballero, P. A. B. (Eds.) en *Genética forense. Del laboratorio a los tribunales* (pp. 425–443). Díaz de Santos. ISBN: 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-213-4

13. General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) (1997) Universal Declaration on the Genome and Human Rights, November 11, 1997. https://cnrha.sanidad.gob.es/documentacion/bioetica/pdf/Universal_Genoma.pdf

14. General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) (2003) International Declaration on Human Genetic Data, 32nd Meeting, Paris, October 17, 2003, v.1, 32https://unesdoc.unesco.org/ark:/48223/pf0000133171_spa.page=47

15. General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) (2006) Universal Declaration on Bioethics and Human Rights, SHS/EST/BIO/06/1, SHS.2006/WS/14. https://unesdoc.unesco.org/ark:/48223/pf0000146180_spa

16. Palomo S, Gomes C, Baeza C, López-Parra AM, Arroyo E (2022) El ADN en las ciencias forenses. M. J. Anadón, A, Muñoz & M. Benito (Coord.). En *Manual para el estudio de las Ciencias Forenses* (pp. 259–281). Tébar Flores Editorial. ISBN: 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-763-6

17. Su Ertürk M, Fitzpatrick C, Press M, Wein M (2022) L., Analysis of the genealogy process in forensic genetic genealogy. *J Forensic Sci*, 2022;67(6):2218–2229. https://doi.org/10.1111/1556-4029.15127. Epub 2022 Sep 4

18. Ortego IA (2019) Aspectos jurídicos y bioéticos del uso forense del ADN. Márquez, M. C. C., & Caballero, P. A. B. (Eds.) en Genética forense. Del laboratorio a los tribunales (pp. 495–517). Díaz de Santos. ISBN: 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-213-4

19. Alharbi SF, Alamri A, Elshehawi A (2022) The Impact of Leukemia on the Detection of Short Tandem Repeat (STR) Markers. *Cureus*. https://doi.org/10.7759/cureus.30954

20. Edge MD, Algee-Hewitt BFB, Pemberton TJ, Li J, Rosenberg N (2017) Linkage disequilibrium matches forensic genetic records to disjoint genomic marker sets. Proc Natl Acad Sci USA 114(22):5671–5676. https://doi.org/10.1073/pnas.1619944114

21. Wu Y, Zhang QM, Liu B, Yu G (2008) The analysis of the entire HLA, partial non-HLA and HPV for Chinese women with cervical cancer. J Med Virol 80(10):1808–1813. https://doi.org/10.1002/jmv.21251

22. Yang C, Ba H, Gao Z, Zhao H, Yu H, Guo W (2013) Case-control study of allele frequencies of 15 short tandem repeat loci in males with impulsive violent behavior. Shanghai Archives Psychiatry 25(6):354–363. https://doi.org/10.3969/j.issn.1002-0829.2013.06.004

23. Hui L, Liping G, Jian Y, Laisui Y (2014) A new design without control population for identification of gastric cancer-related allele combinations based on interaction of genes. Gen 540(1):32–36. https://doi.org/10.1016/j.gene.2014.02.033

24. Kazansky AV, Greenberg NM, Spencer DM (2003) Activation of Signal Transducer and Activator of Transcription 5 is Required for Progression of Autochthonous Prostate Cancer. Cancer Res 63(24):8757–8762

25. Li Q, Chu Y, yao y, Song Q (2024) A Treg-related riskscore model may improve the prognosis evaluation of colorectal cancer. J Gene Med 26(2):e3668

26. Fotsing SF, Margoliash J, Wang CL, Saini S, Yanicky R, Shleizer-Burko S, Goren A, Gymrek M (2019) The impact of short tandem repeat variation on gene expression. Nat Genet 51(11):1652–1659. https://doi.org/10.1038/s41588-019-0521-9

27. Wyner N, Barash M, McNevin D (2020) Forensic Autosomal Short Tandem Repeats and Their Potential Association With Phenotype. Front Genet 11. https://doi.org/10.3389/fgene.2020.00884

28. Linnoila M, Virkkunen M, Scheinin M, Nuutila A, Rimón R, Goodwin F (1983) Low cerebrospinal fluid 5-hydroxyindoleacetic acid concentration differentiates impulsive from nonimpulsive violent behavior. Life Sci 33(26):2609–2614

29. Qi X, Yu Y, Ji N, Ren S, Xu Y, Liu H (2018) Genetic risk analysis for an individual according to the theory of programmedonset, illustrated by lung and liver cancers. Gene. 673:107–111. Epub 2018 Jun 15. PMID: 29913241. https://doi.org/10.1016/j.gene.2018.06.044

30. Kim J, Edge MD, Algee-Hewitt Bfb, Li JZ, ad Rosenberg NA (2018) Statistical detection of relatives typed with disjoint forensic and biomedical loci. Cell 2018 Oct 18(3):848–858e6. https://doi.org/10.1016/j.cell.2018.09.008

31. Mitra I et al (2021) Patterns of de novo tandem repeat mutations and their role in autism. Nature 589:246–250. https://doi.org/10.1038/s41586-020-03078-7

32. Saini S et al (2018) A reference haplotype panel for genome-wide imputation of short tandem repeats. Nat Commun 9(1):4397

33. Glynn CL (2022) Bridging Disciplines to Form a New One: The Emergence of Forensic Genetic Genealogy. *Genes (Basel)*. 2022;13(8):1381. https://doi.org/10.3390/genes13081381

34. Phillips C (2018) The Golden State Killer investigation and the nascent field of forensic genealogy. Forensic Sci Int Genet 2018 Sep 36:186–188.    https://doi.org/10.1016/j.fsigen.2018.07.010Epub 2018 Jul 17

35. Ram N, Murphy EE, Suter SM (2021) Regulating forensic genetic genealogy. *Science*. 2021;373(6562):1444–1446. https://doi.org/10.1126/science.abj5724. 10.1126/science.abj5724

36. Spanish Organic Law 10 (2007) / of October 8, 2007, regulating the police database on identifiers obtained from DNA. *Official State Gazette*, 242, of October 9, 2007. https://www.boe.es/buscar/act.php?id=BOE-A-2007-17634

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

 Springer

International Journal of Legal Medicine (2025) 139:935–943                                                                                 943

Springer Nature or its licensor (e.g. a society or other partner) holds exclusive rights to this article under a publishing agreement with the author(s) or other rightsholder(s); author self-archiving of the accepted manuscript version of this article is solely governed by the terms of such publishing agreement and applicable law.

 Springer