```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
SHAKIRA LESLIE, on behalf of
herself and all others
similarly situated,

                Plaintiff,

        - against -

CITY OF NEW YORK; EDWARD CABAN,
Police Commissioner for the
City of New York, in his
official capacity; JEFFREY
MADDREY, Chief of Department
for the New York City Police
Department, in his official
capacity; JAMES ESSIG, Chief of
Detectives for the New York
City Police Department, in his
official capacity; BRIAN MCGEE,
Deputy Chief in the Forensic
Investigations Division of the
New York City Police
Department, in his official
capacity; and DR. JASON GRAHAM,
Chief Medical Examiner for the
City of New York, in his
official capacity,

                Defendants.

-------------------------------X
```

**MEMORANDUM AND ORDER**

22 Civ. 2305 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Named plaintiff Shakira Leslie ("plaintiff" or "Leslie") brings this action pursuant to 42 U.S.C. § 1983 on behalf of herself and all others similarly situated against defendants City of New York (the "City"), New York City Police Department ("NYPD")

Commissioner Edward Caban, NYPD Chief of Department Jeffrey Maddrey, NYPD Chief of Detectives James Essig, NYPD Deputy Chief in the Forensic Investigations Division Brian McGee, and Chief Medical Examiner for the New York Office of Chief Medical Examiner ("OCME") Dr. Jason Graham (collectively, "defendants").  Plaintiff seeks injunctive and declaratory relief for defendants' alleged violations of the Fourth Amendment to the United States Constitution and New York Executive Law Article 49-B.  Presently before the Court are the parties' cross-motions for summary judgment.  See ECF Nos. 128 ("Defs. Br."); 141 ("Pl. Br.").  For the reasons stated herein, defendants' motion is granted in its entirety and plaintiff's motion is denied.  Plaintiff's state law claim is dismissed without prejudice to refiling in the appropriate state forum.

## I.    Factual Background

The Court's recitation of the pertinent facts is derived primarily from the parties' Rule 56.1 Statements[1] and admissible materials submitted in connection with the present motions.[2]

### a. National and State DNA Indexing Framework

At the direction of Congress in the 1990s, the Federal Bureau of Investigation ("FBI") created the Combined DNA Index System ("CODIS") to facilitate the exchange of DNA identification

---

[1]    Both parties submitted Rule 56.1 Statements in support of their respective cross-motions for summary judgment.  See Defs. Local Civil Rule 56.1 Statement ("Defs. 56.1"), ECF No. 132; Pl. Local Civil Rule 56.1 Statement ("Pl. 56.1"), ECF No. 142. Both parties also submitted responses to each other's 56.1 Statements.  See Pl. Resp. to Def. Local Rule 56.1 Statement ("Pl. Counter 56.1"), ECF No. 147; Defs. Resp. to Pl. Local Rule 56.1 Statement ("Defs. Counter 56.1"), ECF No. 157.  Where the Court relies on facts drawn from any of the 56.1 Statements, it has done so because the record evidence duly supports the statements, no rule of evidence bars admission, and the opposing party has not disputed the facts or has not done so with citations to admissible evidence.

[2]    In support of her cross-motion for summary judgment, plaintiff submitted the declaration of Dr. Leighann Starkey, see ECF No. 145, the Director of Data and Research at The Legal Aid Society and expert in "applied social science research and data analysis," id. at 2.  Dr. Starkey's declaration includes an analysis of an "Abandonment Samples Spreadsheet" produced by defendants in discovery in response to plaintiff's request for the number of abandonment samples collected by the City and the number of DNA profiles generated by the OCME from those abandonment samples.  See id. at 2-5.  In support of their own motion and in opposition to plaintiff's cross-motion, defendants argue that Dr. Starkey's testimony should be precluded because: (i) plaintiff did not disclose Dr. Starkey as an expert witness and did not serve the required expert disclosures; (ii) plaintiff did not list Dr. Starkey as a witness on her Rule 26(a)(1) initial disclosures; and (iii) in any event, Dr. Starkey offers opinions that are based on conjecture or are otherwise irrelevant to the core constitutional issues in this action.  ECF No. 151 ("Defs. Reply") at 31-34. On reply, plaintiff argues that Dr. Starkey is an employee of plaintiff's counsel and only "presented calculations of the City's own data, which is not expert opinion evidence and thus not subject to the disclosure requirements." ECF No. 159 ("Pl. Reply") at 10-11.  Because Dr. Starkey's testimony does not need to be, and is not, considered in order to resolve the parties' motions for summary judgment, the Court need not rule on defendants' objection.

information among law enforcement agencies.  Defs. 56.1 ¶ 16; Pl. Counter 56.1 ¶ 16.  CODIS functions as an umbrella system of interconnected DNA indexes: the National DNA Index System ("NDIS"), maintained by the FBI; State DNA Index Systems ("SDIS"), maintained by all 50 states; and Local DNA Index Systems ("LDIS"), maintained at the city or county level.  Defs. 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17.  Enacted in 1994, Article 49-B of the Executive Law established New York's SDIS, authorized a regulatory structure for its operation, and imposed certain restrictions on the establishment of DNA laboratories and the collection of New Yorkers' DNA.  N.Y. Exec. Law art. 49-B.

New York City's LDIS is maintained by the OCME and is one of nine LDIS laboratories in New York State.  Defs. 56.1 ¶ 18; Pl. Counter 56.1 ¶ 18.  OCME performs forensic analysis, including DNA testing.  Defs. 56.1 ¶¶ 2, 3; Pl. Counter 56.1 ¶¶ 2,3.  DNA analysis at OCME is conducted by the Department of Forensic Biology (the "Laboratory").  Defs. 56.1 ¶ 3; Pl. Counter 56.1 ¶ 3.  The Laboratory has conducted forensic DNA analysis since 1992 and is accredited in forensic science testing to analyze biological samples using nuclear and mitochondrial DNA methods, as well as bodily fluid identification.  Defs. 56.1 ¶¶ 4, 5; Pl. Counter 56.1 ¶¶ 4, 5.  The Laboratory is accredited by (i) the ANSI-ASQ National

Accreditation Board, through the American Society of Crime Lab Directors/Laboratory Accreditation Board ("ASCLD/LAB"), and (ii) the New York State Division of Criminal Justice Services.  Defs. 56.1 ¶ 5; Pl. Counter 56.1 ¶ 5.  The Laboratory received its first ASCLD/LAB accreditation in 1995 and has remained continuously accredited in forensic science testing since that time.  Defs. 56.1 ¶ 6; Pl. Counter 56.1 ¶ 6.

### b. NYPD DNA Collection

In connection with criminal investigations, the NYPD routinely collects DNA evidence from both crime scenes and known individuals.  Pl. 56.1 ¶¶ 5, 6; Defs. Counter 56.1 ¶¶ 5, 6.  DNA samples from known individuals can be obtained through several methods: (i) consent; (ii) court order; or (iii) collection from items that the individual left behind, discarded, or otherwise abandoned.  Pl. 56.1 ¶¶ 7, 8, 10, 11; Defs. Counter 56.1 ¶¶ 7, 8, 10, 11.  Where the NYPD suspects that a person has committed a crime or is otherwise involved in criminal activity, detectives may provide suspects with items that will be partially consumed, such as cigarettes, water, soda, or coffee, and collect those items after use for DNA testing.  Pl. 56.1 ¶¶ 14, 15; Defs. Counter 56.1 ¶¶ 14, 15.  The NYPD has an established policy, as set forth in the NYPD Detective Guide, governing the collection of DNA samples

from items that suspects abandon, discard, or leave behind.  Pl. 56.1 ¶¶ 12, 14, 15, 16; Defs. Counter 56.1 ¶¶ 12, 14, 15, 16.  Such samples are commonly referred to by the NYPD as "abandonment suspect samples."  Pl. 56.1 ¶ 1; Defs. Counter 56.1 ¶ 1.

### c. Forensic DNA Testing

After collection, DNA samples are sent to OCME for testing and analysis.  Pl. 56.1 ¶ 55; Defs. Counter 56.1 ¶ 55.  Forensic DNA testing relies on the analysis of chromosomes, the discrete structures within cells in which DNA is organized.  Defs. 56.1 ¶ 7; Pl. Counter 56.1 ¶ 7.  Each individual carries 46 chromosomes that together contain that person's DNA.  Defs. 56.1 ¶ 8; Pl. Counter 56.1 ¶ 8.  DNA material in chromosomes is composed of genic ("coding") and non-genic ("non-coding") regions.  Defs. 56.1 ¶ 10; Pl. Counter 56.1 ¶ 10.  Only coding regions contain genes.  Defs. 56.1 ¶ 11; Pl. Counter 56.1 ¶ 11.  Non-coding regions do not contain genes.  Defs. 56.1 ¶ 11; Pl. Counter 56.1 ¶ 11.

Forensic laboratories, including OCME, use a process known as PCR/STR testing to create DNA profiles from DNA samples.  Defs. 56.1 ¶ 12; Pl. Counter 56.1 ¶ 12.  "PCR," short for polymerase chain reaction, is the process by which analysts copy DNA in order to generate a DNA profile.  Defs. 56.1 ¶ 13; Pl. Counter 56.1 ¶ 13.  Because many patterns found in DNA are shared among

-6-

individuals, forensic analysis focuses on short, repeated DNA segments called short tandem repeats, or "STRs." Defs. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14. STR analysis is central to DNA identification and makes it "possible to determine whether a biological tissue matches a suspect with near certainty." Maryland v. King, 569 U.S. 435, 443 (2013) (citation omitted); see also Defs. 56.1 ¶ 15; Pl. Counter 56.1 ¶ 15.

The FBI standardized DNA profile analysis by requiring that DNA profiles uploaded to CODIS contain results from 20 "core" locations, or loci, within STR regions. Defs. 56.1 ¶¶ 22, 24; Pl. Counter 56.1 ¶¶ 22, 24. These mandated loci ("CODIS loci") were selected from non-coding regions of chromosomes. Defs. 56.1 ¶ 23; Pl. Counter 56.1 ¶ 23. OCME's Laboratory uses a commercially produced DNA typing kit to perform DNA testing. Defs. 56.1 ¶ 25; Pl. Counter 56.1 ¶ 25. The Laboratory's current kit generates data from the 20 CODIS loci, as well as two additional loci drawn from non-coding regions of the chromosome. Defs. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26.

### d. OCME's LDIS and Suspect Index

OCME's LDIS contains several indexes used to store forensic DNA profiles that meet different criteria. Defs. 56.1 ¶ 19; Pl. Counter 56.1 ¶ 19. Relevant here are "known" indexes, which store

-7-

DNA profiles of identified individuals, and "forensic unknown" indexes, which store DNA profiles developed from evidentiary samples. Pl. 56.1 ¶ 81; Defs. Counter 56.1 ¶ 81. After OCME tests a crime scene DNA sample and generates a DNA profile, that profile is uploaded to the specific forensic index for which it is eligible; a crime scene profile may not be uploaded to more than one forensic index. Pl. 56.1 ¶ 82; Defs. Counter 56.1 ¶ 82. DNA samples collected from known suspects are likewise analyzed by OCME. Pl. 56.1 ¶ 7; Defs. Counter 56.1 ¶ 7. If the resulting profile satisfies certain criteria, it may be stored in a "known" index called the Suspect Index, which was created more than fifteen years ago. Defs. 56.1 ¶ 20; Pl. Counter 56.1 ¶ 20; Pl. 56.1 ¶ 83. DNA profiles uploaded to the Suspect Index are compared against past and future crime scene DNA evidence stored in OCME's forensic indexes. Pl. 56.1 ¶¶ 84, 85; Defs. Counter 56.1 ¶¶ 84, 85. Profiles uploaded to the Suspect Index are not eligible for upload to SDIS. Pl. 56.1 ¶ 88 Defs. Counter 56.1 ¶ 88.

### e. Plaintiff's Arrest and DNA Collection

At approximately 3:10 a.m. on July 3, 2019, NYPD officers observed a silver sedan driving in a bike lane and running a red light. Defs. 56.1 ¶¶ 28, 29; Pl. Counter 56.1 ¶¶ 28, 29. The officers pulled over the car, which was occupied by five

individuals, including Leslie, who was seated in the middle rear seat between two other passengers.  Defs. 56.1 ¶ 30; Pl. Counter 56.1 ¶ 30.  The officers ordered the occupants to exit the car one by one, beginning with the driver, Leslie's cousin Kymani Johnson, and the front-seat passenger, Leslie's cousin Tamarc Johnson. Defs. 56.1 ¶ 31; Pl. Counter 56.1 ¶ 31.  As Tamarc exited the car, an officer stated that he observed a gun behind her fanny pack and recovered it.  Defs. 56.1 ¶ 32; Pl. Counter 56.1 ¶ 32.  The firearm was loaded and had a defaced serial number.  Defs. 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33.  Leslie and the four other occupants were arrested for possessing the loaded firearm with a defaced serial number.[3]  Defs. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34.

Following her arrest, Leslie was transported to the 41st Precinct in the back of a police car.  Defs. 56.1 ¶ 35; Pl. Counter 56.1 ¶ 35.  During booking, officers took Leslie's jewelry and identification and her fingerprints.  Defs. 56.1 ¶ 36; Pl. Counter 56.1 ¶ 36.  Leslie was then placed in a cell and handcuffed to a bench, where she slept for approximately seven hours.  Defs. 56.1 ¶¶ 37, 38; Pl. Counter 56.1 ¶¶ 37, 38.  Shortly before 10:10 a.m.,

---

[3]    Under New York Penal Law § 265.15, the presence in an automobile of any defaced firearm is "presumptive evidence of its possession by all persons occupying such automobile at the time such weapon [] is found[.]"  N.Y. Penal Law § 265.15.

Officer Devernier Smith and Detectives Richard McClain and Ramon Salcedo woke Leslie up and brought her to an interview room.  Defs. 56.1 ¶ 38; Pl. Counter 56.1 ¶ 38.  When they entered, a white disposable cup was on the table.  Defs. 56.1 ¶ 39; Pl. Counter 56.1 ¶ 39.  Detective McClain removed Leslie's handcuffs and advised her of her <u>Miranda</u> rights.  Defs. 56.1 ¶ 40; Pl. Counter 56.1 ¶ 40.  During the ensuing five-minute interview, Leslie answered questions, denied knowing that a defaced firearm was in the car, and stated that she learned of the firearm at the same time the officers did.  Defs. 56.1 ¶ 41; Pl. Counter 56.1 ¶ 41.

Near the end of the interview, Detective McClain asked Leslie whether she wanted water, which she initially declined.  Defs. 56.1 ¶ 42; Pl. Counter 56.1 ¶ 42.  Detective McClain asked again and remarked that it would be some time before she had another opportunity to drink.  Defs. 56.1 ¶ 42; Pl. Counter 56.1 ¶ 42. Leslie then drank from the cup, and Detective McClain told her to keep drinking.  Defs. 56.1 ¶ 42; Pl. Counter 56.1 ¶ 42.  After Leslie placed the cup back on the table, Detective McClain resumed asking questions about her cousin's car.  Defs. 56.1 ¶ 42; Pl. Counter 56.1 ¶ 42.  Approximately thirty seconds later, the interview concluded.  Pl. 56.1 ¶ 140; Defs. Counter 56.1 ¶ 140. Leslie was handcuffed and escorted out of the room.  Pl. 56.1 ¶

140; Def. Counter 56.1 ¶ 140.  Within one minute, Detective McClain returned to the interview room and recovered the disposable cup from which Leslie drank.  Pl. 56.1 ¶ 140; Defs. Counter 56.1 ¶ 140; Defs. 56.1 ¶ 43.  The NYPD vouchered the cup as evidence and sent it to OCME for DNA analysis and comparison with DNA recovered from the defaced firearm.  Defs. 56.1 ¶ 44; Pl. Counter 56.1 ¶ 44; Pl. 56.1 ¶ 141.

OCME successfully generated DNA profiles from both the firearm and the cup.  Defs. 56.1 ¶¶ 45, 46; Pl. Counter 56.1 ¶¶ 45, 46.  From a swab of the firearm's trigger and trigger guard, OCME developed a profile reflecting a mixture of DNA from three individuals, with an unknown male profile constituting 76% of the mixture.  Defs. 56.1 ¶ 45; Pl. Counter 56.1 ¶ 45.  From the disposable cup, OCME generated a DNA profile reflecting two pieces of information about Leslie: (i) a unique identifying number corresponding to her genetic identity, and (ii) her biological sex (female).  Defs. 56.1 ¶ 46; Pl. Counter 56.1 ¶ 46; Defs. Br. at 1.

After comparing the profiles, OCME concluded that Leslie was "excluded as a contributor" to the DNA sample recovered from the firearm.  Defs. 56.1 ¶ 47; Pl. Counter 56.1 ¶ 47; Pl. 56.1 ¶ 142; Defs Counter 56.1 ¶ 142.  OCME uploaded and compared Leslie's DNA profile against profiles in OCME's LDIS, which produced no matches.

Defs. 56.1 ¶ 51; Pl. Counter 56.1 ¶ 51.  Following an initial appearance, Leslie appeared in court at least once more before all charges were dropped.  Defs. 56.1 ¶ 48; Pl. Counter 56.1 ¶ 48; Pl. 56.1 142; Defs. Counter 56.1 ¶ 142.  Leslie's cousin, the driver Kymani Johnson, ultimately pleaded guilty to a crime related to the defaced firearm.  Defs. 56.1 ¶ 50; Pl. Counter 56.1 ¶ 50.  OCME maintained Leslie's DNA profile in the LDIS Suspect Index from August 21, 2019 until May 13, 2022.  Pl. 56.1 ¶ 142; Defs. Counter 56.1 ¶ 142.

## II.  Procedural Background

This action was initially commenced by two plaintiffs, Shakira Leslie and Shamill Burgos, on March 21, 2022, seeking injunctive and declaratory relief for defendants' alleged violations of the Fourth Amendment and New York Executive Law Article 49-B.[4]  ECF No. 1.  Plaintiffs' complaint was accompanied by a motion for class certification.  ECF Nos. 9-11.  On May 20 and May 25, 2022, the parties exchanged pre-motion letters regarding defendants' proposed motion to dismiss.  ECF Nos. 32, 33.  On May 31, 2022, the Court permitted defendants to bring their motion without a pre-motion conference.  ECF No. 34.  The parties

---

[4]    On July 17, 2023, counsel for plaintiff informed the Court that Mr. Burgos no longer wanted to participate in this action, leaving only Leslie as a plaintiff.  ECF No. 82.

-12-

proposed a briefing schedule on June 9, 2022, and requested that briefing on class certification be stayed pending resolution of the motion to dismiss.  ECF No. 35.  The Court endorsed that proposal on June 13, 2022, and denied the class certification motion without prejudice to renewal.  ECF No. 36.

Defendants moved to dismiss for lack of subject matter jurisdiction on July 15, 2022.  ECF Nos. 45-47.  Plaintiffs opposed on August 22, 2022, ECF Nos. 55-56, and defendants replied on September 2, 2022.  ECF No. 63.  At the Court's request, the parties submitted supplemental briefing in February 2023 concerning the applicability of Pullman abstention.  ECF Nos. 64-66, 68-69.  The Court denied defendants' motion on March 24, 2023.  ECF No. 71.

On April 14, 2023, defendants filed an answer.  ECF No. 76. On April 28, 2023, the parties stipulated to defer class certification until after summary judgment.  ECF No. 79.  Following Mr. Burgos' withdrawal from this action, counsel requested leave to file an amended complaint on July 17, 2023 to remove Mr. Burgos as a plaintiff, which was granted the following day.  ECF Nos. 82, 83.  Plaintiff filed the Amended Complaint on July 19, 2023, seeking: (i) permanent injunctive relief prohibiting defendants from subjecting plaintiff and the putative class to the

"unconstitutional and unlawful practices" described in the Amended Complaint, and ordering the expungement of all DNA profiles in the Suspect Index; and (ii) a declaration that the taking, analyzing, and maintaining of DNA in the Suspect Index violates the Fourth Amendment; and (iii) a declaration that the Suspect Index violates Article 49-B of the Executive Law.  ECF No. 84 ("AC").

After a period prolonged by extension requests, discovery closed on June 6, 2025.  Defendants filed a motion for summary judgment on July 9, 2025, with a supporting memorandum, declarations, and exhibits.  ECF Nos. 127-33.  Plaintiff opposed and cross-moved for summary judgment on August 8, 2025.  ECF Nos. 140-44.  Defendants replied and opposed plaintiff's motion on September 8, 2025.  ECF Nos. 151-58.  Plaintiff filed a reply in support of her cross-motion on September 22, 2025.  ECF No. 159.

On October 14, 2025, plaintiff requested a pre-motion conference to discuss a renewed motion for class certification or, alternatively, a briefing schedule.  ECF No. 160.  Defendants opposed that request on October 17, 2025, noting that plaintiff had previously stipulated to defer class certification until after summary judgment.  ECF No. 161.  The Court denied plaintiff's request on October 28, 2025.  ECF No. 162.

### III. Legal Standard

#### a. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Factual disputes that are irrelevant or unnecessary are disregarded. Anderson, 477 U.S. at 248.

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). When moving against a party who bears the ultimate burden of proof at trial, the movant meets this burden by pointing to an "absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, (1986)). In assessing the record,

courts must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  Sec. Ins. Co. of Hartford, 391 F.3d at 83.

Once the moving party has satisfied its burden, to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  Conclusory allegations are insufficient to create a genuine issue.  Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990).  The opposing party "may not merely rest on the allegations or denials of his pleading[.]"  Wright, 554 F.3d at 266; see Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "scintilla of evidence" to defeat summary judgment) (quoting Anderson, 477 U.S. at 252).

The same standards of review apply when, as here, the court faces cross-motions for summary judgment.  Bell v. Pham, 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001)).  Each motion must be reviewed on its own merits, and the Court must draw all

reasonable inferences against the party whose motion is under consideration. Id.

## DISCUSSION

Plaintiff alleges that, unlike the established federal and state DNA systems, OCME's Suspect Index violates the Fourth Amendment and New York Executive Law Article 49-B. Specifically, plaintiff argues that (i) defendants' practice of collecting individuals' DNA, maintaining their DNA profiles in the Suspect Index, and comparing those profiles to crime scene evidence constitutes an unreasonable search in violation of the Fourth Amendment; and (ii) Article 49-B prohibits localities such as New York City from maintaining a DNA index comprised of arrestees and suspects, rather than individuals with criminal convictions. See generally Pl. Br. 10-29.

Defendants maintain that: (i) Leslie had no legitimate expectation of privacy in the disposable cup that contained her DNA; (ii) indexing and comparing a DNA profile derived from a lawfully-acquired DNA sample to other DNA profiles does not constitute a "search" under the Fourth Amendment; and (iii) the Court should decline to exercise supplemental jurisdiction over

-17-

Leslie's state law claim or, alternatively, reject it as meritless. See generally Defs. Br. 13-28.

Prior to addressing the specific constitutional question before it, we will outline the governing legal framework and controlling precedent covering the creation and use of forensic DNA databases and indexes.  First, we will review the constitutional treatment of DNA identification systems maintained by federal and state authorities, which provides the backdrop against which plaintiff's Fourth Amendment challenge must be evaluated.  We will then address the specific collection practices challenged here, focusing on whether the collection of Leslie's DNA from the cup constitutes a "search" within the meaning of the Fourth Amendment and, if so, whether such a search was reasonable. Finally, we will consider the contours and applicability of Article 49-B in deciding whether to exercise supplemental jurisdiction over plaintiff's state law claim.

## I.   Governing Framework for Forensic DNA Databases

### a. Applicable Fourth Amendment Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV. "The Supreme Court has articulated two tests to determine when a

search occurs within the meaning of the Fourth Amendment." United States v. McKenzie, 13 F.4th 223, 231 (2d Cir. 2021).  The first test, known as the "property baseline test," tracks the categories listed in the Fourth Amendment and recognizes a search when the government "obtains information by physically intruding on persons, houses, papers, or effects."  Id. at 231.  The second test, known as the "legitimate expectation of privacy test," forbids warrantless searches that violate an individual's legitimate, or reasonable, expectation of privacy.  Id. at 232. Under this second test, courts apply a two-pronged inquiry: (i) an individual must manifest a subjective expectation of privacy in the object of the challenged search, and (ii) that expectation must be one society is prepared to recognize as reasonable.  Id. If law enforcement's conduct "does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Fourth Amendment."  United States v. Poller, 129 F.4th 169, 174 (2d Cir. 2025) (citing Illinois v. Andreas, 463 U.S. 765, 771 (1983)).

Here, the property baseline test is inapplicable.  Leslie's DNA was not obtained through any physical intrusion into her body. Her blood was not drawn, her fingernails were not scraped, nor was the inside of her cheek swabbed.  Instead, Leslie's DNA was collected from a disposable cup that she sipped from during a post-

arrest interview and left behind upon exiting the room.  Compare
Cupp v. Murphy, 412 U.S. 291, 295 (1973) (applying the Fourth
Amendment to police efforts to scrape an arrestee's fingernails),
and Missouri v. McNeely, 569 U.S. 141, 148 (compelled blood draw),
and Maryland v. King, 569 U.S. 435, 446 (2013) ("King") (applying
the Fourth Amendment to the "gentle" intrusion of a buccal swab),
with Raynor v. State, 99 A.3d 753, 767-68 (Md. 2014) (analyzing to
DNA left behind on a chair at a police station).  The challenged
practices here are therefore governed by the legitimate
expectation of privacy test.

### b. DNA Analysis and CODIS Loci

Because this case turns on whether Leslie's expectation of
privacy in the cup containing her DNA was legitimate, the Court
first clarifies what forensic DNA analysis does, and does not,
reveal about an individual.  Modern forensic DNA analysis enables
law enforcement to establish with remarkable precision whether a
given individual's genetic profile matches evidence recovered from
a crime scene and, with equal reliability, to exclude those who
played no role in the offense.  See King, 569 U.S. at 442 ("[L]aw
enforcement, the defense bar, and the courts have acknowledged DNA
testing's 'unparalleled ability both to exonerate the wrongly
convicted and to identify the guilty.'") (quoting Dist. Attorney's

Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 55 (2009)).   DNA  testing  primarily  relies  on  an  analysis  of chromosomes, the structures within cells that contain DNA.  Id. at 442-43.  Chromosomes contain DNA material composed of coding and non-coding regions.  Id.  Coding regions contain genes that direct the production of proteins.  Id.  Non-coding regions, by contrast, do not encode proteins and have been referred to as "junk" DNA. Id.  These non-coding regions can be "used with near certainty to identify a person," yet they do not "show more far-reaching and complex characteristics like genetic traits."  Id.; see also Raynor 99 A.3d at 761.

The FBI standardized DNA profile analysis by requiring that profiles uploaded to CODIS include results from designated core loci.  King, 569 U.S. at 445.  Currently, the FBI requires analysis from 20 CODIS loci drawn from non-coding regions.  Defs. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26.  Because those loci come from non-coding regions, they "do not reveal the genetic traits of the arrestee."  King, 569 U.S. at 464.  In the Supreme Court's formulation,  a  CODIS  profile  therefore  functions  like  a fingerprint: "the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides."  Id. at 451; accord Williamson v. State, 993 A.2d

626, 639 (Md. 2010) ("[T]he only information collected from testing and storage of DNA profiles is the identity of the person whose DNA is being tested[.]"); United States v. Mitchell, 652 F.3d 387, 410 (3d Cir. 2011) (a DNA profile serves "solely as an accurate, unique, identifying marker -- in other words, as fingerprints for the twenty-first century.").

### c. Governing Precedent Upholding DNA Profile Creation, Indexing, and Comparison

Against this backdrop, the constitutional landscape governing and approving of forensic DNA identification and databases is largely settled.  In King, the Supreme Court considered whether a Maryland statute authorizing the collection of DNA via buccal swabs from individuals arrested for serious crimes violated the Fourth Amendment.[5]  The Court upheld the statute, holding that DNA identification of arrestees is a reasonable search under the Fourth Amendment that "can be considered part of a routine booking procedure."  King, 569 U.S. at 465.  The constitutional holding of King was not cabined to the particular provisions of the state

---

[5]    Importantly for purposes of this action, King involved a physical intrusion -- namely, the "gentle rub along the inside of the cheek" required to obtain a buccal swab.  King, 569 U.S. at 463-64.  That bodily intrusion, the brief and minimal nature of which was emphasized by the Court, was held constitutional because it did not "increase the indignity already attendant to normal incidents of arrest."  Id. at 464.

statute which was broadly the subject of the opinion.  Id. at 465-66.

Central to the Court's conclusion was its observation that the CODIS loci do not "intrude on [the arrestee's] privacy in a way that would make his DNA identification unconstitutional." Id. at 464.  Specifically, the Court explained that the CODIS loci "do not reveal the genetic traits of the arrestee" and are used "for the sole purpose of generating a unique identifying number against which future samples may be matched." Id.  Although the Court acknowledged debate over whether the DNA testing might reveal private medical information, it emphasized that the samples at issue were not, in fact, tested for such information.  Id. ("[A]lleles at the CODIS loci 'are not at present revealing information beyond identification' . . . And even if non-coding alleles could provide some information, they are not in fact tested for that end.").  Accordingly, the Court concluded that the creation and comparison of DNA profiles for identification purposes "is no different than matching an arrestee's face to a wanted poster of a previously identified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene." Id. at 451.

Six years prior to the Supreme Court's decision in King, the Second Circuit likewise endorsed the constitutionality of DNA indexing under a more stringent analytical framework.  In United States v. Amerson, the court applied the "special needs" doctrine, typically reserved for "suspicionless" searches under the Fourth Amendment, and upheld the federal DNA indexing statute as applied to convicted felons on probation.  483 F.3d 73, 89 (2d Cir. 2007).  The court applied that framework because the statute required individuals to provide a DNA sample for indexing in CODIS without "any suggestion that the individual is being suspected of having committed a crime (other than the one of which he had already been convicted)."  Id. at 82; cf. King, 569 U.S. at 463 (explaining special needs cases "do not have a direct bearing" on searches of lawful arrestees, who possess diminished expectations of privacy).

Acknowledging that DNA implicates significant privacy interests because of the sensitive information that could be extracted from genetic material, the Second Circuit nonetheless concluded that those interests were outweighed where the program limited the use of collected samples to identification purposes and served compelling government interests.  Amerson, 483 F.3d at 85-88.  As in King, the court recognized that DNA databases serve a vital dual function weighing in their constitutional favor:

-24-

assisting in the identification of perpetrators while exonerating the innocent.  Id. at 87 ("The greater accuracy and speed with which CODIS allows the government to apprehend and convict those guilty of crimes has, as we have seen, an equally important corollary -- its use in exonerating innocent people criminally suspected, convicted, or charged.").

In light of the foregoing, the creation and indexing of DNA profiles is, in general, constitutionally permissible.  A separate but related question remains: whether law enforcement's comparison of a lawfully obtained DNA profile against other profiles in a database constitutes an independent search requiring its own constitutional justification.  Established precedent indicates that it does not.

The Supreme Court's decision in Arizona v. Hicks, 480 U.S. 321 (1987), provides the governing framework for assessing the constitutionality of DNA profile comparison.  There, a police officer lawfully entered an apartment under exigent circumstances and observed stereo equipment he suspected had been stolen.  Hicks, 480 U.S. at 323.  To confirm his suspicion, the officer moved the equipment to view its serial numbers, recorded those numbers, and relayed them to headquarters, where they were checked against police records and identified as equipment stolen in an armed

robbery.  Id. at 323-24.  The Court held that moving the equipment to expose the serial numbers constituted a search under the Fourth Amendment, but that comparing the recorded numbers against existing police records did not independently implicate the Fourth Amendment.  Id. at 324-25.

The same logic applies to DNA profiles, as the court determined in Johnson v. Quander, 440 F.3d 489 (D.C. Cir. 2006). There, the court held that once an initial DNA sample has been lawfully obtained, "the government's storage and use of it does not give rise to an independent Fourth Amendment claim." Quander, 440 F.3d at 499.  That conclusion rested on the recognition that a DNA profile functions like a fingerprint and is akin to a "snapshot," revealing only unique identifying information "at a single point in time."  Id.

Thus, whatever constitutional question may attend the initial collection of a DNA sample, comparing the resulting profile to those already in a governmental database is no different from checking a serial number against police records or running a fingerprint through a database.  To hold otherwise would defeat, or at least substantially hinder, the dual purposes of DNA databases:  identifying perpetrators while exonerating the innocent.  As Judge Easterbrook observed in highlighting the

similarities between DNA and fingerprint profiles, the Fourth Amendment "does not control how properly collected information is deployed," and the "[u]se of DNA is in this respect no different from use of a fingerprint[.]"  Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004).  That analogy is apt.  Courts have not suggested that law enforcement must obtain a warrant each time a fingerprint is run though a database, and plaintiff identifies no authority to support such a rule.  There is no principled basis for treating DNA profiles differently.[6]  Indeed, King recognized and approved of DNA profile comparison and matching, observing that "[i]t is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which future samples may be matched," and that a DNA profile "is useful to the police because it gives them a form of identification to

---

[6]    The broad consensus of other courts is in accord on the comparison question.  See, e.g., Boroian v. Mueller, 616 F.3d 60, 67-68 (1st Cir. 2010) ("[W]e join the other courts to have addressed the issue in holding that the government's retention and matching of Boroian's profile against other profiles in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment."); Amerson, 483 F.3d at 86 (acknowledging that although offenders' DNA profiles will be retained and "potentially used to identify" offenders after probation ends, "we do not believe that this changes the ultimate analysis"); Wilson v. Collins, 517 F.3d 421, 428 (6th Cir. 2008) ("[T]o the extent the claim is premised on the retention and disclosure of personal DNA information, it does not implicate the Fourth Amendment[.]"); A.A. ex rel. B.A. v. Att'y Gen. of New Jersey, 914 A.2d 260, 267 (N.J. 2007) ("[I]t would be unreasonable to say that an object or substance could be lawfully searched and seized, but that it could not be used to solve a crime committed prior to the search and seizure.").

search the records already in their valid possession." King, 596 U.S. at 464, 451 (emphasis added). Like the creation and indexing of DNA profiles, the comparison of such lawfully obtained profiles is also constitutionally permissible.

## II. Leslie's DNA Profile Is Constitutionally Indistinguishable From That Which Was Upheld in King

At its core, plaintiff's challenge is an attempt to relitigate King through the lens of Carpenter v. United States, 585 U.S. 296 (2018). Plaintiff does not, because she cannot, dispute that the DNA profile created from the disposable cup revealed the same information at issue in King: a unique numeric identifier and her biological sex, generated from the same non-coding loci that the Supreme Court has held do not intrude on an arrestee's privacy in a constitutionally significant way. Defs. Br. at 1, 18-19. Instead, plaintiff invokes Carpenter and the evolving capabilities of DNA technology in an attempt to cast King as providing an insufficient answer to the privacy concerns she raises. As explained infra, that effort fails. Critically, plaintiff does not argue that the analysis performed on her DNA revealed anything that King did not contemplate, but rather that King should be read so narrowly as to have little application here. The Court declines to do so.

It is undisputed that OCME uses the standard 20 CODIS non-coding loci, plus two additional non-coding loci, to generate DNA profiles. Defs. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26. It is similarly undisputed that Leslie's DNA profile was not tested for, and did not reveal, physical traits, medical information, or genetic predispositions. Defs. Br. at 19. In every constitutionally relevant respect, Leslie's DNA profile was therefore the same as the profile upheld in King. That Leslie's DNA might theoretically have been subjected to a more searching analysis capable of revealing more intimate information is simply irrelevant. The Constitution speaks to, and this Court addresses, what the government actually did, not what it could have done. See Mitchell, 652 F.3d at 408 (explaining that courts have "declined to factor [the] future risk" of extracting sensitive information from non-coding loci into the assessment of the "constitutionality of the DNA collection program as it exists at present").

Courts applying King to similar facts are in agreement. In Raynor, the court held that DNA testing of CODIS loci within genetic material not obtained by means of a physical intrusion into an individual's body is no more a search for Fourth Amendment purposes than the testing of fingerprints or the observation of any other identifying feature exposed to the public. Raynor, 99

A.3d at 767-68. The court emphasized the analogy to fingerprinting, explaining that "a fingerprint, like the genetic material swabbed here, has no independent value to the police until it is tested and compared to other, previously collected fingerprints." Id. at 764. Similarly, in Commonwealth v. Arzola, the court held that DNA analysis of a lawfully obtained sample was "no more a search than an analysis of latent fingerprints would be." 26 N.E.3d 185, 191 (Mass. 2015). Here, too, "[a]part from the source's sex," the analysis of Leslie's DNA "revealed nothing more than the identity of the source." Id.

The value of DNA databases is illustrated by the facts of this case. Leslie's DNA profile was compared to DNA recovered from the defaced firearm, and that comparison excluded her as a contributor to a serious crime. Defs. 56.1 ¶ 47; Pl. Counter 56.1 ¶ 47. The DNA process worked precisely as designed, and it worked in Leslie's favor. This exculpatory result reflects the very "equally important corollary" identified in Amerson when discussing the vital investigatory dual function of CODIS. 483 F.3d at 87.

Because Leslie's profile falls squarely within the framework established by King, and because the use of non-coding loci for identification purposes has been expressly sanctioned by the

Supreme Court and the Second Circuit, the constitutional analysis is essentially complete.  Plaintiff's effort to reopen what King closed does not alter that conclusion.

### a. Plaintiff's Invocation of Carpenter Does Not Disturb the King Analysis

Plaintiff advances two related arguments in an effort to escape the force of King.  First, she contends that DNA technology is rapidly evolving and increasingly capable of revealing intimate information about individuals and their relatives.  Pl. Br. at 10-15.  Second, she argues that Carpenter requires courts to consider the range of privacies a technology could implicate, rather than limiting the inquiry to what information was actually revealed in a particular case.  Id.; Pl. Reply at 4-7.  On that basis, plaintiff contends that the Court must evaluate the constitutionality of DNA collection by reference to the full range of information that DNA analysis might someday disclose.  Id.; Pl. Reply at 4-7.  Taken together, these arguments amount to an invitation to revisit King through the lens of Carpenter.  The Court sees no reason to do so.

First, federal courts are courts of limited jurisdiction whose function is to resolve the controversy presented by the parties on the record before them.  See Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (holding that federal courts may only hear "real and substantial controversies" and may not issue

-31-

"opinion[s] advising what the law would be upon a hypothetical state of facts") (citations omitted).  It is undisputed that the testing performed on Leslie's sample was limited to 22 non-coding loci and that the profile generated from the cup revealed nothing beyond her biological sex and unique numeric identifier.  Defs. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26; Defs. Br. at 1, 18-19.

Plaintiff attempts to generate a factual dispute on this point by citing to a declaration from Dr. Maher Noureddine referencing a 2022 study and stating that "information contained at these [non-coding] loci may, in fact, reveal personal medical information." Pl. Counter 56.1 ¶¶ 23, 27 (emphasis added).  That dispute, to the extent it is genuine, is immaterial.  The relevant question under King and its progeny is not what non-coding loci could theoretically reveal, but rather what they revealed here: Leslie's biological sex and unique numeric identifier.  And as discussed supra, that information does not implicate privacy concerns under the Fourth Amendment.  The fact that Leslie's DNA might have disclosed more intimate information is "of no moment" because there is no allegation that law enforcement tested her DNA for that purpose.  See Raynor, 99 A.3d at 768.

Plaintiff's arguments concerning the expectation of privacy in her DNA therefore relate not to the non-coding loci used for

identification but to the hypothetical misuse of DNA.  See Pl. Br. at 13 ("[M]odern forensic DNA analysis can reveal myriad personal details[.]"); Pl. Reply at 5 (referring to the "vast information [the City] could extract from DNA"); Pl. Br. at 14 ("[T]echnology may soon enable the NYPD to collect DNA samples from suspects by vacuuming the air in interrogation rooms[.]") (emphases added). While courts have long acknowledged the possibility of such misuse and technological advancements, those issues are not before the Court.  As the Supreme Court explained, "[i]f in the future police analyze samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here."  King, 569 U.S. at 464-65.  In sum, plaintiff raises the specter of privacy harms that might arise if DNA technology were misused in the future, but that specter remains hypothetical.

Plaintiff's reliance on Carpenter is likewise unavailing. There, the Supreme Court held that the government's acquisition of cell-site location information ("CSLI") from a wireless carrier constituted a Fourth Amendment search because CSLI reveals a detailed chronicle of a person's movements, exposing familial, political, and professional associations continuously and without

any affirmative act by the user.  Carpenter, 585 U.S. at 311-15.
Plaintiff reads Carpenter to require courts to evaluate government
use of technology by reference to the full universe of private
information it might reveal.  Pl. Br. at 14-15; Pl. Reply at 4-6.
Even accepting that reading, it does not assist plaintiff here.
The Supreme Court was aware when it decided Carpenter that DNA
analysis had the theoretical capacity to reveal sensitive
information, yet it had expressly sanctioned the use of non-coding
CODIS loci analysis just five years earlier in King.  Nothing in
Carpenter suggests that it displaced that holding.[7]

Moreover, Carpenter's reasoning does not support plaintiff's
position.  The Court in Carpenter cabined its holding to the
distinctive characteristics of CSLI -- namely, that it
automatically generates a comprehensive, retrospective record of
an individual's physical movements over a period potentially
spanning years.  585 U.S. at 311-13, 316, 320.  The DNA testing at
issue here shares none of those characteristics.  Rather, the
testing was limited to 22 non-coding loci from a single sample and
produced nothing beyond a numeric identifier and biological sex.

---

[7]    Plaintiff fails to even mention, let alone grapple with, the fact that
Justice Kennedy authored the Court's opinion in King and dissented in Carpenter.
King, U.S. 435 at 438; Carpenter, 585 U.S. at 321.  It is a fair inference that
Justice Kennedy was not of the view that Carpenter raised an issue about the
soundness of King, which was not cited in Carpenter.

The breadth and intimacy of the information that made CSLI constitutionally distinctive in Carpenter are absent here, and plaintiff's attempt to invoke Carpenter's framework cannot supply what the facts do not.[8]

### III. Leslie Had No Expectation of Privacy in the Disposable Cup

As established supra, the creation of a DNA profile from a lawfully obtained sample, the indexing of that sample, and its comparison to other profiles in a database are all permissible under established precedent.  The Court therefore turns to the remaining question of whether the collection of Leslie's DNA from the disposable cup intruded upon a legitimate expectation of privacy and thus constituted a search under the Fourth Amendment. The expectation of privacy test requires Leslie to demonstrate both that she manifested a subjective expectation of privacy in the object of the challenged search and that society would recognize that expectation as reasonable.  Poller, 129 F.4th at 174.  Leslie cannot satisfy this test.

---

[8]    Carpenter also cautioned against seismic shifts in Fourth Amendment doctrine.  585 U.S. at 316 ("Our decision today is a narrow one.  We do not express a view on matters not before us[.]").  Plaintiff's position, that Carpenter quietly overruled King and requires courts to evaluate the constitutionality of CODIS loci analysis by what it may theoretically reveal, asks for precisely such a shift.

### a. Subjective Expectation of Privacy

Turning to the first prong, the question is whether Leslie manifested a subjective expectation of privacy in the object of the challenged search: a disposable water cup containing her saliva.  Poller, 129 F.4th at 174.  The record shows that Leslie had never considered her DNA prior to her arrest and, like all individuals who inevitably shed DNA in everyday activities, did not assert a privacy interest in that context.  Defs. 56.1 ¶ 57; Pl. Counter 56.1 ¶ 57.  Moreover, Leslie did not know what information a DNA profile generated from her sample contained, let alone whether such information was private.  Defs. 56.1 ¶ 60; Pl. Counter 56.1 ¶ 60.

United States v. Williams, 2026 WL 264736 (S.D.N.Y Feb. 2, 2026) provides useful guidance.  There, the court confronted nearly identical facts: a DNA sample from an arrestee who was offered water by the NYPD during a post-arrest interview, drank from the bottle, and, consistent with NYPD policy, was not permitted to take the bottle when leaving the interview room.  Williams, 2026 WL 264736, at *1.  The court held that the defendant failed to establish a subjective expectation of privacy in the bottle because he did not ask to retrieve it "or otherwise express[] a desire to keep the water bottle private."  Id. at *2.  Similarly, Leslie

drank from a cup offered by law enforcement, left it on the table when she exited the room, and did not express a desire to keep the cup private.  Accordingly, Leslie did not manifest a subjective expectation of privacy in the disposable cup.  See United States v. Hicks, 2020 WL 7704556, at *3 (W.D. Tenn. May 27, 2020) (no Fourth Amendment violation where defendant did not attempt to preserve as private the cigarette from which DNA was collected).

### b. Objective Expectation of Privacy

Even if Leslie could establish a subjective expectation of privacy in the cup, she has not demonstrated that any such expectation was objectively reasonable under the circumstances of her detention.  This conclusion follows from (i) Leslie's diminished expectations of privacy as a lawful arrestee, (ii) the limited information revealed by the DNA profile, and (iii) the government's legitimate interest in accurately solving crimes.

### i. Arrestees Have Diminished Expectations of Privacy

It is well established that "the expectations of privacy of an individual taken into police custody necessarily are of a diminished scope" and that "[o]nce an individual has been arrested on probable cause for a dangerous offense that may require detention . . . expectations of privacy and freedom from police scrutiny are reduced."  King, 569 U.S. at 462-63 (internal

quotation marks and citation omitted).  Booking procedures routinely involve significant searches of an arrestee's person, and DNA identification fits comfortably within that framework. King itself involved a physical intrusion in the form of a gentle buccal swab, which the Supreme Court upheld as constitutional. Id. at 446 (emphasizing the "gentle" and "negligible" intrusion imposed by a buccal swab).  Here, by contrast, the collection of DNA from a disposable cup that Leslie used and left behind involved no physical intrusion at all.[9]

Further, under 34 U.S.C. § 40702, had Leslie been arrested by the FBI rather than the NYPD for the same offense, she would have been required to provide a DNA sample during the booking process. See 34 U.S.C. § 40702(a)(1)(A); 28 C.F.R. § 28.12(b).  Adopting plaintiff's position would therefore produce the anomalous result that the Constitution affords greater protection to a state arrestee whose DNA is collected from an object she used than to a

---

[9]    The Supreme Court's decision in Birchfield v. North Dakota, 579 U.S. 438 (2016) is instructive by analogy.  There, the Court held that the Fourth Amendment permits warrantless breath tests incident to arrest but not warrantless blood tests.  Id. at 474.  The Court grounded that distinction in the degree of physical intrusion and explained that blood tests require piercing of skin and extracting part of a subject's body, whereas breath tests involve no such invasion and, unlike bleeding, breathing is a constant bodily function. Id. at 463-64.  Applying that logic here, the collection of DNA shed through natural biological processes falls at the least intrusive end of the constitutional spectrum, well below the breath tests and buccal swabs approved by the Supreme Court.

federal arrestee compelled to provide a DNA sample directly.  While a search of an arrestee may require a warrant if privacy concerns are sufficiently "weighty," Riley v. California, 573 U.S. 373, 392 (2014), the collection of DNA from an arrestee's beverage container while in custody does not present concerns of that magnitude, even in the absence of an authorizing state statute.  Williams, 2026 WL 264736, at *2 ("[T]here is no reason to believe that collection of DNA from an arrestee's water bottle would present such 'weighty' concerns as to require a warrant while in custody."); Jones v. Meehan, 2018 WL 459662, at *10 n.12 (S.D.N.Y. Jan. 16, 2018) (explaining that, even without an authorizing state statute, "the language of King suggests that this practice [of warrantlessly obtaining DNA samples from arrestees], as applied to the particular facts of this case, would not violate the Fourth Amendment.").

### ii.  Leslie's DNA Profile Revealed No Private Information

As discussed supra, courts have uniformly held that generating a DNA profile from non-coding loci for identification purposes does not meaningfully intrude upon privacy interests. Plaintiff's attempt to create a factual dispute on this point is unavailing, because the relevant inquiry is what the government actually did, not what technological advances might theoretically permit.  Leslie's own testimony that she did not know what

information a DNA profile reveals underscores the point: a Fourth Amendment claim grounded in hypothetical privacy harms cannot succeed.

### iii. The City's Interest Is Legitimate

In addition to considering the degree of intrusion on Leslie's privacy, the Court must consider the countervailing governmental interests. King, 569 U.S. at 449-54. The City has a compelling interest in maintaining DNA-based identity records for investigatory purposes. Amerson, 483 F.3d at 87. Indeed, "DNA identification plays a critical role" in law enforcement efforts to "process and identify the persons and possessions they must take into custody." King, 569 U.S. at 449-50. Here, the NYPD sought Leslie's DNA in connection with a specific investigation into the possession of a loaded firearm with a defaced serial number, a felony designed to obstruct law enforcement's ability to trace the weapon. Defs. 56.1 ¶ 44. Leslie's DNA profile confirmed her identity and cleared her of any wrongdoing, and the possessor was ultimately convicted. Defs. 56.1 ¶¶ 47, 49, 50. The City's interest in identifying perpetrators while excluding innocent individuals such as Leslie is legitimate and substantial.

Accordingly, no Fourth Amendment search occurred because Leslie lacked both a subjective and an objectively reasonable expectation of privacy in the disposable cup from which she drank.[10] Defendants are therefore entitled to summary judgment on plaintiff's Fourth Amendment claim.[11]

## IV.  Leslie's State Law Claim

In addition to her Fourth Amendment challenge, plaintiff asserts a state law claim and argues that OCME's Suspect Index is not authorized under, and is preempted by, Article 49-B of the New York Executive Law.  Specifically, plaintiff contends that by operating an index containing profiles of individuals not convicted of crimes, defendants run afoul of Article 49-B, which mandates that individuals with convictions provide a DNA sample for inclusion in the New York's statewide DNA identification index

---

[10]  The parties devote substantial briefing to whether Leslie voluntarily abandoned the cup upon exiting the interview room, and specifically whether Leslie could have taken the cup with her given the NYPD's policy prohibiting arrestees from bringing objects back to their cells.  The Court need not resolve that question because Leslie had no expectation of privacy in the disposable cup to begin with.  See Williams, 2026 WL 264736 at *2 n.1.  Accordingly, whether the cup was voluntarily abandoned is immaterial.  The Court nevertheless notes that Leslie did not express any intention to retain the cup.

[11]  Even if the collection of Leslie's DNA from the disposable cup constituted a "search" within the meaning of the Fourth Amendment, the result would be the same.  The King balancing framework, which would be applicable here because Leslie was lawfully arrested for possessing the loaded and defaced firearm, would compel a finding of reasonableness: the DNA sample was obtained through entirely non-intrusive means; the non-coding loci analysis revealed no private information; and the City has a substantial interest in identifying arrestees and accurately investigating crimes.

(SDIS).  Pl. Br. at 24-29.  Defendants maintain that this Court should decline to exercise supplemental jurisdiction over plaintiff's state law claim and, in any event, that Article 49-B does not preclude the operation of the Suspect Index.  Defs. Br. at 25-28.

In a March 24, 2023 Memorandum and Order, this Court reserved decision on whether to decline supplemental jurisdiction, explaining that Leslie's state law claim is "analytically independent" of her constitutional claim.  Leslie v. City of New York, 2023 WL 2612688, at *11 (S.D.N.Y. Mar. 24, 2023).  The Court further observed that although Article 49-B is "clearly worded insofar as it does not expressly authorize the creation of local DNA indexes," there remains an open state law question of whether such local indexes are nevertheless permissible.  Id. at *10.  As confirmed by the intervening litigation, that observation remains apt.  State court decisions addressing the OCME's LDIS and Article 49-B have reached differing results.  Some courts have concluded that Article 49-B governs OCME's operations and constrains the information OCME may maintain in its local index, while others have reached the opposite conclusion.[12]

---

[12]    Compare People v. White, 60 Misc. 3d 304, 307 (Sup. Ct. 2018) (holding that "[w]hile the provisions of [Article 49-B] . . . only allow a DNA sample to be included in the New York State DNA data bank upon conviction of a designated offense, they do not explicitly prohibit OCME from entering a lawfully obtained

The Court therefore exercises its discretion under 28 U.S.C. § 1367(c)(1) to decline supplemental jurisdiction. That provision authorizes a district court to decline jurisdiction where a claim "raises a novel or complex issue of State law," a standard satisfied here. 28 U.S.C. § 1367(c)(1). The question of whether, and to what extent, Article 49-B governs, authorizes, or preempts the operation of OCME's Suspect Index presents a novel question of New York law.

Article 49-B established New York's SDIS and provides only for the profiles of individuals convicted of crimes to be uploaded to that system. N.Y. Exec. Law §§ 995-c(1), 995-c(3)(a). It does not expressly address the creation of local indexes or the collection, analysis, and retention of DNA for investigatory purposes. Determining whether a statute regulating a statewide, conviction-based databank occupies the field in which a local investigatory index operates would require the interpretation of

---

DNA sample into its own local database"), and People v. Belliard, 70 Misc. 3d 965, 970 (Sup. Ct. 2020) (holding that while "nothing in [state law or regulations] authorizes local public DNA laboratories to 'index' DNA profiles," there is "no prohibition against such indexing either"), and People v. Mohammed, 48 Misc. 3d 415, 417 (Sup. Ct. 2015) (Article 49-B "does not prohibit uploading a defendant's DNA sample into the local OCME DNA database for comparison to DNA profiles in that database"), with People v. K.M., 54 Misc. 3d 825, 830 (Sup. Ct. 2016) (local DNA indexes including individuals not convicted of crimes "run afoul of [state law], which allows inclusion of a DNA profile into a wide-ranging database only after conviction"), and People v. Blank, 61 Misc. 3d 542, 545 (Sup. Ct. 2018) ("OCME's practice of uploading DNA samples for all purposes runs afoul of the Executive Law.").

a statute in a context not explicitly addressed by the Legislature, application of state preemption doctrine to a local government practice, and reconciliation of conflicting lower-court decisions. The Court declines to undertake that inquiry here.  Plaintiff's state law claim is therefore dismissed without prejudice to refiling in the appropriate state forum.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.  The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 127 and 140 and close the case.[13]  The Clerk of Court is also respectfully directed to unseal the filing at ECF No. 128.

Dated:    March 20, 2026
          New York, New York

_____
     NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[13]    The Court acknowledges that defendants requested oral argument on the cross-motions for summary judgment.  ECF Nos. 128, 151.  Because defendants were the only ones to do so and the Court is ruling in their favor, and given that the issues presented in this action are resolvable on the basis of established law, the Court has determined that oral argument is not necessary.